COOLEY LLP
MICHAEL G. RHODES (116127)
(rhodesmg@cooley.com)
TRAVIS LEBLANC (251097)
(tleblanc@cooley.com)
KATHLEEN R. HARTNETT (314267)
(khartnett@cooley.com)
BETHANY C. LOBO (248109)
(blobo@cooley.com)
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone:      (415) 693 2000
Facsimile:      (415) 693 2222

Attorneys for Plaintiffs
ROCK THE VOTE; VOTO LATINO;
COMMON CAUSE; FREE PRESS; and
MAPLIGHT

*Additional counsel listed on next page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCK THE VOTE; VOTO LATINO; COMMON CAUSE; FREE PRESS; and MAPLIGHT, | Case No. |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; WILLIAM P. BARR, in his official capacity as Attorney General of the United States; WILBUR L. ROSS, JR. in his official capacity as United States Secretary of Commerce; DOUGLAS W. KINKOPH, in his official capacity as Associate Administrator of the Office of Telecommunications and Information Applications; and RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget, | |
| Defendants. | |

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  DAVID GREENE (160107)
   (davidg@eff.org)
2  CORYNNE MCSHERRY (221504)
   (corynne@eff.org)
3  AARON MACKEY (286647)
   (amackey@eff.org)
4  ELECTRONIC FRONTIER FOUNDATION
   815 Eddy Street
5  San Francisco, CA   94109-7701
   Telephone:     (415) 436-9333
6
   KRISTY PARKER (*pro hac vice forthcoming*)
7  (kristy.parker@protectdemocracy.org)
   THE PROTECT DEMOCRACY PROJECT, INC.
8  2020 Pennsylvania Avenue, NW, #163
   Washington, DC 20006
9  Telephone:     (202) 849-9307
   Facsimile:     (929) 777-8428
10
   NGOZI J. NEZIANYA (*pro hac vice forthcoming*)
11  (ngozi.nezianya@protectdemocracy.org)
   THE PROTECT DEMOCRACY PROJECT, INC.
12  115 Broadway, Fl 5
   New York, NY 10006
13  Telephone:     (202) 934-3636
   Facsimile:     (929) 777-8428
14
   BEN BERWICK (*pro hac vice forthcoming*)
15  (ben.berwick@protectdemocracy.org)
   THE PROTECT DEMOCRACY PROJECT, INC.
16  15 Main Street, Suite 312
   Watertown, MA 02472
17  Telephone:     (202)  579-4582
   Facsimile:     (929) 777-8428

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

**INTRODUCTION**

1.      This Complaint arises out of President Donald J. Trump's Executive Order 13925, titled "Executive Order on Preventing Online Censorship" ("Executive Order"), which targets online platforms with a range of official reprisal—including threats to their established legal immunity under 47 U.S.C. § 230 ("Section 230"),[1] investigation by government enforcement agencies, and the loss of significant government spending—for engaging in constitutionally protected speech, including combating misinformation online.

2.      Plaintiffs are non-profit organizations that rely on and encourage social media platforms and other intermediary online platforms to raise voter awareness, increase voter turnout, promote political discourse for traditionally underrepresented groups, and combat misinformation on online platforms, including with respect to voting. The effect of the Executive Order— encouraging the spread of misinformation about vote-by-mail, impeding voter registration initiatives, discouraging broader access to voting, and encouraging the spread of other kinds of misinformation and harmful content—flies in the face of the critical purposes Plaintiffs serve, frustrates their missions, and will require them to divert scarce resources to combat misinformation.

3.      In a year in which the COVID-19 pandemic makes it impracticable to register and engage eligible voters at the rock concerts, community festivals, and large gatherings of years past, civic engagement organizations such as Plaintiffs Rock the Vote, Voto Latino, and Common Cause have increasingly turned to online platforms to help voters understand how to make their voices heard, including through registering to vote and voting remotely.  Others, such as Plaintiffs Free Press and MapLight, campaign to improve online platforms so that users can receive and share accurate information, rather than hateful speech and misinformation.  Plaintiffs understand that misinformation about voting, if unchecked, threatens the franchise.   Hate speech and misinformation about the pandemic, if unchecked, threaten public health and people's lives.

4.      The online platforms upon which Plaintiffs rely have First Amendment rights, including the right to curate, fact-check, and comment on third-party posts, as well as the right to speak and not to speak. Specifically, the First Amendment protects a speaker's "expression of

---

[1] Section 230 was originally adopted as part of the Communications Decency Act of 1996 ("CDA").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

editorial opinion on matters of public importance," which "is entitled to the most exacting degree of First Amendment protection." *Fed. Commc'ns Comm'n v. League of Women Voters of Cal.*, 468 U.S. 364, 375–76 (1984).  This principle applies to online platforms, which curate the speech of others.

5.     Thus, online platforms such as Twitter, Facebook, and Instagram (all targeted by name in the Executive Order) have First Amendment rights to ensure that accurate information— including about how to register to vote and successfully cast a ballot by Election Day—is not undermined by misinformation on their platforms.

6.     Plaintiffs have a corresponding right to receive that curated information, free from governmental interference.  "[W]here a speaker exists," the First Amendment not only protects the speaker, but "necessarily protects the right to receive" the speech.  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) (internal quotation marks and citation omitted).

7.     The Executive Order violates that right by undermining online platforms' ability to moderate and speak and, in turn, impeding the efforts of those, like Plaintiffs, who rely on and advocate for truthful and accurate information online, including about voting.

8.     The Executive Order presents online platforms with an untenable choice:  either let President Trump and others post lies without any context or fact-checking, or face the prospect of losing Section 230's protections, which immunize online services from liability based on the content their users post, and specifically protect their ability to curate content broadly.

9.     Congress enacted Section 230 to safeguard the interests of both speakers and recipients by providing online platforms with an immunity from potential liability for curating, editing, and screening third-party content, or for choosing not to do any of those things.  47 U.S.C. § 230(c)(1).  Congress determined that Section 230 was critical to ensure that the Internet is "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." *Id.* § 230(a)(3).

10.     Courts have widely interpreted Section 230 to immunize platforms from liability for engaging in the work of a "publisher," meaning "reviewing, editing, and deciding whether to

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

11.     Section 230 is thus a powerful statutory supplement to an intermediary's First Amendment rights, and the architecture of the modern intermediary-based Internet is founded upon it.  In turn, the threat of gutting Section 230's protections is a powerful lever for the government to use to coerce online intermediaries to fall in line and substitute the government's preferred editorial position for their own.

12.     The Executive Order is a binding directive to agencies to interpret Section 230(c) narrowly, contrary to congressional intent and the interpretation of the federal courts.  It identifies Twitter and other online platforms by name (also labelling them "un-American and anti-democratic" "behemoths" and "titans"); announces a "national policy," effective immediately, to construe Section 230 narrowly so as to hinder platforms' right to convey accurate information to voters; invites costly and lengthy rulemaking procedures to gut Section 230; threatens law enforcement investigations against platforms that dare to correct President Trump or remove misinformation posted by him; and contemplates cutting significant government advertising spending on platforms (including valuable information provided by the Census Bureau, the Centers for Disease Control and Prevention, and other federal entities).

13.     The Executive Branch's implementation of the Order is fully underway, including by the Trump Administration's July 27, 2020, petition to the Federal Communications Commission ("FCC") to gut Section 230, for which the FCC promptly opened a 45-day period of public comment.

14.     The Executive Order is intended to punish online platforms for their curation decisions.

15.     It was triggered by the efforts of an online platform, in the midst of a global pandemic, to ensure the accuracy of information about the fundamental right to vote in advance of the upcoming November elections.

16.     Facing failing polls and a global pandemic, on May 26, 2020, President Trump tweeted misinformation about voting by mail, including that mail-in ballots will be "substantially

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

fraudulent" and that "[m]ail boxes will be robbed."[2]  President Trump's tweet was likely to sow confusion, spread untruthful rumors about voting by mail, and undermine confidence in and the legitimacy of the 2020 election.  In response, Twitter appended a notice to the President's tweet, labeled "Get the facts about mail-in ballots."  Twitter's notice contained a link to a page that fact-checked the President's false claims.  The underlying tweet remains available on Twitter's site.

17.    Two days later, on May 28, 2020, President Trump responded by issuing the Executive Order.[3]

18.    President Trump's admitted motivation for the Executive Order was his concern that certain online platforms allegedly "have points of view" and "we're fed up with it, and it's unfair, and it's been very unfair."[4] The Executive Order is intended to coerce those platforms to adopt the President's preferred editorial viewpoint.

19.    The Executive Order is fundamentally incompatible with the First Amendment.  It deprives users of their right to receive information curated by online platforms, including information critical of President Trump or corrective of his falsehoods.

20.    It is a presumptively invalid speaker-based restriction on speech, motivated by dislike of particular speakers and their perceived editorial viewpoints.  It also is an unconstitutional attempt to leverage government advertising dollars in order to silence disfavored speech.  It is unlawfully retaliatory and coercive, sending a clear and chilling message:  question President Trump and face retribution from the entire Executive Branch.

21.    The risk of depriving users of accurate information about vote-by-mail initiatives is particularly acute in the final 100 days before an election when many voters may be voting remotely because of the risk of contracting or spreading COVID-19.

22.    As a result of the Executive Order, Plaintiffs have had to divert their limited

---

[2] Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020, 5:17 AM), https://twitter.com/ realDonaldTrump/status/1265255835124539392.

[3] https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/ (attached as Exhibit A to this Complaint).

[4] *See* Remarks by President Trump Announcing an Executive Order on Preventing Online Censorship (May 28, 2020, 3:47 PM), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-announcing-executive-order-preventing-online-censorship/  (official transcript).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

resources away from their central organizational missions, such as registering new voters and providing information about the upcoming election or encouraging platforms to remove hate and misinformation more generally, to, among other things, responding to and correcting President Trump's voting and election misinformation on these platforms.

23.     The Executive Order is legally binding on all executive agencies and officials until it is rescinded or ordered unlawful.  This action seeks a declaration that the Executive Order is unconstitutional under the First Amendment, and an injunction of its enforcement by the President and other Executive Branch officials.

## PARTIES

24.     Plaintiff Rock the Vote is a nonprofit organization headquartered in Washington, DC, with offices in Los Angeles, California.  Founded in 1990, its mission is to (1) build the long-term political power of young people through voter registration, education, mobilization, and provision of nonpartisan voting information; and (2) reduce barriers to civic participation by modernizing the civic process and protecting the right to vote.  It focuses on protecting the right to vote for young people, who are often the target of voter suppression efforts.  Rock the Vote pioneered the use of Internet technology to register voters and help them to cast a ballot.  Today, Rock the Vote continues to provide its innovative civic technology resources and tailored direct voter contact messaging to more than 1,100 organizations across the United States.  Together, Rock the Vote and its partners have processed the registration applications of nearly 12 million voters since its founding and substantially increased the percentage of newly registered, young voters that cast a ballot, by deploying research-based strategies, interactive voter contact, and step-by-step guidance to help new voters participate for the first time.

25.     In furtherance of its mission, Rock the Vote expends significant resources to register and mobilize thousands of young voters each election cycle.  Rock the Vote heavily relies on online platforms—including those targeted by the Executive Order—to reach and inform the young people whom it seeks to have fully included in the political process.

26.     Plaintiff Voto Latino is a nonprofit organization whose mission is to (1) educate and empower a new generation of Latinx voters and (2) create a more robust and inclusive democracy.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

Founded in 2004, Voto Latino focuses its work on Latinx voters across the United States because Latinx communities face distinctive challenges including racial profiling from law enforcement, insufficient access to affordable housing, unsafe working conditions, segregated public schools, and immigration raids.  Voto Latino pioneered the use of text messaging as a political tool.    For the 2020 election cycle, Voto Latino set a goal to register at least 500,000 voters. As of Wednesday, August 26, 2020, the organization has registered 275,113 voters.

27.    In furtherance of its mission, Voto Latino expends significant resources to register and mobilize thousands of Latinx voters each election cycle.  Voto Latino heavily relies on online platforms—including those targeted by the Executive Order—to reach and inform the Latinx voters whom it seeks to have fully included in the political process.

28.    Plaintiff Common Cause is a nonprofit membership organization, founded in 1970, which is dedicated to upholding the core values of American democracy.  Since its founding, Common Cause has grown into a nationwide network of more than 1 million members and supporters, with a presence in 30 states and Washington, DC.  It works to create open, honest, and accountable government that serves the public interest; promote equal rights, opportunity, and representation for all; and empower all people to make their voices heard in the political process. Among other things, Common Cause works to advance the integrity of the voting process— including that votes will be counted accurately in a secure process and that anyone who interferes and tampers with American elections will be held accountable.  Common Cause provides a variety of online voting tools—for registering to vote, checking registration status, requesting absentee ballots, and receiving election reminders—to ensure that eligible Americans can vote.

29.    In furtherance of its mission, Common Cause expends significant resources to help voters know election rules and voter rights, and be able to successfully cast their ballot each election cycle.   Common Cause heavily relies on online platforms—including those targeted by the Executive Order—to reach and inform the voters whom it seeks to have fully included in the political process.

30.    Plaintiff Free Press is a nonpartisan 501(c)(3) organization founded in 2003 whose mission is fighting for the public's rights to connect and communicate, including online, free from

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

government interference.  It works to ensure that Americans have access to diverse and accurate information, including through advocacy and activism to protect the open Internet, to achieve affordable Internet access for all, to uplift the voices of people of color in the media, to challenge old and new media gatekeepers to serve the public interest, to end unwanted surveillance, to defend press freedom, and to reimagine local journalism.

31.     In furtherance of its mission, Free Press expends significant resources to push online platforms to remove and stop amplifying misinformation and hate online while recognizing and strongly advocating for those platforms' rights to do so under the First Amendment.  Free Press relies heavily on online platforms—including those targeted by the Executive Order—to promote its own messages and advance its mission of allowing all members of the public to connect and communicate freely with each other, including online.

32.     Key among these is Free Press's participation in the Change the Terms campaign. Change the Terms is a coalition of civil rights, anti-hate, and open-Internet organizations united in their belief that technology companies should do more to combat hateful content on their platforms. To that end, Change the Terms developed model corporate policies to help Internet companies stop hate and extremism online and ensure that they do more to protect people of color, women, LGBTQIA people, religious minorities, and other marginalized communities.  Change the Terms advocates for online intermediaries to take on a more proactive role in curating and moderating user content on their sites—and that curating and moderating is precisely the speech that the Executive Order punishes and seeks to eradicate.  Change the Terms advocates directly with the large online intermediaries, including Twitter, Facebook, and YouTube.[5]

33.     Plaintiff MapLight is a nonprofit organization headquartered in Berkeley, California. Its mission includes revealing the influence of money in politics, informing and empowering voters, and advancing reforms that promote a more responsive democracy. Including through its Voter's Edge initiative, MapLight aims to provide voters with accurate information about elections, including candidates, issues, and ballot initiatives at the federal, state, and local levels. And including through its Digital Deception Solutions project, it develops policy solutions

---

[5] https://www.changetheterms.org/faqs.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

and technology to combat the spread of political disinformation and manipulation on digital platforms. MapLight is currently developing a software tool, to be made publicly available in the near future, that will allow Facebook users to report election-related misinformation in a manner that can be aggregated to help platforms monitor their users' content for deceptive material. MapLight publishes a weekly newsletter that highlights news, analysis, and research about political manipulation, and its online voter guide has reached over 1.8 million people. Since its inception in 2004, MapLight has also been a leader in promoting transparency around political contributions and the influence of money in politics.

34.    In furtherance of its mission, MapLight expends significant resources to publish accurate information about federal, state, and local elections and to combat the spread of political disinformation. MapLight relies heavily on online platforms—including those targeted by the Executive Order—to promote its mission of ensuring transparency, accuracy, and fairness in politics and elections.

35.    Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued the Executive Order challenged in this lawsuit.

36.    Defendant William P. Barr is the Attorney General of the United States.  He is sued in his official capacity.  The Executive Order directs Defendant Barr to consult with the Secretary of Commerce regarding the submission of a petition for rulemaking with the FCC, establish a working group regarding the potential enforcement of state statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices, and develop a proposal for federal legislation that would be useful to promote the policy objectives of the Executive Order.  It also directs Defendant Barr to review reports of agency spending on online platforms to determine "whether any online platforms are problematic vehicles for government speech due to viewpoint discrimination, deception to consumers, or other bad practices."  Defendant Barr appeared with President Trump and presented remarks at the signing of the Executive Order, endorsing the President's actions and also indicating that he would take litigation positions consistent with the Executive Order.

37.    Defendant Wilbur L. Ross, Jr. is the United States Secretary of Commerce.  He is

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

sued in his official capacity. The Executive Order directs Defendant Ross (in consultation with Defendant Barr) to file a petition for rulemaking with the FCC that requests the FCC expeditiously to propose regulations that would purport to clarify and limit the scope of immunity under Section 230 of the Communications Decency Act. The Department of Commerce filed the referenced FCC rulemaking petition on July 27, 2020, on which the FCC invited public comment on August 3, 2020.

38. Defendant Douglas W. Kinkoph is the Associate Administrator of the Office of Telecommunications and Information Applications and leads the National Telecommunications and Information Administration ("NTIA"). He currently performs the non-exclusive functions and duties of the Assistant Secretary of Commerce for Communications and Information. He is sued in his official capacity. The Executive Order directs Defendant Kinkoph (in consultation with Defendant Barr and under the supervision of Defendant Ross) to file a petition for rulemaking with the FCC that requests the FCC expeditiously to propose regulations that would purport to clarify and limit the scope of immunity under Section 230 of the Communications Decency Act. The Department of Commerce filed the referenced FCC rulemaking petition on July 27, 2020, on which the FCC invited public comment on August 3, 2020.

39. Defendant Russell T. Vought is the Director of the Office of Management and Budget ("OMB"). He is sued in his official capacity. OMB's powers include managing the budgetary, procurement, and financial management decisions of federal agencies. The Executive Order directs Defendant Vought to collect reports that are to be submitted to him by the head of all executive departments and agencies regarding their spending on advertising and marketing paid to online platforms. The Executive Order contemplates that this review will lead to a loss of federal advertising revenue for impacted online platforms.

## **JURISDICTION**

40. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the First Amendment to the United States Constitution.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

## **VENUE**

41.     Venue is proper in this district under 28 U.S.C. § 1391(c) and (e) because a substantial part of the events or omissions giving rise to the claim occurred in this district and because Plaintiff MapLight resides in this district.

42.     Assignment to either the San Francisco or Oakland division is proper pursuant to Local Rule 3-2(c) and (d) because a substantial portion of the events giving rise to this action occurred in Alameda County, where Plaintiff MapLight is headquartered.

## **LEGAL BACKGROUND**

**A.  The First Amendment Protects Users' Access To The Curated Speech Of Online Platforms, Which Also Enjoy First Amendment Protection**

43.     The First Amendment protects both the rights of speakers and the rights of those seeking to receive protected speech.  *Va. State Bd. of Pharmacy*, 425 U.S. at 756-57 (explaining that the First Amendment "protection afforded is to the communication, to its source and to its recipients both," and thus that "[i]f there is a right to advertise, there is a reciprocal right to receive the advertising").

44.     The "right to receive information and ideas, regardless of their social worth . . . is fundamental to our free society," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969), because it is essential to fostering open debate.  Indeed, "[i]t would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) (protecting the "right to receive" foreign publications).

45.     Users and consumers of content provided by online intermediaries targeted by the Executive Order thus have a First Amendment right to receive that curated speech.  This includes the right to receive information about election processes and other topics of public concern as curated by online platforms.

46.     The First Amendment protects not only a speaker's own speech (or lack thereof), but also a speaker's curation, compilation, and moderation of the speech of others:  "the presentation of an edited compilation of speech generated by other persons . . . fall[s] squarely within the core of First Amendment security." *Hurley v. Irish-American Gay, Lesbian & Bisexual*

1    *Grp. of Boston*, 515 U.S. 557, 570 (1995).

2        47.    The Supreme Court has long recognized that First Amendment principles apply to

3    the speech of intermediaries—those who provide the platform for others to speak.  It has, for

4    example, protected the rights of book publishers to choose what books to print and sell, as well as

5    the rights of newspapers to make editorial decisions about what material to publish.  *See Bantam*

6    *Books, Inc. v. Sullivan*, 372 U.S. 58 (1963); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241

7    (1974); *N.Y. Times v. Sullivan*, 376 U.S. 254, 266 (1964).  The speech of intermediaries is protected

8    both for their own benefit and because they facilitate the speech of others.

9        48.    As courts have widely recognized, online intermediaries are no different than

10   traditional intermediaries: they have a First Amendment right to speak freely, as well as to curate

11   content and choose which ideas, speakers, and messages to associate with and on what terms.[6]  Like

12   the speech of traditional newspapers, the speech of intermediaries facilitates public participation in

13   art, politics, and culture; organizes public conversation so people can easily find and communicate

14   with each other; and curates public opinion.

15       49.    Without these fundamental First Amendment protections, the government could

16   turn all speakers and platforms for speech into government mouthpieces or render them each so

17   irrelevant that only the government's voice can break through the noise—precisely the opposite of

18   "the widest possible dissemination of information from diverse and antagonistic sources" the First

19   Amendment was meant to secure.  *See Associated Press v. United States Tribune Co.*, 326 U.S. 1,

20   20 (1945).

21   ────────────────────

22   [6] *See, e.g.*, *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019) ("[W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor.  The private entity may thus exercise

23   editorial discretion over the speech and speakers in the forum."); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015); *Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020)

24   (collecting authorities and rejecting claim that YouTube violated plaintiff's First Amendment rights by placing plaintiff's videos in its restricted mode, thus limiting their dissemination, explaining that

25   YouTube does not perform a public function by inviting public discourse on its property);  *Freedom Watch, Inc. v. Google Inc.*, No. 19-7030, 2020 WL 3096365, at *1 (D.C. Cir.

26   May 27, 2020) (rejecting claim that Google, Facebook, Twitter, and Apple violated the First Amendment by suppressing conservative political views, quoting the Supreme Court for the

27   proposition that "the First Amendment 'prohibits only *governmental* abridgement of speech'" (quoting *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019)); *Jian Zhang v.*

28   *Baidu.com Inc.*, 10 F. Supp. 3d 433, 435 (S.D.N.Y. 2014) (Furman, J.) ("[T]he First Amendment protects as speech the results produced by an [i]nternet search engine.").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

**B.  Section 230 Provides Online Platforms With Protections For Content Curation**

50.      In enacting Section 230 in 1996, Congress recognized the Internet's power to sustain and promote individual speech, a value rooted in the First Amendment.  Congress sought to further encourage the already robust free speech occurring online in the mid-1990s, and to speed the development of online platforms by providing broad immunity to service providers that host user-generated content.

51.      Section 230 categorically protects online platforms that host or take steps to curate third-party speech online from common law publisher and distributor liability that might otherwise flow from that third-party speech.

52.      Section 230(c)(1) provides that "no provider or user of an interactive computer service shall be treated as the publisher or speaker" of third-party content.  This provision has been widely understood and interpreted by courts to immunize online platforms from suit based on their "publication decisions," such as "whether to edit, to remove, or to post . . . content generated entirely by third parties."  *Barnes*, 570 F.3d at 1105.

53.      Section 230 thus allows online platforms to curate the content that they host, to whatever degree they choose, without fear of liability.

54.      Since 1996, intermediary immunity has become part of the fundamental architecture of today's platform-based modern Internet.  Because of the sheer scale of speech that passes through intermediaries, many would not be able to operate without the protection it offers. Thus, the threat of eliminating Section 230 immunity is a powerful lever that government can exert against online platforms.

## FACTUAL ALLEGATIONS

**A.  The President's Repeated Threats Against Online Platforms For Exercising Their First Amendment Rights**

55.      Since taking office—and particularly in light of the growing public realization that those seeking to interfere with and spread misinformation about elections and other topics of public concern are using and abusing online platforms—President Trump has repeatedly threatened to

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

punish online platforms that curate content (or that the President believes curate content) in ways with which the President disagrees.

56.     For example, on August 28, 2018, President Trump threatened to regulate Google for purportedly prioritizing bad news about him while suppressing news that is good:[7], [8]

> **Donald J. Trump** ✔
> @realDonaldTrump
>
> ....results on "Trump News" are from National Left-Wing Media, very dangerous. Google & others are suppressing voices of Conservatives and hiding information and news that is good. They are controlling what we can & cannot see. This is a very serious situation-will be addressed!
>
> 11:02 AM · Aug 28, 2018 · Twitter for iPhone

57.     Later that day, when a reporter asked the Chief of President Trump's White House Economic Council, Larry Kudlow, whether "there needs to be some regulation of Google," he responded, "We'll let you know. We're taking a look at it."[9]

58.     In a June 26, 2019, interview on Fox Business Network, President Trump complained that the heads of major online platforms "are all Democrats, it's totally biased toward Democrats."  He went on to single out Twitter: "Twitter is just terrible, what they do. They don't let you get the word out.  I'll tell you what, they should be sued because of what's happening with the bias."  In response to a question about Google, he alleged that Google "is trying to rig the election."  He also threatened, "We should be suing Google and Facebook and all that, which perhaps we will."[10]

---

[7] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 28, 2018, 11:02 AM), https://twitter.com/realDonaldTrump/status/1034456273306243076.

[8] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 28, 2018, 11:02 AM), https://twitter.com/realDonaldTrump/status/1034456281120206848.

[9] Rebecca Morin, *Kudlow: White House 'taking a look' at Google regulations*, Politico (Aug. 28, 2018), https://www.politico.com/story/2018/08/28/larry-kudlow-google-regulations-conservative-outlets-798995.

[10] Joe Williams, *Trump: US should sue Google for 'trying to rig' the 2020 Elections*, Fox Business Network (June 26, 2019), https://www.foxbusiness.com/technology/trump-us-should-sue-google-facebook.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

59.     On July 11, 2019, the White House hosted a "Presidential Social Media Summit."[11]

60.     In his remarks at the summit, President Trump complained that social media companies are "terribl[y] bias[ed]," suppress his follower numbers, and engage in "censorship" of conservative views.  He told the audience, "[W]e can't have it. We're not going to let it happen."[12] "I'm not going to allow — and [Senator] Josh [Hawley] and all of us, we're not just going to allow it to happen like this.  We're not going to be silenced."[13]

**B.  The President's May 2020 False And Misleading Tweets About Mail-In Voting And Online Platforms' Response**

61.     In the Spring of 2020, as the spread of COVID-19 led states to expand mail-in voting, the President began publicly denouncing mail-in voting through a series of attacks largely premised on false and misleading information.  For example, during a Fox & Friends appearance on March 30, 2020, he attacked mail-in voting, saying "[t]hey have things, levels of voting, that if you ever agreed to it, you'd never have a Republican elected in this country again."[14]  On April 8, 2020, he tweeted, "Republicans should fight very hard when it comes to state wide mail-in voting. Democrats are clamoring for it.  Tremendous potential for voter fraud, and for whatever reason, doesn't work out well for Republicans."[15]

62.     On May 20, 2020, President Trump tweeted a threat to "hold up" funding to Michigan if the state sent voters absentee ballots, falsely claiming that the state had sent voters absentee *ballots* as opposed to absentee ballot *applications*:[16]

---

[11]  https://www.whitehouse.gov/briefings-statements/remarks-president-trump-presidential-social-media-summit/.

[12] *Id.*

[13] *Id.*

[14]  Aaron Rupar (@atrupar), Twitter (Apr. 8, 2020, 5:40 AM), https://twitter.com/atrupar/status/1247866822252277760.

[15]  Donald J. Trump (@realDonaldTrump), Twitter (Apr. 8, 2020, 5:20 AM), https://twitter.com/realDonaldTrump/status/1247861952736526336.

[16]  Donald J. Trump (@realDonaldTrump), Twitter (May 20, 2020, 7:44 AM), https://media-cdn.factba.se/realdonaldtrump-twitter/1263073073839947776.jpg.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

1
2
3
4
5
6
7
8



9     63.    That same day, he similarly threatened Nevada:[17]

10
11
12
13
14
15
16



17
18     64.    Michigan Secretary of State Jocelyn Benson tweeted to point out President Trump's

19 error, stating that she had sent out absentee ballot applications, not ballots, and noting that several

20 GOP-led states had done the same.[18] President Trump thereafter revised his tweet about Michigan

21 to refer to absentee ballot applications rather than ballots, but maintained his unfounded claim that

22 such dissemination was unlawful.[19]

23     65.    Then, on May 26, 2020, the President tweeted more false claims about mail-in

24
25

---

26 [17] Donald J. Trump (@realDonaldTrump), Twitter (May 20, 2020, 9:11 AM),
https://twitter.com/realDonaldTrump/status/1263094958417985538.

27 [18] Jocelyn Benson (@JocelynBenson), Twitter (May 20, 2020, 5:49 AM),
https://twitter.com/JocelynBenson/status/1263089382690631680.

28 [19] Donald J. Trump (@realDonaldTrump), Twitter (May 20, 2020, 11:13 AM),
https://twitter.com/realDonaldTrump/status/1263170880298942464.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

1    voting:[20], [21]





18   66.    Twitter—whose terms of use prohibit "us[ing] Twitter's services for the purpose of

19   manipulating or interfering in elections," including by spreading "[m]isleading information about

20   how to vote or register to vote"[22]—appended to these May 26 tweets a notice that users could "[g]et

21   the facts about mail-in ballots."  Users who clicked on the notice were taken to fact-checks about

22   the President's claims.

---

[20] Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020, 8:17 AM), https://twitter.com/
realDonaldTrump/status/1265255835124539392.

[21] Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020, 8:17 AM), https://twitter.com/
realDonaldTrump/status/1265255845358645254.

[22] *See* Twitter Safety, Strengthening our approach to deliberate attempts to mislead voters, Twitter
(Apr. 24, 2019), https://blog.twitter.com/en_us/topics/company/2019/strengthening-our-
approach-to-deliberate-attempts-to-mislead-vot.html.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

67.     The President responded to Twitter's notice—its constitutionally protected speech—by accusing the company of interfering in the 2020 election:[23], [24]



68.     On May 26, 2020, Twitter posted an explanation of its decision to contextualize the President's tweets, stating that this was "part of our efforts to enforce our civic integrity policy" because "[w]e believe those Tweets could confuse voters about what they need to do to receive a ballot and participate in the election process."[25]

69.     Early the next morning, the President attacked not only Twitter but online platforms and "Big Tech" more generally.  His attacks continued throughout the day, expressly threatening regulation of online platforms or even to "close them down" in direct retaliation for disfavored

---

[23] Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020, 4:40 PM), https://twitter.com/realDonaldTrump/status/1265427538140188676.

[24] Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020, 4:40 PM), https://twitter.com/realDonaldTrump/status/1265427539008380928.

[25] Twitter Safety (@TwitterSafety), Twitter (May 27, 2020, 7:54 PM) https://twitter.com/twittersafety/status/1265838823663075341.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

1    speech:[26], [27], [28], [29]

2

3

4

5

6

7

8

9



Donald J. Trump ✔
@realDonaldTrump

Republicans feel that Social Media Platforms totally silence conservatives voices. We will strongly regulate, or close them down, before we can ever allow this to happen. We saw what they attempted to do, and failed, in 2016. We can't let a more sophisticated version of that....

7:11 AM · May 27, 2020 · Twitter for iPhone

10

11

12

13

14

15

16

17

Donald J. Trump ✔
@realDonaldTrump

....happen again. Just like we can't let large scale Mail-In Ballots take root in our Country. It would be a free for all on cheating, forgery and the theft of Ballots. Whoever cheated the most would win. Likewise, Social Media. Clean up your act, NOW!!!!

7:11 AM · May 27, 2020 · Twitter for iPhone

18

19

20

21

22

23

24    [26] Donald J. Trump (@realDonaldTrump), Twitter (May 27, 2020, 7:11 AM), https://twitter.com/
25    realDonaldTrump/status/1265601611310739456 (emphasis added).

26    [27] Donald J. Trump (@realDonaldTrump), Twitter (May 27, 2020, 7:11 AM), https://twitter.com/
       realDonaldTrump/status/1265601615261827072 (emphasis added).

27    [28] Donald J. Trump (@realDonaldTrump), Twitter (May 27, 2020, 10:22 AM),
       https://twitter.com/realDonaldTrump/status/1265649545410744321.

28    [29] Donald J. Trump (@realDonaldTrump), Twitter (May 27, 2020, 9:36 PM), https://twitter.com/
       realDonaldTrump/status/1265819308699070464.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

1

2

3

4

5

6

7

8

Donald J. Trump ✓
@realDonaldTrump

Twitter has now shown that everything we have been saying about them (and their other compatriots) is correct. Big action to follow!

10:22 AM · May 27, 2020 · Twitter for iPhone

9

10

11

12

13

14

Donald J. Trump ✓
@realDonaldTrump

Big Tech is doing everything in their very considerable power to CENSOR in advance of the 2020 Election. If that happens, we no longer have our freedom. I will never let it happen! They tried hard in 2016, and lost. Now they are going absolutely CRAZY. Stay Tuned!!!

9:36 PM · May 27, 2020 · Twitter for iPhone

15

16      70.     That same day, Kellyanne Conway, Counselor to the President, appeared on Fox &

17   Friends and announced the Twitter handle for Twitter's Head of Site Integrity, effectively calling

18   for viewers to track down and harass him.[30]

19      71.     The next day, on May 28, 2020, the President issued his "Executive Order on

20   Preventing Online Censorship."

21   **C. President Trump's And Attorney General Barr's Comments In Conjunction With**
        **Issuing The Executive Order Make Plain Its Retaliatory Motive**

22

23      72.     On May 28, 2020, President Trump conducted an Oval Office press conference with

24   Attorney General Barr to announce the Executive Order.[31]  President Trump's remarks made plain

25   _____

26   [30] Julia Musto, *Kellyanne Conway slams Twitter's Trump fact-checks: They're done by 'people who attack him all day long,'* Fox News (May 27, 2020),

27   https://www.foxnews.com/media/kellyanne-conway-twitter-fact-check-trump-mail-in-ballot-fraud (with link to Fox & Friends video interview).
     [31] Remarks by President Trump Announcing an Executive Order on Preventing Online

28   Censorship (May 28, 2020, 3:47 PM), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-announcing-executive-order-preventing-online-censorship/ (official transcript);

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

his intent to retaliate against online platforms, which he characterized as "taking over the airwaves,"

"hav[ing] points of view" he disfavored, and acting as "editor[s] with a viewpoint"—all leading

him to be "fed up with it, and it's unfair, and it's been very unfair."[32]

73.     He specifically referenced Twitter's fact check notice posted in response to his May

26, 2020, tweets, labeling Twitter's speech "inappropriate" and explaining it as the basis for his

targeting Twitter and similar platforms:

> The choices that Twitter makes when it chooses to suppress, edit,
> blacklist, shadow-ban are editorial decisions, pure and simple.
> They're editorial decisions.  In those moments, Twitter ceases to be
> a neutral public platform, and they become an editor with a
> viewpoint.  And I think we can say that about others also, whether
> you're looking at Google, whether you're looking at Facebook and
> perhaps others.  One egregious example is when they try to silence
> views that they disagree with by selectively applying a "fact check"
> — a fact check — F-A-C-T.  Fact check.  What they choose to fact
> check and what they choose to ignore or even promote is nothing
> more than a political activism group or political activism.  And it's
> inappropriate.[33]

74.     He also personally attacked Twitter's Head of Site Integrity, going so far as to hold

up a newspaper cover displaying his photo:

> This is our — this is the arbiter.  This guy is the arbiter of what's
> supposed to go on Twitter.  He's the one.  He thought that — he
> thought — and he used CNN as a guide — CNN, which is fake
> news.  He uses CNN as a guide.  His name is Y*** R*** . . .
>
> So here's your — here's your man, and that's on Twitter.[34]

75.     He also claimed that he was reserving the right to "shut down" Twitter and similar

companies:

> If Twitter were not honorable — if you're going to have a guy like
> this be your judge and jury, I think just shut it down, as far as I'm
> concerned, but I'd have to go through a legal process to do that. . . .
> [I]f it were able to be legally shut down, I would do it.[35]

76.     President Trump explained that, under the auspices of his Executive Order, he was

"directing my administration to develop policies and procedures to ensure taxpayer dollars are not

---

https://www.c-span.org/video/?472574-1/president-trump-signs-social-media-executive-order
(video with transcript).
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*

Cooley LLP
Attorneys at Law
San Francisco

33

Complaint for Declaratory
And Injunctive Relief
Case No. ****

going into any social media company that repress [sic] free speech.  The government spends billions of dollars on giving them money.  They're rich enough.  So we're going to be doing none of it or a very little of it."[36]

77.     Attorney General Barr endorsed President Trump's political and retaliatory motivations.[37]

78.     Attorney General Barr also emphasized that the Executive Branch's retaliation against these companies would happen immediately in the context of "litigation going forward": "there is litigation going on all the time on Section 230 and its scope.  So we would look for appropriate vehicles to weigh in and file statement[s] of interest."[38]

79.     Just hours after the Oval Office press conference on May 28, President Trump further confirmed the Executive Order's retaliatory motive through a series of tweets.  In response to protests following the death of George Floyd, just after midnight on May 29, 2020, President Trump tweeted:[39]



Twitter added a label to President Trump's tweet: "This Tweet violated the Twitter Rules about glorifying violence.  However, Twitter has determined that it may be in the public's interest

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:53 PM), https://twitter.com/realDonaldTrump/status/1266231100780744704.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

for the Tweet to remain accessible."[40]  The tweet remains accessible to the public.

80.    At 7:10 AM. on May 29, 2020, President Trump tweeted:[41]



At 8:44 AM on May 29, 2020, the President tweeted:[42]

**D.  The Executive Order**

81.    The Executive Order (attached as **Exhibit A** to this Complaint) is a legally-binding directive to all federal agencies and departments, requiring them to carry out the President's unconstitutional retaliation.

---

[40] *Id.*

[41] Donald J. Trump (@realDonaldTrump), Twitter (May 29, 2020, 7:10 AM), https://twitter.com/realDonaldTrump/status/1266326065833824257.

[42] Donald J. Trump (@realDonaldTrump), Twitter (May 29, 2020, 8:44 AM), https://twitter.com/realDonaldTrump/status/1266349790507515905.  Similarly, on the morning of May 29, 2020, White House Deputy Chief of Staff Dan Scavino tweeted, "Twitter is targeting the President of the United States 24/7, while turning their heads to protest organizers who are planning, plotting, and communicating their next moves daily on this very platform.  Twitter is full of shit – more and more people are beginning to get it."  Dan Scavino Jr. (@scavino45), Twitter (May 29, 2020, 5:18 AM), https://twitter.com/Scavino45/status/1266343153466060803.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

82.    The Executive Order applies to "online platforms," which it defines to include "any website or application that allows users to create and share content or engage in social networking, or any general search engine."[43]  It also expressly identifies Twitter, Facebook, Instagram, and YouTube, referring to these online platforms as "titans" and "behemoths."[44]

83.    This singling out of certain "online platforms" has a twofold harmful effect.  It sends a direct message to the named online platforms that their speech is particularly disfavored and that they must stop their efforts to address misinformation or suffer ongoing retaliation in the forms of heightened regulation, increased liability, and loss of advertising dollars.  It also threatens other online platforms not only with the terms of the Order, but with being called out in the future if they moderate content or correct government misstatements to the President's dislike.

84.    The Executive Order also expressly referenced as allegedly "political[ly] bias[ed]" the same Twitter employee called out by name by Kellyanne Conway and the President in the preceding days, observing: "Unsurprisingly, [Twitter's] officer in charge of so-called 'Site Integrity' has flaunted his political bias in his own tweets."[45]

85.    Section 1 sets forth the "policy" underlying the Executive Order, explaining that it intends action to prevent "[o]nline platforms" from "engaging in selective censorship that is harming our national discourse"—i.e., not censorship but such platforms' curation and expression protected by the First Amendment.[46]  Expressly referencing the President's own tweets and Twitter's counterspeech, the Executive Order repeatedly underscores that it is prompted by online platforms' expression:

> Tens of thousands of Americans have reported, among other troubling behaviors, online platforms "flagging" content as inappropriate, even though it does not violate any stated terms of service; making unannounced and unexplained changes to company policies that have the effect of disfavoring certain viewpoints; and deleting content and entire accounts with no warning, no rationale, and no recourse.
>
> Twitter now selectively decides to place a warning label on certain tweets in a manner that clearly reflects political bias.  As has been

---

[43] Exhibit A.

[44] *Id.*

[45] *Id.*

[46] *Id.*

Cooley LLP
Attorneys at Law
San Francisco

33

Complaint for Declaratory
And Injunctive Relief
Case No. ****

reported, Twitter seems never to have placed such a label on another politician's tweet. As recently as last week, Representative Adam Schiff was continuing to mislead his followers by peddling the long-disproved Russian Collusion Hoax, and Twitter did not flag those tweets. Unsurprisingly, its officer in charge of so-called 'Site Integrity' has flaunted his political bias in his own tweets.

At the same time online platforms are invoking inconsistent, irrational, and groundless justifications to censor or otherwise restrict Americans' speech here at home, several online platforms are profiting from and promoting the aggression and disinformation spread by foreign governments like China.

86.    Subsection 2(a) of the Executive Order purports to establish as "the policy of the United States" that the scope of Section 230 immunity shall be sharply narrowed.[47]  Although the Executive Order claims to be simply "clarif[ying]" Section 230 immunity, its described vision contemplates a complete gutting of the current understanding and judicial interpretation of Section 230.[48]  According to the Executive Order, online platforms must lose their Section 230 immunity when they "censor content and silence viewpoints that they dislike" (ignoring that such curation and speech by platforms is protected not only by Section 230, but by the First Amendment).[49]

87.    Subsection 2(b) of the Executive Order directs all executive departments and agencies, **effective immediately**, to "ensure that their application of [Section 230] properly reflects the narrow purpose of the section and take all appropriate actions in this regard."[50]

88.    Subsection 2(b) also directs the Secretary of Commerce, in consultation with the Attorney General, to file a petition for rulemaking with the FCC "requesting" that the FCC propose regulations that would narrowly interpret Section 230's liability shield.[51]

89.    Section 3 of the Executive Order directs each federal agency to review its federal spending on advertising and marketing paid to online platforms, and to submit a report on its findings to the Office of Management and Budget.[52]  Section 3 also directs the Department of Justice to "review the viewpoint-based speech restrictions imposed by each online platform

---

[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*

Cooley LLP
Attorneys at Law
San Francisco

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

identified in the report . . . and assess whether any online platforms are problematic vehicles for government speech due to viewpoint discrimination, deception to consumers, or other bad practices."[53]  This threat to pull advertising is another powerful lever for government to exert its influence over the platforms and punish them for adopting editorial viewpoints the President dislikes.  In 2018 alone, the federal government was one of the country's largest advertisers, spending nearly a billion dollars on advertising.[54]

90.     Subsection 4(a) of the Executive Order purports to establish as another "policy of the United States"—one that conflicts with recognized First Amendment principles, under which online platforms are not held to the standards applicable to state actors—that "large online platforms, such as Twitter and Facebook, as the critical means of promoting the free flow of speech and ideas today, should not restrict protected speech."[55]

91.     Subsections 4(b)–(d) of the Executive Order purport to set the agenda of the Federal Trade Commission ("FTC").  Subsection 4(b) directs the White House to submit to the Department of Justice and the FTC "over 16,000 complaints of online platforms censoring or otherwise taking action against users based on their political viewpoints" collected by the White House.  Subsection 4(c) requires the FTC to "consider taking action" against "practices by entities covered by section 230 that restrict speech in ways that do not align with those entities' public representations about those practices."[56]  Subsection 4(d) further directs the FTC specifically to investigate whether large online platforms such as Twitter violate the law pursuant to the Order's erroneous conception of the First Amendment's applicability to online platforms.[57]

92.     Section 5 of the Executive Order directs the Attorney General to "establish a working group regarding the potential enforcement of State statutes that prohibit online platforms

---

[53] *Id.*

[54] *See* Federal Advertising: Contracting with Small Disadvantaged Businesses and Those Owned by Minorities and Women Has Increased in Recent Years, GAO-18-554 (July 17, 2018), https://www.gao.gov/products/GAO-18-554.

[55] Exhibit A.

[56] *Id.*

[57] *Id.*

from engaging in unfair or deceptive acts or practices."[58]  It directs the working group to develop model legislation for states and to collect publicly available information about platforms' moderation policies.[59]  In short, Section 5 also seeks to impose liability upon platforms for engaging in editorial practices that are protected by the First Amendment.

93.    Finally, Section 6 of the Executive Order directs the Attorney General to "develop a proposal for Federal legislation that would be useful to promote the policy objectives of this order."[60]

94.    The Executive Order thus compounds and effectuates President Trump's threats to regulate online platforms by initiating regulatory processes targeting these platforms, in violation of the First Amendment.  The Executive Order further communicates to online platforms that exercise of their First Amendment rights to host accurate information and combat hate speech and misinformation about topics including but not limited to voting will lead to punishment in the form of increased regulation, in retaliation for the platforms' own protected speech.

### E.  Defendants Are Actively Implementing The Executive Order

95.    On June 17, 2020, pursuant to Section 6 of the Executive Order, the Justice Department, through Attorney General Barr, proposed legislation to curtail online platforms' legal protections for the content they carry.[61]  Among other things, the Department's recommendations would limit platforms' ability to moderate content on their sites and require platforms to provide explanations of their moderating decisions.

---

[58] *Id.*

[59] *Id.*  The Executive Order directs the working group to collect publicly available information about "(i) increased scrutiny of users based on the other users they choose to follow, or their interactions with other users; (ii) algorithms to suppress content or users based on indications of political alignment or viewpoint; (iii) differential policies allowing for otherwise impermissible behavior, when committed by accounts associated with the Chinese Communist Party or other anti-democratic associations or governments; (iv) reliance on third-party entities, including contractors, media organizations, and individuals, with indicia of bias to review content; and (v) acts that limit the ability of users with particular viewpoints to earn money on the platform compared with other users similarly situated."

[60] *Id.*

[61] https://www.justice.gov/opa/pr/justice-department-issues-recommendations-section-230-reform; https://www.justice.gov/ag/department-justice-s-review-section-230-communications-decency-act-1996?utm_medium=email&utm_source=govdelivery; https://www.justice.gov/file/1286331/download.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

96.     On July 27, 2020, the NTIA, on behalf of Secretary of Commerce Ross, filed, as directed by Section 2(b) of the Executive Order, a petition for rulemaking with the FCC related to Section 230. The petition pertains to: (1) whether, and to what degree, Section 230 provides protection for social media's content moderation decisions; (2) the conditions under which content moderation and editorial decisions by social media companies shape content to such a degree that Section 230 no longer protects them; and (3) social media's disclosure obligations with respect to their content moderation practices.[62]

97.     President Trump issued a statement in conjunction with the FCC petition making clear that Department of Commerce officials were acting "as directed by President Donald J. Trump's Executive Order on Preventing Online Censorship," as part of President Trump's self-proclaimed efforts "to fight back against unfair, un-American, and politically biased censorship of Americans online."[63]

98.     On August 3, 2020, the FCC "invite[d] public input" concerning the Trump Administration's Section 230 petition, announcing a 45-day public comment period.[64]

99.     Also on August 3, 2020, President Trump withdrew the nomination of FCC Commissioner Mike O'Rielly to serve a new term, after "O'Rielly in June expressed 'deep reservations' in a C-SPAN program about whether Congress had given the FCC power to limit social media companies' legal protections."[65]

100.     After FTC Chair Joseph Simons expressed to Senators earlier in August 2020 that

---

[62] https://www.commerce.gov/news/press-releases/2020/07/commerce-department-files-petition-clarify-liability-protections-online.

[63] https://www.whitehouse.gov/briefings-statements/statement-press-secretary-regarding-implementation-president-trumps-executive-order-preventing-online-censorship/.

[64] https://docs.fcc.gov/public/attachments/DOC-365904A1.pdf.

[65] David Shepardson, *Trump withdraws nomination of Republican FCC commissioner to serve new term*, Reuters (Aug. 3, 2020), https://www.reuters.com/article/us-usa-fcc-trump/trump-withdraws-nomination-of-republican-fcc-commissioner-to-serve-new-term-idUSKCN24Z2NI (stating that "O'Rielly made comments last week that drew attention of some White House and industry officials," including that "'we should all reject demands, in the name of the First Amendment, for private actors to curate or publish speech in a certain way'"); Russell Brandom, *President Trump withdraws FCC renomination after 5G controversy*, The Verge (Aug. 3, 2020), https://www.theverge.com/2020/8/3/21353233/orielly-fcc-nomination-withdrawn-trump-ligado-5g-230 ("O'Rielly had also expressed public skepticism over President Trump's recent executive order, which would task the FCC with oversight over Section 230 and social media moderation more broadly").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

"he didn't plan to act on the president's May 28 executive order on social media because he considers it outside the agency's jurisdiction," President Trump reportedly continues to pressure Simons to take action against online platforms pursuant to Section 4 of the Executive Order: "President Donald Trump has personally pushed the head of the Federal Trade Commission to aid his crusade against alleged political bias in social media, according to two people familiar with the conversations—an unusually direct effort by a president to bend a legally independent agency to his agenda."[66]

### F.   The Executive Order Harms Plaintiffs

####    a.   The Executive Order, By Attacking Online Platforms For Combating Misinformation Online About Voting And For Combatting Hate Speech, Frustrates Plaintiffs' Missions

101.   As speakers, disseminators of information, listeners, and electoral and civic participation activists, Plaintiffs Rock the Vote, Voto Latino, Common Cause, Free Press, and MapLight depend on the moderating functions of online platforms to promote accurate and truthful information, including for several of the Plaintiffs their efforts to obtain information about voting and provide it to eligible voters that they seek to register and encourage to cast a ballot by Election Day.

102.   Defendants' actions pose a particularly acute risk to the missions of these Plaintiffs—which seek to have eligible voters register and vote and rely on online platforms to accomplish this goal, or more generally to seek to promote healthy civic discourse and prevent the amplification of hate and misinformation online.  Because the 2020 election will occur in the midst of a pandemic, which is impacting voting procedures and options across the country, the need for timely and accurate information about voting options, including voting by mail, is more important than ever.  More than half of voters under the age of 35 do not have the resources or knowledge they need to vote by mail in November.[67]  Black and Latinx Americans are three times more likely than white Americans to be told they lack correct voting identification, to be unable to locate a

---

[66] Leah Nylen, John Hendel, and Betsy Woodruff Swan, *Trump pressures head of consumer agency to bend on social media crackdown*, Politico (Aug. 21, 2020), https://www.politico.com/news/2020/08/21/trump-ftc-chair-social-media-400104.
[67] https://www.npr.org/2020/07/30/896993401/poll-more-than-half-of-young-people-lack-resources-to-vote-by-mail.

Cooley LLP
Attorneys at Law
San Francisco

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

polling place, or to miss a registration deadline.[68] These realities, coupled with young voters' and Latinx voters' dependence on social media for information, including about voting, make the core constituencies of Plaintiffs Rock the Vote and Voto Latino particularly susceptible to voting and vote-by-mail misinformation on online platforms.

103.    Critical to the mission of Plaintiff Free Press is combatting misinformation and hate online.  Free Press is heavily involved with the Change the Terms campaign, a coalition effort to encourage online platforms to ensure that their services are not used for hateful activities. Defendants' actions—threatening and retaliating against online platforms for curating content and correcting misinformation about issues of public importance—flies in the face of Free Press's efforts to encourage precisely that type of content moderation.

104.    As explained above, online platforms in turn rely on their Section 230 immunity to moderate and curate third-party content—including removal of problematic or inaccurate content or directing users to third-party fact-checking—without fear of liability for taking these measures. The Executive Order seeks to gut Section 230 immunity for online platforms because the President disfavors their expression—most immediately, their correction of his false tweets about voting, and broadly the editorial viewpoint he perceives them to have adopted.

105.    When a speaker with a large following—such as President Trump—spreads unchecked misinformation online regarding election security and voting procedures, it can spread quickly.  This creates confusion for voters, hampers education and advocacy efforts to make elections safe and accessible through procedures such as absentee voting and vote-by-mail, and undermines faith in election systems.  Online platforms' moderation function is essential to correct the spread of false information, and that moderation function is protected by the First Amendment.

106.    Online platforms will reasonably respond to the punitive, threatening measures directed by the Executive Order by rolling back their moderating functions.  In light of the Executive Order's ongoing and threatened retribution against online platforms for moderating content, particularly about elections, Plaintiffs cannot rely on these platforms' moderation and

---

[68] https://www.prri.org/research/American-democracy-in-crisis-voters-midterms-trump-election-2018/.

Cooley LLP
Attorneys at Law
San Francisco

33

Complaint for Declaratory
And Injunctive Relief
Case No. ****

speech as they otherwise would, including fact-checking on critically important topics like voting. The Executive Order also will discourage online platforms from engaging in fact-checking partnerships with organizations like Plaintiffs, for fear of being viewed as actively working to fact-check the President and his allies.

107.    As explained above in Paragraphs 61–80, the Executive Order was prompted most immediately by Twitter fact-checking the President's false posts about mail-in balloting.  Twitter appended a warning label, and the Executive Order followed two days later.  Shortly thereafter, when Twitter again labeled as violating its rules a post by President Trump about police violence, President Trump again responded with a tweet threatening the platform and its Section 230 immunity.

108.    Since then, President Trump has posted additional false content on online platforms about mail-in-voting that has gone unchecked.  For example, on July 29, 2020, President Trump tweeted the following false information about New York's mail-in voting infrastructure:[69]



109.    Unlike his previous tweet about California, Twitter did not take corrective action by posting a "Get the facts" clarification with respect to the New York tweet.  As a result, Plaintiffs have had to expend resources to correct this and other misinformation about voting, and platform users—including Plaintiffs—have been deprived of critical corrective information in real time.

110.    Other election-related tweets posted by President Trump since he issued the Executive Order that have gone unchecked by Internet platforms include this tweet from June 22,

---

[69] Donald J. Trump (@realDonaldTrump), Twitter (July 29, 2020, 6:28 PM), https://twitter.com/realDonaldTrump/status/1288602262567153664.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

2020, which was not removed, corrected, or edited by Twitter:[70]

> **Donald J. Trump** ✔
> @realDonaldTrump
>
> RIGGED 2020 ELECTION: MILLIONS OF MAIL-IN BALLOTS WILL BE PRINTED BY FOREIGN COUNTRIES, AND OTHERS. IT WILL BE THE SCANDAL OF OUR TIMES!
>
> 7:16 AM · Jun 22, 2020 · Twitter for iPhone

111.    Likewise, the following July 30, 2020, election-related tweet by President Trump was not removed, corrected or edited by Twitter:[71]

> **Donald J. Trump** ✔
> @realDonaldTrump
>
> With Universal Mail-In Voting (not Absentee Voting, which is good), 2020 will be the most INACCURATE & FRAUDULENT Election in history. It will be a great embarrassment to the USA. Delay the Election until people can properly, securely and safely vote???
>
> 8:46 AM · Jul 30, 2020 · Twitter for iPhone

112.    On the morning of August 16, 2020, President Trump began retweeting multiple accounts spreading the same falsehoods about mail-in voting.[72]

> ⇄ Donald J. Trump Retweeted
>
> **robjh1: The Conservative Black Cowboy** @robjh1 · Aug 16
> The liberal media & Dems don't want the election called the night of the election. They want a few extra days to massage the numbers, so they are planting the seed now that voters won't know. Ordinarily they'd hold officials accountable for not being prepared. #MailInBallots

---

[70] Donald J. Trump (@realDonaldTrump), Twitter (June 22, 2020, 7:16 AM), https://twitter.com/realDonaldTrump/status/1275024974579982336.
[71] Donald J. Trump (@realDonaldTrump), Twitter (July 30, 2020, 8:46 AM), https://twitter.com/realDonaldTrump/status/1288818160389558273.
[72] Donald. J. Trump (@realdonaldtrump), Twitter (Aug. 16, 2020), https://twitter.com/robjh1/status/1295001038676791297.

Cooley LLP
Attorneys at Law
San Francisco

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

113. President Trump continued in the same vein on the morning of August 17, 2020:[73]

**Donald J. Trump** ✔
@realDonaldTrump

Some states use "drop boxes" for the collection of Universal Mail-In Ballots. So who is going to "collect" the Ballots, and what might be done to them prior to tabulation? A Rigged Election? So bad for our Country. Only Absentee Ballots acceptable!

8:40 AM · Aug 17, 2020 · Twitter for iPhone

114. Other Twitter users have begun propagating the same misinformation that President Trump has been sharing repeatedly on his public Twitter account. A verified Twitter account posted the following on the morning of August 17, 2020:[74]



**ACTforAmerica** ✔
@ACTforAmerica

You can't have fair elections with mass mail-in voting!

9:43 AM · Aug 17, 2020 · Twitter for iPhone

115. Another verified Twitter account posted:[75]

**Jim Hoft** ✔
@gatewaypundit

STOP THE STEAL!
Mail-in Voting and Ballot Harvesting Are For STEALING Elections!
DON'T LET THE DEMONS WIN!

9:19 PM · Aug 16, 2020 · Twitter Web App

[73] Donald. J. Trump (@realdonaldtrump), Twitter (Aug. 16, 2020, 8:40 AM), https://twitter.com/realDonaldTrump/status/1295385113862090753.
[74] ACT for America (@ACTforAmerica), Twitter (Aug. 17, 2020, 9:43 AM), https://twitter.com/ACTforAmerica/status/1295355493901389824.
[75] Jim Hoft (@gatewaypundit), Twitter (Aug. 16, 2020, 9:19 PM), https://twitter.com/gatewaypundit/status/1295168320791031808.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

116.    On August 23, 2020, the President tweeted further false information about mail-in voting:[76]



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> This Tweet violated the Twitter Rules about civic and election integrity. However, Twitter has determined that it may be in the public's interest for the Tweet to remain accessible. Learn more
>
> So now the Democrats are using Mail Drop Boxes, which are a voter security disaster. Among other things, they make it possible for a person to vote multiple times. Also, who controls them, are they placed in Republican or Democrat areas? They are not Covid sanitized. A big fraud!
>
> 4:25 AM · Aug 23, 2020 · Twitter for iPhone

As depicted, Twitter added a notice to the tweet reading: "This Tweet violated the Twitter Rules about civic and election integrity. However, Twitter has determined that it may be in the public's interest for the Tweet to remain accessible. Learn more[.]"  Twitter did not include a fact-check link, as it had for the May 26, 2020 tweets that immediately prompted the Executive Order.

117.    President Trump also has continued to assail platforms targeted by the Executive Order since its issuance, characterizing their First Amendment protected speech as "illegal."  For example, on July 27, 2020, he tweeted:[77]

---

[76] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 23, 2020, 4:25 AM), https://twitter.com/realDonaldTrump/status/1297495295266357248.
[77] Donald. J. Trump (@realdonaldtrump), Twitter (July 27, 2020, 6:41 PM), https://twitter.com /realDonaldTrump/status/1287880895051907072.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

1

2

3

4

5

6

7

8



9

   **b.  Plaintiffs Must Divert Resources To Address The Consequences Of The Executive Order, Including The Misinformation It Seeks To Protect**

10

   *Rock the Vote*

11

12       118.    Plaintiff Rock the Vote's primary mission is to build the long-term political power

13   of young people through voter registration, education, and mobilization and to reduce barriers to

14   civic participation by modernizing the civic process and protecting the right to vote.  Its work

15   includes ensuring that accurate information on how to register to vote successfully and cast a ballot

16   in each election is readily available on the Internet and on social media platforms—used by 90

17   percent of people aged 18–29,[78] and to which many new, young voters look for information.

18       119.    Young voters face unique obstacles to voting that result in turnout that has

19   historically been 20–30 points below older voters.  Young voters are also increasingly the target of

20   voter suppression efforts, including the rise of voter identification laws and intensified efforts to

     remove polling sites from college campuses.

21

22       120.    Rock the Vote relies on social media to spread its message, especially to young

23   voters, and especially in this year's voting cycle in the midst of a pandemic.  Rock the Vote's

24   Instagram following has more than doubled just since the beginning of June 2020.  Rock the Vote

25   also uses Twitter, Facebook, and Snapchat as part of its voter registration and education campaigns.

26       121.    To effectively provide voter registration opportunities and turn out voters, Rock the

27   Vote utilizes and maintains its own voter registration platform and offers it for use to partners across

28

---

[78] *See* Social Media Fact Sheet, Pew Research Center for Internet & Technology (June 12, 2019), https://www.pewresearch.org/internet/fact-sheet/social-media/.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

the country. The voter registration platform is available in 13 languages and can be used organizations and individuals working on voter registration drives, as well as potential voters themselves, to assist in voter registration. The platform allows users to determine whether a potential voter's state offers online voter registration, and if so, whether the voter is eligible to register online since many states only offer fully-online registration if the potential voter has an in-state driver's license or state-issued ID card. If online registration is not available in the registrant's state, or the individual is not eligible for online registration, the platform can be used to assist the voter in registering using the federal voter registration form.

122.  Rock the Vote also offers a voter registration status lookup tool, which can be used to assist voters in confirming their registration status, including whether their current voter registration information is correct. If a potential voter using the lookup tool cannot be found on the voter file, they will be prompted to register using the Rock the Vote voter registration platform. Similarly, a voter who determines that their registration is out of date using the look-up tool also has the opportunity to update their registration information through Rock the Vote's registration platform.

123.  Organizations such as League of Women Voters and HeadCount partner with Rock the Vote through the use of its platform to assist voters in registering to vote.

124.  Defendants' unconstitutional acts will force Rock the Vote to divert organizational resources away from mission-critical activities in a federal election year (i.e., enabling young voters to register and vote) to counter misinformation online about voting, including from President Trump, particularly as online platforms are disincentivized from moderating and fact-checking in light of Defendants' retaliation and threats.  Rock the Vote also will need to ensure that its voice is heard by government decisionmakers and online platforms concerning the threat posed by unchecked false information about voting online—the correction of which prompted the Executive Order and which the Executive Order seeks to deter.

125.  Rock the Vote has already had to divert resources to combatting misinformation, including through voter education sessions to explain how voters can be targeted with misinformation.  Rock the Vote will have to continue to divert resources to ensure, especially

Cooley LLP
Attorneys at Law
San Francisco

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

during the current pandemic, that new voters are receiving accurate information on online platforms about voting and the 2020 election.

**Voto Latino**

126.    Voto Latino's mission is to educate and empower a new generation of Latinx voters and to create a more robust and inclusive democracy.  Latinx communities face distinctive challenges including racial profiling from law enforcement, insufficient access to affordable housing, unsafe working conditions, segregated public schools, and immigration raids.  To ensure that Latinx voices are represented in the democratic process, Voto Latino works to register and inform Latinx voters, and in this election cycle seeks to register 500,000 voters.  60 percent of Latinx individuals in the United States are 34 or younger, and 3 million Latinx individuals have turned 18 since 2014.[79]  Because young people, as well as Latinx communities more broadly, are heavy users of social media, they are particularly susceptible to false information spread on online platforms.

127.    Voto Latino uses Facebook, Twitter, and Instagram, as well as dating and other online platforms, to reach and engage young Latinx voters.  In June 2020 alone, Voto Latino had 92 million impressions (i.e., views of its posts) across Facebook, Twitter, and Instagram.

128.    Defendants' unconstitutional acts will force Voto Latino to divert organizational resources away from mission-critical activities in a federal election year (i.e., enabling Latinx voters to register and vote) to counter misinformation online about voting, including from President Trump, particularly as online platforms are disincentivized from moderating and fact-checking in light of Defendants' retaliation and threats.  Voto Latino also will need to ensure that its voice is heard by government decisionmakers and online platforms concerning the threat posed by unchecked false information about voting online—the correction of which prompted the Executive Order and which the Executive Order seeks to deter.

129.    Voto Latino will engage in significant spending to correct voting misinformation in the 2020 election cycle—misinformation whose propagation is encouraged by the Executive Order. For example, 76 percent of Latinx households use Facebook, and thus Voto Latino must divert

---

[79] *See* Voto Latino, "Why Vote," https://votolatino.org/whyvote.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

resources from its mission-critical activities in order to combat misinformation about elections on Facebook.

130.    Voto Latino already has had to eliminate a planned campaign to educate voters about specific candidates in order to divert resources to a campaign to provide voters with accurate information about voting by mail—the very issue that prompted the Executive Order, after a platform fact-checked of President Trump's misinformation about mail-in voting.

***Common Cause***

131.    Common Cause's mission is to empower Americans to make their voices heard in the political process.  Common Cause works to ensure that all eligible citizens have the right to vote and that their votes are accurately counted, all to the end of free, fair, and secure elections.  In advance of the 2020 election, Common Cause is specifically working to expand access to vote-by-mail options and provide better voter registration options.

132.    Common Cause relies on online platforms such as Twitter, Facebook, Nextdoor, and others for informing eligible voters about the voting process (including how to register and ways voters can cast a ballot, including vote-by-mail options), and for its advocacy regarding elections and voting.  Common Cause monitors online platforms for misinformation about voting and reports such instances of misinformation to the platforms, urging them (sometimes successfully) to remove misinformation and, more broadly, to address the propagation of misinformation online.  Misinformation about voting is particularly pernicious this election cycle, in the midst of the pandemic, because voting rules and procedures are being adapted to the pandemic, and thus voters can be more easily tricked with misinformation.  Because the Executive Order disincentivizes platforms from addressing misinformation, it makes more difficult Common Cause's efforts to combat that misinformation, both with the platforms directly and with counterspeech efforts to provide accurate voting information from trusted sources (including non-partisan civil society organizations as well as state and national government offices, like Secretaries of State).

133.    Defendants' unconstitutional acts will force Common Cause to divert organizational resources away from mission-critical activities in a federal election year (i.e., empowering voters to register and vote) to counter misinformation online about voting, including from President

Cooley LLP
Attorneys at Law
San Francisco

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

Trump, particularly as online platforms are disincentivized from moderating and fact-checking in light of Defendants' retaliation and threats.  Common Cause also will need to ensure that its voice is heard by government decisionmakers and online platforms concerning the threat posed by unchecked false information about voting online—the correction of which prompted the Executive Order and which the Executive Order seeks to deter.

### *Free Press*

134.    Free Press's mission is to ensure that people in the United States receive diverse and accurate news and media responsive to community needs, without government interference, and free of hate and misinformation.  As a media and technology policy advocacy group, Free Press's activities include organizing activist campaigns, researching policies and news developments, monitoring FCC proposals, and planning trainings.

135.    Free Press uses Facebook, Instagram, and Twitter to publicize its advocacy and campaigns.  Free Press is also an integral part of the Change the Terms campaign, which, as explained above, is a coalition effort to encourage social media platforms to ensure that their services are not used for hateful activities that cause harm to groups based on their immutable characteristics, such as race or sexual orientation.  Through the Change the Terms campaign, Free Press is advocating for social media platforms to adopt and then enforce terms of service that would restrict such hateful material on their platforms.

136.    The Executive Order is precisely the type of government interference in platform content moderation that Free Press seeks to prevent.  Defendants' unconstitutional acts will make it more costly and difficult for Free Press to obtain the voluntary content moderation by online platforms for which Free Press advocates, as the Executive Order and the processes it directs retaliate against and threaten those platforms for engaging in the type of content moderation that Free Press seeks.  The challenged actions also will force Free Press to divert organizational resources away from other mission-critical activities to counter the processes the Executive Order deploys to attack online platforms' curation of content supplied by other speakers.  Among other things, Free Press will now have to participate in the FCC rulemaking process that the Executive Order mandates and conduct a wide range of outreach—to other governmental agencies, to other

Cooley LLP
Attorneys at Law
San Francisco

33

Complaint for Declaratory
And Injunctive Relief
Case No. ****

1    activist groups, to the public, and to the platforms—to curb the Executive Order's effects.  By

2    discouraging platforms from moderating their own content, the Executive Order will frustrate Free

3    Press's efforts to improve online platforms' content moderation, including through the Change the

4    Terms campaign.

5         *MapLight*

6         137.    MapLight's mission includes informing and empowering voters, including through

7    its Voter's Edge initiative, which seeks to provide voters with accurate information about elections.

8    MapLight also advances public policy to address digital deception, meaning the use of online media

9    to spread political disinformation and manipulate public opinion.

10        138.    MapLight uses online platforms such as Facebook and Twitter for its advocacy and

11   educational efforts, including about voting and its Voter's Edge initiative.   Also central to

12   MapLight's work is combatting the spread of political disinformation and manipulation on such

13   online platforms, including through its Digital Deceptions Solutions project.  Most immediately,

14   MapLight is currently developing a software tool, to be made publicly available in the near future

15   in advance of the 2020 elections, that will allow Facebook users to easily and effectively report

16   misinformation, including about voting.

17        139.    The Executive Order was prompted by precisely the type of online misinformation

18   about voting (namely, President Trump's tweets) that MapLight seeks to prevent.  The Executive

19   Order has the purpose and effect of disincentivizing online platforms from policing misinformation,

20   including about voting—the exact opposite of what MapLight seeks to do through its Digital

21   Deception Solutions project.   Defendants' unconstitutional acts will make it more costly and

22   difficult for MapLight both to help accurate information about voting get into voters' hands and to

23   obtain the voluntary content moderation by online platforms that MapLight seeks, including

24   through its soon-to-be operational software tool.  The challenged actions will force MapLight to

25   divert organizational resources away from other mission-critical activities to counter the effects of

26   the Executive Order on misinformation online.

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

c.  **The Executive Order Harms Plaintiffs' Right to Receive Online Platforms' Speech**

140.    Plaintiffs use online platforms not only to disseminate information, but to receive information critical to their missions, which they use to inform themselves and their constituencies. This information includes accurate speech about voting posted by third parties on those platforms, as well as the platforms' moderation of content and fact-checking of inaccurate or hateful speech.

141.    Plaintiffs have the right to receive information as moderated and curated by online platforms, which are best equipped to fulfill these functions.  Plaintiffs rely on online platforms' moderation of misinformation that would otherwise be presented to voters—including the populations that Plaintiffs serve, such as young and Latinx voters—unchecked.

142.    Without the Executive Order there is thus a willing audience (Plaintiffs) and willing speakers—the platforms that intend to speak by labeling false election information as meriting fact-checking, posting third-party speech that includes corrective facts, and otherwise curating their sites according to their preferred editorial viewpoints.  The Executive Order interferes with Plaintiffs' access to moderated, accurate, and truthful information.  Thus, Defendants' actions deprive Plaintiffs of their right to receive such speech.

## CAUSES OF ACTION

## COUNT I: VIOLATION OF THE FIRST AMENDMENT—PRESUMPTIVELY UNLAWFUL CONTENT-BASED RESTRICTION

143.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

144.    "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

145.    A government restriction on speech is content-based and thus presumptively invalid when it discriminates among different speakers, allowing speech by some but not others.  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

146.     A government restriction on speech also is content-based and presumptively invalid if it was "adopted by the government 'because of disagreement with the message [the speech] conveys,'" regardless if it is content-based on its face.  *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

147.     The Executive Order is a content-based regulation of intermediaries' First Amendment rights both on its face and in its purpose and justification.

148.     On its face, the Executive Order distinguishes among speakers, singling out "online platform[s]"—private Internet intermediaries—and purports to prohibit them from curating content as they are constitutionally entitled to do. It also singles out a certain subset of these platforms for particular disdain, referring to this subset by name and as "titans" and "behemoths."  To this end, Subsection 4(a) of the Executive Order provides, "It is the policy of the United States that large online platforms, such as Twitter and Facebook, as the critical means of promoting the free flow of speech and ideas today, should not restrict protected speech."

149.     In addition to being facially content-based, the Executive Order was content-based in motive and purpose:  the President admittedly issued the Order because he disagreed with Twitter's speech, as well as the speech of other intermediaries. The purpose of the order is plainly to punish and discourage such speech and curation.

150.     Section 1 of the Executive Order itself openly acknowledges as much.  Section 1 explains that the Executive Order targets intermediaries precisely because the President disagrees with how they curate their sites.  *See* Executive Order § 1 ("Twitter now selectively decides to place a warning label on certain tweets in a manner that clearly reflects political bias.").

151.     Although the speech-punitive purpose and intent of the Executive Order is clear on its face, it is further confirmed by the President's tweets surrounding the Order and his press conference unveiling it.  The Order's purpose is as clear as it is illegal: to suppress content curation with which the President disagrees.

152.     The Executive Order is not narrowly tailored to serve a compelling government interest.

153.     The Executive Order injures Plaintiffs' First Amendment rights and causes them to

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

divert resources, including to check platforms for the accuracy of speech, including speech related to voting, and to take measures to support the First Amendment rights of individuals and intermediaries upon which Plaintiffs rely to further their mission of accurately informing voters and other members of the public.

154.    The Executive Order further injures Plaintiffs' First Amendment rights by depriving them of their right to receive expression including moderated content from online platforms, which are subject to ongoing and threatened retaliation by the government, including the withholding of government spending, for curating and editing content and correcting misinformation.

155.    Plaintiffs have been and will be irreparably injured by the Executive Order issued in violation of the First Amendment and have no adequate remedy at law.

## COUNT II: VIOLATION OF THE FIRST AMENDMENT—RETALIATION

156.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

157.    The First Amendment prohibits government officials from punishing disfavored platforms in retaliation for their speech:  "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *accord Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

158.    On May 26, 2020, Twitter engaged in constitutionally protected speech on its online platform by adding a corrective tag to President Trump's untruthful tweet about mail-in voting, thereby expressing its viewpoint that the tweet was false and adding to the discourse on its platform.

159.    Two days later, after publicly attacking the company's exercise of free speech, President Trump retaliated by issuing the Executive Order.  The company's constitutionally protected speech was a but-for cause of the Executive Order.  The Executive Order was issued to pressure the company—and similarly situated online platforms, several referenced by name in the Executive Order—into removing their own constitutionally protected speech from their online platforms and not engaging in such constitutionally protected speech in the future.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

160.     President Trump's retaliatory acts would deter a person of ordinary firmness from engaging in First Amendment–protected speech and activity.

161.     The Executive Order was intended to and reasonably will chill the constitutionally protected speech of online platforms.  That violates the First Amendment.  *See Hartman*, 547 U.S. at 256 ("Official reprisal for protected speech offends the Constitution [because] it threatens to inhibit exercise of the protected right . . . ." (quotation marks and citation omitted)).

162.     The Executive Order injures Plaintiffs' First Amendment rights and causes them to divert resources, including to check platforms for the accuracy of speech, including speech related to voting, and to take measures to support the First Amendment rights of individuals and intermediaries upon which Plaintiffs rely to further their mission of accurately informing voters and other members of the public.

163.     The Executive Order further injures Plaintiffs' First Amendment rights by depriving them of their right to receive expression including moderated content from online platforms, which are subject to ongoing and threatened retaliation by the government, including the withholding of government spending, for curating and editing content and correcting misinformation.

164.     Plaintiffs have been and will be irreparably injured by the Executive Order issued in violation of the First Amendment and have no adequate remedy at law.

## COUNT III: VIOLATION OF THE FIRST AMENDMENT—RETALIATORY THREATS

165.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

166.     "[A] public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (citing *Am. Family Ass'n, Inc. v. City & Cty. of S.F.*, 277 F.3d 1114, 1125 (9th Cir. 2002)); *see also Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) ("A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form."); *see also Bantam Books, Inc.*, 372 U.S. at 66–72.

167.    Restrictions on speech accompanied by threatened official retaliation are informal prior restraints.  This undermines all First Amendment safeguards.  Moreover, it is antithetical to the First Amendment that a government official would abuse his discretion and target or seek to eliminate particular speech based on his distaste for the speech.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988).

168.    The Executive Order threatens intermediaries if they engage in protected speech to correct President Trump's misstatements or otherwise remove President Trump's statements.

169.    The Executive Order also subjects online intermediaries to substantial risk of other injuries should they choose to exercise their First Amendment rights, including the loss of government advertising, threatened investigation by the U.S. Department of Justice and state attorneys' general, and being subjected to civil liability based on an erosion of Section 230 protections.

170.    President Trump and those enforcing the Executive Order will carry out President Trump's will.

171.    The Executive Order injures Plaintiffs' First Amendment rights and causes them to divert resources, including to check platforms for the accuracy of speech, including speech related to voting, and to take measures to support the First Amendment rights of individuals and intermediaries upon which Plaintiffs rely to further their mission of accurately informing voters and other members of the public.

172.    The Executive Order further injures Plaintiffs' First Amendment rights by depriving them of their right to receive expression including moderated content from online platforms, which are subject to ongoing and threatened retaliation by the government, including the withholding of government spending, for curating and editing content and correcting misinformation.

173.    Plaintiffs have been and will be irreparably injured by the Executive Order issued in violation of the First Amendment and have no adequate remedy at law.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

## COUNT IV: VIOLATION OF THE FIRST AMENDMENT—RIGHT TO RECEIVE

174.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

175.    The First Amendment "necessarily" protects "the right to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972); *Stanley*, 394 U.S. at 564. "Indeed, the right to hear and the right to speak are flip sides of the same coin." *Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002) (Kozinski, J., concurring).  The First Amendment prohibits the government from arbitrarily or vindictively limiting the stock of information from which members of the public may draw. *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978).  Because, when there is a right to speak, "there is a reciprocal right to receive" that speech. *Va. State Bd. of Pharmacy*, 425 U.S. at 757.

176.    By violating intermediaries' First Amendment rights to speak and curate content, the Order also violates the First Amendment rights of Internet users, including Plaintiffs, interfering with their right to receive intermediaries' speech and curated content.

177.    Plaintiffs are five advocacy groups that depend on Internet platforms to further their goal of informing and educating the electorate and the general public.  Plaintiffs rely on platforms to check the content on their platforms, correct misinformation where appropriate, and remove posts that violate their own terms of service.  The Executive Order threatens intermediaries from enforcing those terms and curating their own platforms.  As a result, Plaintiffs are deprived of the right to receive information that corrects, removes, or contextualizes inaccurate voter statements and other harmful misinformation.

178.    The danger of failing to receive corrective speech that clarifies inaccurate statements about vote-by-mail initiatives posted by government officials is particularly pernicious because (1) a core demographic of several Plaintiffs' constituencies, young voters, overwhelmingly rely on Internet sources to obtain voting information and (2) in the midst of a global pandemic, many voters will be voting by mail for the first time.

179.    The Executive Order injures Plaintiffs' First Amendment rights and causes them to

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****

divert resources, including to check platforms for the accuracy of speech, including speech related to voting, and to take measures to support the First Amendment rights of individuals and intermediaries upon which Plaintiffs rely to further their mission of accurately informing voters.

180.    The Executive Order further injures Plaintiffs' First Amendment rights by depriving them of their right to receive expression including moderated content from online platforms, which are subject to ongoing and threatened retaliation by the government, including the withholding of government spending, for curating and editing content and correcting misinformation.

181.    Plaintiffs have been and will be irreparably injured by the Executive Order issued in violation of the First Amendment and have no adequate remedy at law.

## COUNT V: *ULTRA VIRES* ACTION IN VIOLATION OF THE FIRST AMENDMENT

182.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

183.    Plaintiffs have a cause of action in equity and under the All Writs Act, 28 U.S.C. § 1561, to declare unlawful and enjoin an Executive Order or other Presidential Action that is *ultra vires* and therefore void.

184.    The Executive Order violates the First Amendment for several separate reasons, which are actionable separately and collectively:  it retaliates against named companies, threatens other Internet platforms, and constitutes a presumptively unlawful content-based restriction.

185.    The Executive Order injures Plaintiffs' First Amendment rights and causes them to divert resources, including to police platforms for the accuracy of speech, including speech related to voting, and to take measures to support the First Amendment rights of individuals and intermediaries upon which Plaintiffs rely to further their mission of accurately informing voters.

186.    The Executive Order further injures Plaintiffs' First Amendment rights by depriving them of their right to receive expression including moderated content from online platforms, which are subject to ongoing and threatened retaliation by the government, including the withholding of government spending, for curating and editing content and correcting misinformation.  Plaintiffs have been and will be irreparably injured by the Executive Order issued in violation of the First

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO.  ****

1    Amendment and have no adequate remedy at law.

2                            **PRAYER FOR RELIEF**

3           WHEREFORE, Plaintiff requests that this Court:

4           1.   Enter judgment pursuant to 28 U.S.C. § 2201(a) declaring that the Order is

5    unconstitutional and invalid;

6           2.   Enjoin, preliminarily and permanently, Defendants, their officials, agents, employees,

7    assigns, and all persons acting in concert or participating with them from implementing or enforcing

8    any part of the Order;

9           3.   Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

10          4.   Grant such other relief as the Court may deem just and proper.

11   Dated:  August 27, 2020                    COOLEY LLP

12

13                                        By: /s/ Michael G. Rhodes
                                             Michael G. Rhodes
14                                            Travis LeBlanc
                                             Kathleen R. Hartnett
15                                            Bethany C. Lobo

16                                            Electronic Frontier Foundation
                                             David Greene
17                                            Corynne McSherry
                                             Aaron Mackey
18
                                             The Protect Democracy Project, Inc.
19                                            Kristy Parker
                                             Ngozi J. Nezianya
20                                            Ben Berwick

21                                            Attorneys for Plaintiffs
                                             ROCK THE VOTE, VOTO LATINO,
22                                            COMMON CAUSE, FREE PRESS, and
                                             MAPLIGHT
23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
CASE NO. ****