COOLEY LLP
MICHAEL G. RHODES (116127)
(rhodesmg@cooley.com)
TRAVIS LEBLANC (251097)
(tleblanc@cooley.com)
KATHLEEN R. HARTNETT (314267)
(khartnett@cooley.com)
BETHANY C. LOBO (248109)
(blobo@cooley.com)
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone:     (415) 693 2000
Facsimile:     (415) 693 2222

Attorneys for Plaintiffs
ROCK THE VOTE; VOTO LATINO;
COMMON CAUSE; FREE PRESS; and
MAPLIGHT

*Additional counsel listed on next page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCK THE VOTE; VOTO LATINO; COMMON CAUSE; FREE PRESS; and MAPLIGHT, | Case No. 3:20-cv-06021-WHO |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; WILLIAM P. BARR, in his official capacity as Attorney General of the United States; WILBUR L. ROSS, JR., in his official capacity as United States Secretary of Commerce; DOUGLAS W. KINKOPH, in his official capacity as Associate Administrator of the Office of Telecommunications and Information Applications; and RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget, | Date:        October 14, 2020<br>Time:        2:00 PM<br>Courtroom: 2, 17th Floor<br>Judge:      Hon. William H. Orrick |
| Defendants. | |

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  DAVID GREENE (160107)
   (davidg@@@eff.org)
2  CORYNNE MCSHERRY (221504)
   (corynne@eff.org)
3  AARON MACKEY (286647)
   (amackey@eff.org)
4  ELECTRONIC FRONTIER FOUNDATION
   815 Eddy Street
5  San Francisco, CA   94109-7701
   Telephone:     (415) 436-9333
6

7  KRISTY PARKER (*pro hac vice forthcoming*)
   (kristy.parker@protectdemocracy.org)
   THE PROTECT DEMOCRACY PROJECT, INC.
8  2020 Pennsylvania Avenue, NW, #163
   Washington, DC 20006
9  Telephone:     (202) 849-9307
   Facsimile:     (929) 777-8428
10

11 NGOZI J. NEZIANYA (*pro hac vice forthcoming*)
   (ngozi.nezianya@protectdemocracy.org)
   THE PROTECT DEMOCRACY PROJECT, INC.
12 115 Broadway, Fl 5
   New York, NY 10006
13 Telephone:     (202) 934-3636
   Facsimile:     (929) 777-8428
14

15 BEN BERWICK (*pro hac vice forthcoming*)
   (ben.berwick@protectdemocracy.org)
   THE PROTECT DEMOCRACY PROJECT, INC.
16 15 Main Street, Suite 312
   Watertown, MA 02472
17 Telephone:     (202) 579-4582
   Facsimile:     (929) 777-8428

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ......................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

I.     INTRODUCTION ..................................................... 1

II.    FACTUAL BACKGROUND ........................................... 3

    A.    Online platforms are central sources of news and information, including about voting and elections, upon which plaintiffs rely ............. 3

    B.    Since 1996, Section 230 immunity has reinforced online platforms' exercise of their First Amendment rights ............................... 4

    C.    President Trump has threatened online platforms for exercising their First Amendment rights ...................................... 5

    D.    In May 2020, President Trump tweeted false and misleading information about mail-in voting, and Twitter responded ....................... 5

    E.    President Trump retaliates by issuing the Executive Order ....................... 7

    F.    Defendants are actively implementing the Executive Order ...................... 8

    G.    The Executive Order irreparably harms plaintiffs and the public interest ....................................................... 9

III.    THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION AGAINST DEFENDANTS' ENFORCEMENT OF THE EXECUTIVE ORDER ..................................................... 11

    A.    Plaintiffs are likely to succeed on the merits ........................... 12

        1.    Plaintiffs have standing to bring their First Amendment claims ....................................................... 12

        2.    The order is an unjustified content-based restriction on speech that violates First Amendment strict scrutiny ................... 14

            a.    The order is a content-based restriction subject to strict scrutiny ................................................ 14

            b.    The order fails strict scrutiny ........................... 16

                (i)    The government does not have a compelling interest in preventing speech with which it disagrees ............................... 16

                (ii)    The order does not directly advance any compelling interest and is not narrowly tailored ................................... 17

        3.    The order unlawfully retaliates against online platforms for engaging in constitutionally protected speech .............................. 18

        4.    The order unlawfully and coercively threatens online platforms with retaliation if they exercise their first amendment rights ....................................... 20

        5.    The order deprives plaintiffs of their First Amendment right to receive protected expression ................................... 21

**TABLE OF CONTENTS**
(continued)

**Page**

    B.    Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction ................................................................. 23

    C.    The equities tip sharply in plaintiffs' favor and granting the injunction is in the public interest ........................................... 24

IV.    CONCLUSION ................................................................. 25

FIRM NAME
ATTORNEYS AT LAW
OFFICE ADDRESS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011)........................................................................... 12

*Am. Fam. Ass'n, Inc. v. City & Cty. of S.F.*,
   277 F.3d 1114 (9th Cir. 2002) .......................................................................... 20

*Ariz. Right to Life Political Action Comm. v. Bayless*,
   320 F.3d 1002 (9th Cir. 2003) .......................................................................... 12

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015) ............................................................................ 20

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ...................................................................................... 20, 22

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009).............................................................................. 5

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011) .......................................................................................... 16

*Capp v. Cty. of San Diego*,
   940 F.3d 1046 (9th Cir. 2019) .......................................................................... 18

*Carey v. Brown*,
   447 U.S. 455 (1980) .......................................................................................... 17

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) .......................................................................................... 14

*City & Cty. of S.F. v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) .......................................................................... 11

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2002) (Kozinski, J., concurring)................................... 21

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
   518 U.S. 727 (1996) .......................................................................................... 22

*Elrod v. Burns*,
   427 U.S. 347 (1976) .......................................................................................... 23

*Fair Hous. of Marin v. Combs*,
   285 F.3d 899 (9th Cir. 2002)............................................................................. 13

FIRM NAME
ATTORNEYS AT LAW
OFFICE ADDRESS

i

**NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984) ................................................................................................ 4

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) .............................................................................................. 21

*FreedomWatch, Inc. v. Google Inc.*,
No. 19-7030, 2020 WL 3096365 (D.C. Cir. May 27, 2020) ................................. 18

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) .............................................................................. 24

*Hartman v. Moore*,
547 U.S. 250 (2006) .............................................................................................. 18

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) .............................................................................................. 16

*Innovation Law Lab v. Wolf*,
951 F.3d 1073 (9th Cir. 2020) .............................................................................. 24

*Johnson v. Stuart*,
702 F.2d 193 (9th Cir. 1983) ................................................................................ 12

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) ........................................................................ 23, 24

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .............................................................................................. 21

*Kuba v. 1-A Agric. Ass'n*,
387 F.3d 850 (9th Cir. 2004) ................................................................................ 17

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019) ......................................................................................... 17

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ................................................................................ 24

*Miami Herald Publ'g Co. v Tornillo*,
418 U.S. 241 (1974) .............................................................................................. 17

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ........................................................................................ 17, 22

*Nieves v. Bartlett*,
139 S. Ct. 1715 (2019) ......................................................................................... 18

FIRM NAME
ATTORNEYS AT LAW
OFFICE ADDRESS

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*North Miss. Commc'ns, Inc. v. Jones*,

4

    792 F.2d 1330 (5th Cir. 1986)............................................................................. 20

5

*O'Brien v. Welty*,
    818 F.3d 920 (9th Cir. 2016)............................................................................. 18

6

*Okwedy v. Molinari*,

7

    333 F.3d 339 (2d Cir. 2003)............................................................................. 20

8

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,

9

    961 F.3d 1062 (9th Cir. 2020)........................................................................... 12

10

*Pen Am. Ctr., Inc. v. Trump*,
    No. 18 Civ. 9433 (LGS), 2020 WL 1434573 (S.D.N.Y. Mar. 24, 2020) ............................... 13

11

*Prager Univ. v. Google LLC*,

12

    951 F.3d 991 (9th Cir. 2020)............................................................................. 18

13

*Reed v. Town of Gilbert, Ariz.*,

14

    576 U.S. 155 (2015) ............................................................................. 14, 15, 16

15

*Smith v. People*,
    361 U.S. 147 (1959)............................................................................. 22

16

*Stanley v. Georgia*,

17

    394 U.S. 557 (1969)............................................................................. 21

18

*Trump v. Int'l Refugee Assistance Project*,

19

    137 S. Ct. 2080 (2017) (per curiam) ............................................................................. 11

20

*United States v. Playboy Entm't Group, Inc.*,
    529 U.S. 803 (2000)............................................................................. 14, 16

21

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,

22

    478 F.3d 413 (1st Cir. 2007) ............................................................................. 5

23

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,

24

    425 U.S. 748 (1976)............................................................................. 4, 13, 21

25

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)............................................................................. 14

26

*Winter v. Nat. Res. Def. Council, Inc.*,

27

    555 U.S. 7 (2008)............................................................................. 12

28

FIRM NAME
ATTORNEYS AT LAW
OFFICE ADDRESS

iii

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Statutes**

47 U.S.C.
 § 230 ........................................................................................................................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 65 ................................................................................... 1

FIRM NAME
ATTORNEYS AT LAW
OFFICE ADDRESS

iv

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on October 14, 2020, at 2:00 p.m. or as soon thereafter as they may be heard before the Honorable Judge William H. Orrick in Courtroom 2, 17th Floor, of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs Rock the Vote, Voto Latino, Common Cause, Free Press, and MapLight ("Plaintiffs") will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants Donald J. Trump, in his official capacity as President of the United States; William P. Barr, in his official capacity as Attorney General of the United States; Wilbur L. Ross, Jr., in his official capacity as United States Secretary of Commerce; Douglas W. Kinkoph, in his official capacity as Associate Administrator of the Office of Telecommunications and Information Applications; and Russell T. Vought, in his official capacity as Director of the Office of Management and Budget (collectively, "Defendants"); and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them.

Plaintiffs respectfully move for a nationwide preliminary injunction prohibiting Defendants from enforcing Executive Order 13925, dated May 28, 2020 and entitled "Executive Order on Preventing Online Censorship" ("Executive Order" or "Order"), attached as Exhibit A to the Complaint, because it violates the First Amendment. This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the accompanying supporting declarations, the papers, evidence and records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

In the midst of a deadly pandemic and massive economic crisis, our country is approaching one of the most consequential elections in its history. To combat the pandemic, localities have deployed social distancing and other restrictions—and many are altering their typical voting procedures. Given these changes, accurate information about this year's election, including mail-in voting procedures that many voters will be using for the first time, is more important than ever.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

1    And given reduced in-person contact, online platforms such as Twitter and Facebook are more

2    central than ever in disseminating election- and voting-related information.

3        As states have expanded mail-in voting due to the pandemic, President Trump has engaged

4    in a sustained campaign to discredit it, premised largely on false and misleading claims about its

5    voter fraud.  On May 26, 2020, President Trump posted a tweet falsely asserting that mail-in ballots

6    will be "substantially fraudulent" and "[m]ail boxes will be robbed."  Complaint, ECF No. 1

7    ("Compl.") ¶ 16.  In response that day, and in an exercise of its First Amendment rights, Twitter

8    fact-checked the President, appending a notice to his tweet stating "Get the facts about mail-in

9    ballots" and linking to information rebutting the President's false claims (but keeping the tweet

10   available).  *Id.*

11       Two days later, on May 28, 2020, President Trump retaliated against Twitter and other

12   online platforms by issuing the Executive Order.  The Executive Order directs a range of official

13   reprisals at online platforms—including threats to their established legal immunity under 47 U.S.C.

14   § 230 ("Section 230"), of investigation by government enforcement agencies, and of loss of

15   significant government spending on advertising—for engaging in constitutionally protected speech.

16       The Executive Order violates the First Amendment in multiple respects: it is a speaker-

17   based restriction on speech that is presumptively unconstitutional and fails strict scrutiny; it is

18   unlawful retaliation for disfavored speech; it is a coercive threat against disfavored speech; and it

19   violates the right of recipients—including the five organizational Plaintiffs who bring this action—

20   to receive speech from the online platforms targeted by the Executive Order.  Since the Executive

21   Order's issuance, Defendants have been actively implementing it.  And in its wake, President

22   Trump has continued making dangerous, unchecked false claims about voting on online platforms.

23       Plaintiffs are organizations that help eligible voters register to vote and vote, including

24   through online platforms; that disseminate accurate information about voting and elections,

25   including through online platforms; that work to combat misinformation online, including about

26   voting and elections; and that encourage online platforms to combat such misinformation.  The

27   Executive Order irreparably harms Plaintiffs.  It disincentives online platforms from responding to

28   misinformation in advance of a critical election, which deprives Plaintiffs and their constituents of

Cooley LLP
Attorneys at Law
San Francisco

2

Notice of Motion and Motion for
Preliminary Injunction
Case No. 3:20-cv-06021-WHO

much-needed voting information. It frustrates Plaintiffs' missions, undermines their efforts, requires the diversion of their scarce resources, and, most significantly, impairs their First Amendment rights to receive speech from willing speakers. It also is directly contrary to the public interest and advances no legitimate governmental interest. It thus should be preliminarily enjoined.

## II.     FACTUAL BACKGROUND

### A.     Online platforms are central sources of news and information, including about voting and elections, upon which plaintiffs rely.

Online platforms such as Facebook, Twitter, YouTube, and Instagram play a central role in Americans' lives and politics, including as vital sources for news and information. As of 2019, "around seven-in-ten Americans use social media to connect with one another, engage with news content, share information and entertain themselves."[1] And "Americans' usage of social media has only increased—and drastically so, as a result of the pandemic."[2] Few Internet users communicate online without using online intermediaries, including website hosts, email providers, and messaging and social media platforms. (Newman Decl. ¶ 5.)

Plaintiffs are five organizations that use online platforms to disseminate and receive information, including about elections and voting. (DeWitt Decl. ¶¶ 4, 6, 8, 9; Friedman Decl. ¶¶ 2, 7, 8; Littlewood Decl. ¶¶ 3, 4; Newman Decl. ¶¶ 5, 6, 8, 9.) They rely on online platforms to curate content and combat misinformation on their platforms. (DeWitt Decl. ¶ 10; Friedman Decl. ¶ 10; Littlewood Decl. ¶¶ 5, 8; Newman Decl. ¶ 9; Wood Decl. ¶ 5.) Plaintiffs Rock the Vote and Voto Latino work to build the long-term political power of young and Latinx people, respectively, through voter registration, education, and mobilization; they rely on online platforms to help disseminate their message, including accurate information about elections and voting. (DeWitt Decl. ¶¶ 6, 8; Friedman Decl. ¶¶ 7–9.) Plaintiff Common Cause relies on online platforms to advance its work helping voters know election rules and voter rights to be able to successfully cast their ballots, and for its advocacy regarding elections and voting. (Littlewood Decl. ¶¶ 3–4, 7.) Through its Change the Terms campaign, Plaintiff Free Press works to combat misinformation and

---

[1] Hartnett Decl. Ex. 1.
[2] Hartnett Decl. Ex. 2.

CooLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

1   hate online, urging platforms to moderate content.  (Wood Decl. ¶ 5.)  And Plaintiff MapLight

2   relies on online platforms to accomplish its work of informing and empowering voters, including

3   through its Voter's Edge initiative.  MapLight also fights misinformation online through its Digital

4   Deception Solutions project, including a soon-to-be-released software tool for reporting election

5   misinformation to Facebook.  (Newman Decl. ¶ 6.)

6       Plaintiffs use online platforms such as Twitter and Facebook to receive and disseminate

7   accurate information to the public on issues of public concern such as elections and voting.  (DeWitt

8   Decl. ¶ 9; Newman Decl. ¶¶ 8–9; Friedman Decl. ¶ 10.)  Because of these platforms' centrality,

9   they are prime targets for those who seek to misinform and manipulate, including about elections.

10  (Littlewood Decl. ¶ 9; Friedman Decl. ¶ 7.)  A stark example is Russia's use of social media to

11  interfere with the 2016 election to advantage President Donald Trump.[3]

12      **B.      Since 1996, Section 230 immunity has reinforced online platforms' exercise of
13             their First Amendment rights.**

14      Online platforms—like other intermediaries such as newspapers—have First Amendment

15  rights to speak, curate, fact-check, moderate, and comment on third-party and user posts.  Compl.

16  ¶¶ 4–5.  The First Amendment protects "expression of editorial opinion on matters of public

17  importance," which "is entitled to the most exacting degree of First Amendment protection."  *FCC*

18  *v. League of Women Voters of Cal.*, 468 U.S. 364, 375–76 (1984).  Users of online platforms have

19  a corresponding right to receive information curated by such platforms, free from governmental

20  interference.  "[W]here a speaker exists," the First Amendment "necessarily protects the right to

21  receive" the speech.  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S.

22  748, 756–57 (1976) (internal quotation marks and citation omitted).

23      Those First Amendment protections are reinforced by and reflected in Section 230, which

24  was enacted by Congress in 1996 to safeguard the constitutionally protected First Amendment

25  interests of both speakers and recipients by providing online platforms with an immunity from

---

26  [3] Hartnett Decl. Ex. 3 at 3–4 (U.S. Senate Select Committee on Intelligence Report, Vol. 2, *Russia's*
27  *Use of Social Media*, released Oct. 2019) (Russian intelligence  operatives "used social media to
    conduct an information warfare campaign designed to spread disinformation and societal division
28  in the United States," including "to influence the 2016 U.S. presidential election by harming Hillary
    Clinton's chances of success and supporting Donald Trump at the direction of the Kremlin").

Cooley LLP
Attorneys at Law
San Francisco

4

Notice of Motion and Motion for
Preliminary Injunction
Case No. 3:20-cv-06021-WHO

potential liability for curating, editing, and screening third-party content, or for choosing not to do so.  47 U.S.C. § 230(c)(1).  Section 230 immunizes online platforms from suit based on their "publication decisions," such as "whether to edit, to remove, or to post . . . content generated entirely by third parties."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009).  Congress recognized that Internet speech would be stifled if online intermediaries faced civil or state criminal liability for speech posted by third parties, and Section 230 was specifically designed to eliminate that risk.  *See, e.g.*, *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418–19 (1st Cir. 2007) (explaining that online intermediaries are particularly vulnerable to threats of liability "given the volume of material communicated . . . , the difficulty of separating lawful from unlawful speech, and the relative lack of incentives to protect lawful speech").

### C.   President Trump has threatened online platforms for exercising their First Amendment rights.

While in office, President Trump has consistently threatened to punish online platforms for exercising their First Amendment rights to make editorial choices with which he disagrees.  Compl. ¶¶ 55–60.  For example, in June 2019, President Trump stated that the heads of major online platforms "are all Democrats, it's totally biased toward Democrats," and asserted that Google "is trying to rig the election" and "Twitter is just terrible, what they do.  They don't let you get the word out.  I'll tell you what, they should be sued because of what's happening with the bias."  *Id.* ¶ 58.  He also said that "[w]e should be suing Google and Facebook and all that, which perhaps we will."  *Id.*  In July 2019, President Trump claimed that social media companies are "terribl[y] bias[ed]" and engage in "censorship" and that "[w]e're not going to let it happen"  *Id.* ¶¶ 59–60.

### D.   In May 2020, President Trump tweeted false and misleading information about mail-in voting, and Twitter responded.

In Spring 2020, as the pandemic led states to expand mail-in voting during the 2020 primary election, the President began a sustained campaign against mail-in voting, relying largely on false and misleading statements.  Compl. ¶ 61.  For example, in March 2020, he claimed that "[t]hey have things, levels of voting, that if you ever agreed to it, you'd never have a Republican elected in this country again."  *Id.*  On April 8, 2020, he tweeted, "Republicans should fight very hard when

Cooley LLP
Attorneys at Law
San Francisco

5

Notice of Motion and Motion for
Preliminary Injunction
Case No. 3:20-cv-06021-WHO

it comes to state wide mail-in voting.  Democrats are clamoring for it.  Tremendous potential for voter fraud, and for whatever reason, doesn't work out well for Republicans." *Id*.  Then, on May 20, 2020, he threatened to "hold up" funding to Michigan if the state sent voters absentee ballots, falsely claiming that the state had sent voters absentee *ballots* as opposed to absentee ballot *applications*. *Id*. ¶ 62.  He similarly threatened Nevada on the same day, tweeting: "State of Nevada 'thinks' that they can send out illegal vote by mail ballots, creating a great Voter Fraud scenario for the State and the U.S.  They can't!  If they do, 'I think' I can hold up funds to the State." *Id*. ¶ 63.

On May 26, 2020, the President escalated his false claims, tweeting: "There is NO WAY (ZERO!) that Mail-In Ballots will be anything less than substantially fraudulent.  Mail boxes will be robbed, ballots will be forged & even illegally printed out & fraudulently signed" and "The Governor of California is sending Ballots to millions of people, anyone . . . living in the state, no matter who they are or how they got there, will get one.  That will be followed up with professionals telling all of these people, many of whom have never even thought of voting before, how, and for whom, to vote.  This will be a Rigged Election. No way!" *Id.* ¶ 65.

Twitter's terms of use prohibit using its "services for the purpose of manipulating or interfering in elections," including by spreading "[m]isleading information about how to vote or register to vote." *Id*. ¶ 66.  In response to the President's May 26, 2020 tweets, Twitter "fact-checked" the President that day by appending a notice to the President's tweets that users could "[g]et the facts about mail-in ballots." *Id*.  Users who clicked the notice were taken to fact-check information about the President's claims. *Id*.  The underlying tweets remained available. *Id.* ¶ 16.

The President responded to Twitter's constitutionally-protected speech by accusing the company of election interference: "@Twitter is now interfering in the 2020 Presidential Election.  They are saying my statement on Mail-In Ballots, which will lead to massive corruption and fraud, is incorrect, based on fact-checking by Fake News CNN and the Amazon Washington Post . . . ." *Id*. ¶ 67.  He added, "Twitter is completely stifling FREE SPEECH, and I, as President, will not allow it to happen!" *Id*.  Also on May 26, 2020, Twitter explained its decision to add the fact-check notice, stating that it was "part of our efforts to enforce our civic integrity policy" because "[w]e believe those Tweets could confuse voters about what they need to do to receive a ballot and

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

participate in the election process." *Id.* ¶ 68.  President Trump responded on May 27, 2020, with a flurry of tweets attacking Twitter, online platforms, and "Big Tech," threatening to regulate or even "close [] down" online platforms due to their disfavored speech.  *Id.* ¶ 69.

**E.    President Trump retaliates by issuing the Executive Order.**

On May 28, 2020, President Trump issued the Executive Order.  Compl. ¶ 71.  Both its terms (discussed below) and the President's statements announcing it at an Oval Office press conference make clear that it was issued in retaliation for online platforms' speech.  The Executive Order states on its face that it is directed at preventing "online platforms" from "engaging in selective censorship that is harming our national discourse."  Order § 1.  It applies to all "online platforms," but specifically calls out Twitter, Facebook, Instagram, and YouTube for disfavored expression.  *Id.*

In announcing the Executive Order, President Trump characterized online platforms as "taking over the airwaves," "hav[ing] points of view" he disfavored, and acting as "editor[s] with a viewpoint"—all leading him to be "fed up with it, and it's unfair, and it's been very unfair."  Compl. ¶ 72.  He specifically referenced the fact check notice posted by Twitter two days earlier, labeling it "inappropriate" and citing it as the basis for targeting Twitter and other platforms.  *Id.* ¶ 73.

The Executive Order directs executive agencies to take several categories of action against online platforms as punishment for their speech.  It:

- asserts that sharply narrowing the scope of Section 230 immunity as established by existing caselaw is "the policy of the United States," proclaims that online platforms should lose Section 230 immunity when they "censor content and silence viewpoints that they dislike," and directs agencies to narrow their application of Section 230 accordingly.  Order § 2.

- directs the Secretary of Commerce and Attorney General to file a petition for rulemaking with the Federal Communications Commission ("FCC") proposing regulations narrowly interpreting Section 230's liability shield.  *Id.*

- threatens to pull federal advertising dollars, which amount to nearly $1 billion annually, from online platforms that adopt editorial viewpoints the President dislikes.  *Id.* § 3.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

- requires the Federal Trade Commission ("FTC") to "consider taking action" against "practices by entities covered by section 230 that restrict speech in ways that do not align with those entities' public representations about those practices," and directs the FTC to investigate whether large online platforms such as Twitter violate the law pursuant to the Executive Order's erroneous conception of the First Amendment's applicability to online platforms. *Id.* § 4.

- directs the Attorney General, in consultation with state attorneys general, to "establish a working group regarding the potential enforcement of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices[,]" thus targeting for state law enforcement online platforms engaging in speech the President disfavors. *Id.* § 5.

- directs the Attorney General to "develop a proposal for Federal legislation that would be useful to promote the policy objectives of this order." *Id.* § 6.

**F.   Defendants are actively implementing the Executive Order.**

The administration has taken several public steps to implement the Executive Order. At the May 28, 2020 press conference announcing the Order, Attorney General Barr emphasized that retaliation against online platforms would happen immediately in the context of "litigation going forward": "there is litigation going on all the time on Section 230 and its scope. So we would look for appropriate vehicles to weigh in and file statement[s] of interest." Compl. ¶ 78.

On June 17, 2020, the Justice Department, through Defendant Attorney General Barr and pursuant to Section 6 of the Executive Order, proposed legislation to curtail online platforms' Section 230 immunity—legislation that would limit platforms' ability to moderate content on their sites and require platforms to provide explanations of their moderating decisions. *Id.* ¶ 95.

On July 27, 2020, the National Telecommunications and Information Administration ("NTIA"), on behalf of Defendant Secretary of Commerce Wilbur Ross, filed an FCC petition to narrow Section 230 immunity, as directed by Section 2(b) of the Executive Order. *Id.* ¶ 96. President Trump issued a statement to make clear that NTIA officials were acting "as directed by" the Executive Order, as part of President Trump's self-proclaimed efforts "to fight back against unfair, un-American, and politically biased censorship of Americans online." *Id.* ¶ 97. In early

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

1    August, the FCC "invite[d] public input" concerning the NTIA's Section 230 petition.  *Id.* ¶ 98.[4]

2           **G.     The Executive Order irreparably harms plaintiffs and the public interest.**

3           This year, the COVID-19 pandemic makes it impracticable to register and engage eligible

4    voters at the rock concerts, community festivals, and large gatherings of years past.  The pandemic

5    also has prompted changes to voting procedures nationwide, including increased reliance on voting

6    by mail.  (DeWitt Decl. ¶ 13; Littlewood Decl. ¶ 6.)  Young, new, minority and marginalized voters

7    face particular challenges in voting and are particularly likely to depend on social media for

8    information.  (DeWitt Decl. ¶ 14; Friedman Decl. ¶ 7.)  Voter suppression efforts often target these

9    communities.   (DeWitt Decl. ¶¶ 3, 14; Friedman Decl. ¶ 3.)   More than half of voters under the

10   age of 35 do not have the resources or knowledge they need to vote by mail in November.  (DeWitt

11   Decl. ¶ 14.)  And Black and Latinx Americans are three times more likely than white Americans to

12   be told they lack correct voting identification, to be unable to locate a polling place, or to miss a

13   registration deadline.   (DeWitt Decl. ¶ 14; Friedman Decl. ¶ 5.)   As such, civic engagement

14   organizations such as Plaintiffs Rock the Vote, Voto Latino, MapLight, and Common Cause have

15   increasingly turned to online platforms as essential tools for helping eligible voters understand how

16   to make their voices heard, including through registering to vote and voting remotely.  (DeWitt

17   Decl. ¶ 13; Friedman Decl. ¶ 9; Littlewood Decl. ¶ 7; Newman Decl. ¶ 8.)

18          Whereas Plaintiffs rely on online platforms such as Twitter and Facebook in their efforts to

19   disseminate accurate information about voting and elections to promote the exercise of the

20   franchise, others seek to exploit online platforms with misinformation about voting.  For example,

21   President Trump, who has over 85 million followers on Twitter,[5] over 30 million followers on

22   Facebook,[6] and posts regularly on these and other platforms, has been using these platforms to

23   spread false information regarding election security and voting procedures.  Compl. ¶¶ 61–71.  He

24   has specifically targeted mail-in voting, apparently based on his expressed view that mail-in voting

25

26   [4] The same day, President Trump withdrew the nomination of FCC Commissioner Mike O'Rielly,
     after "O'Rielly in June expressed 'deep reservations' in a C-SPAN program about whether
27   Congress had given the FCC power to limit social media companies' legal protections."  *Id.* ¶ 99.
     [5] Harnett Decl. Ex. 4.
28   [6] Hartnett Decl. Ex. 5.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

1   "doesn't work out well for Republicans."  Compl. ¶ 61.  Additionally, U.S. intelligence officials

2   have concluded that Russia and other foreign actors are seeking to interfere in the 2020 election, as

3   they did in 2016, including by using online platforms to spread misinformation.[7]

4         Misinformation online spreads quickly and creates massive confusion, jeopardizing voters'

5   successful exercise of the franchise, discouraging potential voters from participating, and ultimately

6   undermining faith in the election system.  (DeWitt Decl. ¶¶ 14, 17; Friedman Decl. ¶ 13; Littlewood

7   Decl. ¶ 14.)  Plaintiffs rely on online platforms to correct misinformation about the electoral process

8   and are actively pressing them to do so in the context of the 2020 election.  (DeWitt Decl. ¶ 10,

9   Friedman Decl. ¶ 10; Littlewood Decl. ¶¶ 5, 8, Newman Decl. ¶ 9, Wood Decl. ¶ 5.)

10        The Executive Order—issued in retaliation for disfavored editorial choices by online

11  platforms—threatens platforms with loss of Section 230 immunity, investigation by state and

12  federal law enforcement agencies, and the loss of significant government advertising revenue if

13  they continue to moderate content in a manner disfavored by the President.  *See supra* pp. 7–8.  It

14  is plainly intended to chill their exercise of their essential moderating functions.  (Newman Decl. ¶

15  10; Littlewood Decl. ¶ 10; Wood Decl. ¶ 6.)

16        Since issuing the Executive Order, President Trump has posted false content about mail-in

17  voting on online platforms that has gone unchecked or not fully checked.  In July 2020, President

18  Trump tweeted that "Mail-in voting is in a disastrous state" in New York, that mail-in ballots will

19  lead to a "rigged 2020 election," and that "mail-in voting will cause 2020 to be "the most

20  INACCURATE & FRAUDULENT Election in history."  Compl. ¶¶ 108–11.  In August 2020, he

21  stated that mail-in ballots would lead to "[a] Rigged Election." Id. ¶ 113.  None of these tweets

22  were removed, corrected, or edited by Twitter.  *Id.* ¶¶ 108–11, 113.  On August 23, 2020, the

23  President tweeted that mail drop boxes were "[a] big fraud[.]"  *Id.* ¶ 116.  Twitter added a notice

24  that the tweet "violated the Twitter Rules about civic and election integrity[,]" but did not include

25  a fact-check link as it had for the May 26, 2020 tweets that immediately prompted the Executive

26  Order.  *Id.*

27

28  ---
[7] Harnett Decl. Ex. 6 ("[s]ome Kremlin-linked actors are also seeking to boost President Trump's candidacy on social media and Russian television").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

The Executive Order interferes with Plaintiffs' First Amendment right to receive the curated and moderated content that online platforms have a right to provide.  (Wood Decl. ¶ 5.)  It frustrates Plaintiffs' missions of advancing voter participation and combating misinformation online. (DeWitt Decl. ¶¶ 14, 18; Friedman Decl. ¶¶ 11, 12; Littlewood Decl. ¶¶ 10, 11; Newman Decl. ¶ 11; Wood Decl. ¶ 8.)  And, as a result of the Order, Plaintiffs have been forced to divert resources away from other mission-critical activities to combat misinformation on online platforms before the November 2020 election.  (*Id.*)  For instance, Voto Latino has eliminated a planned campaign to educate voters about specific candidates, to divert resources to provide voters with accurate information about voting by mail.  (Friedman Decl. ¶ 12.)  Rock the Vote has had to organize voter education sessions to explain how voters can be targeted with misinformation.  (DeWitt Decl. ¶ 16.)  Common Cause has had to expend more resources combatting voting misinformation, both with the platforms directly and with counterspeech efforts.  (Littlewood Decl. ¶ 10.)  Free Press has had to divert resources to engage in the FCC rulemaking process.  (Wood Decl. ¶¶ 8–10.)  And MapLight has expended resources to develop a software tool to report misinformation that will strengthen its efforts to press platforms to remove such content.  (Newman Decl. ¶ 6.)

## III.   THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION AGAINST DEFENDANTS' ENFORCEMENT OF THE EXECUTIVE ORDER

Federal courts have the power and responsibility to enjoin unconstitutional executive orders.  *See, e.g.*, *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2088 (2017) (per curiam) (upholding portion of a preliminary injunction against executive order's enforcement, determining that the executive order "may not be enforced against foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States"); *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1245 (9th Cir. 2018) (affirming "injunction as to the Executive Order's effect in California" and vacating "for further consideration by the district court in the first instance" whether a nationwide injunction was justified).[8]

---

[8] Federal Defendants thereafter stipulated to a permanent injunction against enforcement of the executive order in California in *City and County of San Francisco* as part of a settlement.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

1    Plaintiffs are entitled to a preliminary injunction because they can establish that they are

2    "[1] likely to succeed on the merits, . . . [2] likely to suffer irreparable harm in the absence of

3    preliminary relief, [3] that the balance of equities tips in [their] favor, and [4] that an injunction is

4    in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  If the balance

5    of equities tips sharply in the plaintiff's favor, injunctive relief is appropriate if there are "serious

6    questions going to the merits," regardless whether a likelihood of success is shown.  *All. for the*

7    *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

8         **A.      Plaintiffs are likely to succeed on the merits.**

9         The First Amendment bars Defendants from using the power of the government to cudgel

10   disfavored speech, but that is exactly what the Executive Order does.  Plaintiffs are likely to succeed

11   on the merits of each of their First Amendment claims—all of which they have standing to assert.

12   ***First***, the Order is a content-based restriction that cannot survive strict scrutiny; it discriminates

13   against certain speakers based on the content of their expression, with the motive and purpose of

14   restricting specific speech of those speakers.  ***Second***, the Order retaliates against online platforms

15   for engaging in constitutionally protected speech.  ***Third***, the Order coercively threatens online

16   platforms with retaliation and reprisal if they exercise their First Amendment rights.  ***Fourth***, the

17   Order deprives Plaintiffs of their right to receive protected expression.

18            **1.      Plaintiffs have standing to bring their First Amendment claims.**

19        "[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry

20   tilts dramatically toward a finding of standing." *Ariz. Right to Life Political Action Comm. v.*

21   *Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (citation omitted).  Plaintiffs have direct

22   organizational standing to assert each First Amendment claim based on two distinct injuries:

23   infringement of their right to receive speech, and diversion of resources and frustration of mission.

24        Government action "implicates the First Amendment" when it "restrict[s] the rights of both

25   speakers [] and would-be listeners []." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d

26   1062, 1069–70 (9th Cir. 2020) (finding listener standing for First Amendment claim).  To establish

27   actual injury from a restriction of the right to receive information, there must be a speaker who is

28   willing to convey the information.  *Johnson v. Stuart*, 702 F.2d 193, 195–96 (9th Cir. 1983)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

(reversing district court and finding students had standing to pursue First Amendment claims arising from restrictions of receipt of information in certain textbooks). "[W]here a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy*, 425 U.S. at 756–57.

Here, Plaintiffs are willing recipients and online intermediaries are willing speakers: plaintiffs desire online platforms' content moderation, including their fact-checking, editorializing, and contextualizing inaccurate voting information, Compl. ¶ 142, and online platforms' stated policies and examples of such content moderation demonstrates they are willing speakers, *id.* ¶ 65 (Twitter inserting "Get the facts" link into President Trump's false tweet about mail-in voting). Because of the Executive Order, Plaintiffs have been restricted from receiving desired information in violation of their First Amendment rights, providing standing to sue. *See Pen Am. Ctr., Inc. v. Trump*, No. 18 Civ. 9433 (LGS), 2020 WL 1434573, at *7–8 (S.D.N.Y. Mar. 24, 2020) (finding right-to-receive injury with respect to White House threats to revoke press credentials and security clearances; "The Complaint has plausibly alleged therefore that Defendant's retaliation and threats of further retaliation against these officials have objectively chilled the volume or quality of their media speech. Plaintiff's right to receive the speech has in turn been impaired.").

Plaintiffs additionally have organizational standing to support each of the four First Amendment claims because their resources have been diverted and their missions have been frustrated by the Executive Order. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). Plaintiffs have had to divert resources away from their regular course to combat misinformation on platforms. (DeWitt Decl. ¶¶ 15, 18; Friedman Decl. ¶¶ 11, 12; Littlewood Decl. ¶¶ 11, 12, Newman Decl. ¶ 11; Wood Decl. ¶¶ 8–10.) And the Executive Order has frustrated the missions of each Plaintiff: Rock the Vote, Voto Latino, and Common Causes' ability to educate and register voters; and Free Press and MapLight efforts to improve online platforms and promote transparency in elections. (*Id.*)

Cooley LLP
Attorneys at Law
San Francisco

13

Notice of Motion and Motion for
Preliminary Injunction
Case No. 3:20-cv-06021-WHO

2.     **The order is an unjustified content-based restriction on speech that violates First Amendment strict scrutiny.**

a.     **The order is a content-based restriction subject to strict scrutiny.**

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  Presumptively unconstitutional restrictions include those "distinguishing among different speakers, allowing speech by some but not others" as a "means to control content." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).  Thus, "laws favoring some speakers over others demand strict scrutiny when the [government's] speaker preference reflects a content preference." *Reed*, 576 U.S. at 170; *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812 (2000) ("[l]aws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles").

An "additional category of laws that, though facially content neutral, will be considered content-based regulations of speech" are "laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message [the speech] conveys." *Reed,* 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (alteration in original) (internal quotation marks omitted).

The Executive Order is presumptively unconstitutional both facially and in purpose and justification.

***First***, the Executive Order clearly, facially, and impermissibly targets for punitive or retaliatory measures a class of speakers based on the content of their speech, namely "online platform[s]" for their alleged "editorial conduct" and "censorship." *See* Order § 7 (explaining that, for purposes of the Order, "'online platform' means any website or application that allows users to create and share content or engage in social networking, or any general search engine").  According to the Order, "[w]hen large powerful social media companies censor opinions with which they disagree, they exercise a dangerous power" of "content creators." *Id.* § 1.  Calling out Twitter, Facebook, Instagram, and YouTube by name, *id.*, the Order explains that it targets these "titans"

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

and "behemoths" for sanction because of their ***"editorial conduct"***:  their alleged "selective censorship" of content, including "plac[ing] a warning label" on the President's tweet; "remov[ing] or restrict[ing] access to content"; and failing to place labels on other political third-party content, such as Representative Adam Schiff's tweets about Russia's interference with the 2016 campaign. *Id.* §§ 1, 2(a) (emphasis added).  In other words, the Order seeks to restrict "large, powerful social media companies" from adopting editorial viewpoints that the Order claims reflect "political bias," including by threatening to strip their Section 230 immunity.  *Id.*  Because the Order seeks to restrict or deter specific platforms from engaging in political speech, the Order is a content-based restriction.  *See Reed*, 576 U.S. at 170 ("a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny").

**Second**, and for many of the same reasons that it is facially content-based, the Executive Order is content-based in motive, purpose, and design.  *Id.* at 164.  The Order openly acknowledges as much, explaining that it targets online platforms precisely because the President disagrees with their expression—including with respect to his own content.  *See* Order § 1 ("Twitter now selectively decides to place a warning label on certain tweets in a manner that clearly reflects political bias.").

Although the text of the Order alone shows its unconstitutional motive, President Trump has left no doubt in his public remarks that the purpose of the Order was to punish Twitter and other online platforms for their disfavored speech.  The day before issuing the Order, President Trump launched a series of tweets threatening to "strongly regulate" and "close [ ] down" online platforms because they "totally silence conservatives [sic] voices."  Compl. ¶ 69.  In announcing the Order, President Trump lambasted platforms because they were "taking over the airwaves," "hav[ing] points of view" he disfavored, and acting as "editor[s] with a viewpoint," which he viewed as "very unfair."  Compl. ¶ 72.  He claimed that under the Order, "social media companies that engage in censoring ***or any political conduct*** will not be able to keep their [Section 230] liability shield.

Cooley LLP
Attorneys at Law
San Francisco

15

Notice of Motion and Motion for
Preliminary Injunction
Case No. 3:20-cv-06021-WHO

1     That's a big deal.  They have a shield; they can do what they want.  They have a shield.  They're

2     not going to have that shield."[9]

3                          **b.**       **The order fails strict scrutiny.**

4     "It is rare that a regulation restricting speech because of its content will ever be permissible."

5     *Playboy*, 529 U.S. at 818.  A content-based regulation is presumptively unconstitutional, and the

6     government bears the burden to rebut that presumption.  *Id.* at 817.  The restriction must satisfy

7     strict scrutiny, that is, "further[] a compelling interest and [be] narrowly tailored to achieve that

8     interest."  *Reed*, 576 U.S. at 171.  To demonstrate that a restriction furthers a compelling interest,

9     the government must show that it is directed at "an actual problem in need of solving" where the

10     solution requires a restriction on speech, and must provide evidence demonstrating a "causal link"

11     between the problem and the solution.  *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)

12     (internal quotation marks and citation omitted).  Narrow tailoring requires the law to be neither

13     overinclusive nor underinclusive and that no "less restrictive alternative would serve [its] purpose."

14     *Playboy*, 529 U.S. at 813.  Here, the government cannot show any of these things.

15
16                  **(i)**       **The government does not have a compelling interest in preventing speech with which it disagrees.**

17     The stated interest that the Executive Order serves—both on its face and as confirmed by

18     the President's accompanying statements—is to restrict and punish disfavored speakers and their

19     speech:  namely, online platforms' editorializing.  *See supra* Section III.A.2.a.  This claimed interest

20     is constitutionally illegitimate and could never be compelling.  *See Hurley v. Irish-Am. Gay,*

21     *Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 579 (1995) ("[T]he law . . . is not free to interfere

22     with speech for no better reason than promoting an approved message or discouraging a disfavored

23     one, however enlightened either purpose may strike the government.").

24     The Executive Order also attempts to frame its interest as protecting speakers allegedly

25     censored by online platforms, accusing online platforms of "engaging in selective censorship that

26     is harming our national discourse" and then stating a policy of "promoting free and open debate on

27     the internet," Order, § 1 and § 2(a).  But restricting private speakers' purported "censorship" is, by

28

---

[9] Hartnett Decl. Ex. 7 (emphasis added).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

1   definition, restricting speech based on a disagreement with it.  In short, the Order's attack on online

2   platforms' alleged "censorship" is *itself* government censorship. This flies in the face of the First

3   Amendment:  "the censorial power is in the people over the Government, and not in the Government

4   over the people."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 282 (1964) (citation omitted).

5                    **(ii)    The order does not directly advance any compelling
                              interest and is not narrowly tailored.**

6

7       Although the lack of a compelling interest is dispositive, the Order further fails strict

8   scrutiny because it does not directly advance any compelling interest or do so through narrowly

9   tailored means. *Carey v. Brown*, 447 U.S. 455, 464–65 (1980) ("[E]ven the most legitimate goal

10  may not be advanced in a constitutionally impermissible manner."); *Kuba v. 1-A Agric. Ass'n*, 387

11  F.3d 850, 859 (9th Cir. 2004) ("[M]erely invoking interests . . .  is insufficient. The government

12  must also show that the proposed communicative activity endangers those interests.").

13      Far from advancing any claimed interest in protecting online expression (*see* Order § 2(a)

14  (claiming a policy of "promoting free and open debate on the internet")), the Executive Order

15  instead attacks such expression, railing against the editorial decisions of online platforms and

16  setting forth various punitive measures and threats to deter those platforms' expression.  *See supra*

17  Section II.E.  It thus fails strict scrutiny.

18      The Order also fails to advance "free and open debate on the internet" because it directly

19  inserts the government and its threats between willing speakers (the platforms that curate speech

20  and mark misinformation) and recipients (those who use and rely upon the platforms' expression).

21  The Supreme Court has consistently upheld the right of publishers—not the government—to make

22  these types of editorial decisions.  *See Miami Herald Publ'g Co. v Tornillo*, 418 U.S. 241, 258

23  (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on

24  the size and content of the paper, and treatment of public issues and public officials—whether fair

25  or unfair—constitute the exercise of editorial control and judgment"); *Manhattan Cmty. Access

26  Corp. v. Halleck*, 139 S. Ct. 1921, 1931 (2019) ("The Constitution does not disable private property

27  owners and private lessees from exercising editorial discretion over speech and speakers on their

28  property.").  Courts have consistently applied this principle of editorial freedom to social media

Cooley LLP
Attorneys at Law
San Francisco

17

Notice of Motion and Motion for
Preliminary Injunction
Case No. 3:20-cv-06021-WHO

1  platforms, including recent decisions of the Ninth and D.C. Circuits. *See Prager Univ. v. Google*

2  *LLC*, 951 F.3d 991, 996–97 (9th Cir. 2020) ("These are not antiquated principles that have lost their

3  vitality in the digital age."); *FreedomWatch, Inc. v. Google Inc.*, No. 19-7030, 2020 WL 3096365,

4  at *1 (D.C. Cir. May 27, 2020) (affirming rejection of claim against YouTube for allegedly

5  suppressing conservative political views).

### 3.   The order unlawfully retaliates against online platforms for engaging in constitutionally protected speech.

8  The First Amendment precludes the government from "subjecting an individual to

9  retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722

10  (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)) (internal quotation marks omitted).

11  "To state a First Amendment retaliation claim, a plaintiff must plausibly allege 'that (1) [they were]

12  engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of

13  ordinary firmness from continuing to engage in the protected activity and (3) the protected activity

14  was a substantial or motivating factor in the defendant's conduct.'" *Capp v. Cty. of San Diego*, 940

15  F.3d 1046, 1053 (9th Cir. 2019) (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)).  To

16  "prevail on such a claim, a plaintiff must establish a 'causal connection' between the government

17  defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Id.*

18  The Executive Order—which targets the expression of online platforms to the detriment of

19  both those platforms and their willing listeners—plainly satisfies each of these elements.

20  ***First***, online platforms engage in constitutionally protected speech when they editorialize,

21  including the curation of the President's false statements. For instance, Twitter engaged in

22  constitutionally protected speech on May 26, 2020, by adding a corrective tag to the President's

23  tweet about mail-in voting, thereby expressing its viewpoint that the tweet was false and adding to

24  the discourse on its platform.  Compl. ¶ 66.  Twitter enjoys a First Amendment right to fact-check

25  the President, just as every person, journalist, and news organization does.

26  ***Second***, President Trump's retaliatory acts would deter a person of ordinary firmness from

27  engaging in First Amendment speech and activity, in order to avoid being a target of additional,

28  specific retaliatory actions by Defendants.  The Executive Order singles out several disfavored

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

platforms for public rebuke and seeks to use all available levers in the Executive Branch to squelch online platforms' disfavored expression. It threatens to: strip online platforms' highly valued Section 230 immunity, both in immediate interpretation of the law and in future rulemakings and legislation; eliminate substantial government advertising revenue that the platforms would otherwise collect; and institute law enforcement proceedings against the platforms. *See supra* Section II.E (listing punitive elements of the Order). Plainly the probable and reasonable response to such threats—by both the named and unnamed platforms—is to cut back or eliminate the disfavored speech, lest liability and pulled advertising dollars follow. *See supra* Section II.G (noting that post-Order tweets have gone unchecked).

*Third*, President Trump and the Order make explicit that the "substantial or motivating factor" for the Order is the platforms' protected speech. On May 26, 2020, Twitter—for the first time—fact-checked false tweets posted by President Trump. Compl. ¶ 66. Immediately after Twitter posted its fact-check, the President threatened to "strongly regulate, or close . . . down" social media platforms that engaged in, or facilitated, disfavored speech. *Id.* ¶ 69. He then issued the Order two days later, making clear both on the face of the Order and in statements made in conjunction with the release of the Order that he was taking the action precisely because he disagreed with the "editorial conduct"—i.e., speech—of Twitter and other specifically named platforms. *See supra* Section II.E. Thus, not only was platforms' protected speech a "substantial or motivating factor" for the Order—it was the **sole, admitted** basis for the Order.

*Fourth*, there is a direct causal connection between the President's retaliation and Plaintiffs' injuries. In addition to inflicting obvious harm on the targeted platforms, the Order (as discussed further below) deprives Plaintiffs of their First Amendment right to receive the expression targeted by the Order—moderated content from online platforms that are central to their work. *See infra* Section III.A.5. The Order also injures Plaintiffs by frustrating their missions (including providing voters with accurate information about elections and fighting misinformation online), and it causes them to divert resources from other mission-critical work to combat the Order's ill effects.

Cooley LLP
Attorneys at Law
San Francisco

19

Notice of Motion and Motion for
Preliminary Injunction
Case No. 3:20-cv-06021-WHO

4. **The order unlawfully and coercively threatens online platforms with retaliation if they exercise their first amendment rights.**

Just as the Order is unlawful retaliation for disfavored expression, *see supra* Section III.A.3, it is also an unconstitutional, coercive threat to all online platforms going forward. It expressly uses the specter of a variety of adverse government actions—unfavorable regulation, pulled spending, law enforcement proceedings, and other liability—to chill platforms from speaking in a manner that the President disfavors. "[A] public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (quoting *Am. Fam. Ass'n, Inc. v. City & Cty. of S.F.*, 277 F.3d 1114, 1125 (9th Cir. 2002) ("*AFA*")); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66–72 (1963) (determining that operation of Commission to Encourage Morality was "a scheme of state censorship"); *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) ("A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights . . . .").

*First*, the President's Order and accompanying statements are clear and explicit threats "imposition of government power or sanction" on online platforms based on a disagreement with their expression. *AFA*, 277 F.3d at 1125. Indeed, they are not merely "implicit" threats—all that is required for the First Amendment claim—but instead are express and memorialized in the Order itself. *See* Compl. Ex. A; *supra* Section II.E (summarizing the Order).

*Second*, the President, and those executive branch officials to whom the Order is directed as a command, have "regulatory or other direct decision-making authority" over the targeted entities, as well as the "power" to direct or encourage others to take such action. *Okwedy*, 333 F.3d at 343–44. Among other things, all Defendants (as well as all federal agencies), under the supervision of Defendant Vought, can cut spending to disfavored platforms as the Order contemplates. Order § 3. *See, e.g.*, *North Miss. Commc'ns, Inc. v. Jones*, 792 F.2d 1330 (5th Cir. 1986) (discussing retaliation against a publisher in the context of withheld government advertising). Defendant Barr can take litigation positions adverse to online platforms (including concerning their

Cooley LLP
Attorneys at Law
San Francisco

20

Notice of Motion and Motion for
Preliminary Injunction
Case No. 3:20-cv-06021-WHO

Section 230 immunity), institute federal law enforcement investigations and encourage states to do so, as well as make adverse legislative proposals. *Id.* §§ 5–6.

**Third,** and as explained above, the Order's executive branch-wide hammer of adverse regulation and litigation, withheld spending, and law enforcement investigation is intended to and reasonably can be expected to chill online platforms. *See supra* Section II.A.3. This is true not only for the expressly named large platforms singled out for public rebuke, but also for the thousands of smaller Internet intermediaries also covered by the Order. These smaller platforms routinely exercise the same First Amendment rights as large platforms, but do not have the same resources to fight back even if they wanted to or to withstand the consequences of adverse governmental action, leaving them with an even stronger incentive to curb their expression and stay under the President's punitive radar.

### 5. The order deprives plaintiffs of their First Amendment right to receive protected expression.

The Order not only violates the First Amendment rights of online platforms in multiple respects, but it correspondingly violates Plaintiffs' right to ***receive*** that speech, depriving them of important expression of public interest and frustrating their advocacy efforts with respect to voter participation and combatting misinformation online.

"[W]here a speaker exists," the First Amendment "necessarily protects the right to receive" the speech. *Va. State Bd. of Pharmacy*, 425 U.S. at 756–57 (internal quotation marks and citation omitted) (describing the "reciprocal" nature of the right); *see also Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). "Indeed, the right to hear and the right to speak are flip sides of the same coin." *Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002) (Kozinski, J., concurring). The First Amendment prohibits the government from arbitrarily or vindictively limiting the information available to the public. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978).

It is well established that restrictions on intermediaries, both online and off, have serious effects on the First Amendment rights of their users, both to speak on those platforms and to receive information from others. Well before the Internet, the Supreme Court repeatedly recognized that

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

1    laws threatening to impose liability on those who provide a forum for the speech of others pose

2    special threats to the rights of speakers and readers who depend on those services.  *See, e.g.*, *Smith*

3    *v. People*, 361 U.S. 147, 153–54 (1959) (explaining that law imposing bookseller liability for

4    obscene content "would tend to restrict the public's access to forms of the printed word which the

5    State could not constitutionally suppress directly"); *Bantam Books, Inc.*, 372 U.S. at 71–72

6    (rejecting bookseller liability law); *N.Y. Times Co.*, 376 U.S. at 266 (imposing liability on a

7    newspaper for third-party ads "might shut off an important outlet for the promulgation of

8    information and ideas by persons who do not themselves have access to publishing facilities");

9    *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 760 (1996) (rejecting laws

10   requiring cable operators to segregate and block content).  The concerns expressed in *Smith*,

11   *Bantam Books*, and *Denver Area* are only amplified in the context of the Internet due to the volume

12   of speech passing through online intermediaries.

13        Plaintiffs are public advocacy and activist organizations that aim to provide accurate

14   information to the public about elections; educate voters about political issues, electoral candidates,

15   and voting procedures; and limit the spread of misinformation in digital media.  (DeWitt Decl. ¶ 3;

16   Friedman Decl. ¶¶ 2, 3; Littlewood Decl. ¶¶ 2, 3; Newman Decl. ¶¶ 3, 4, 6; Wood Decl. ¶¶ 3–5.)

17   Plaintiffs rely on online platforms—including the specific platforms singled out by the Order—to

18   disseminate and receive information critical to their missions.  (DeWitt Decl. ¶ 9; Friedman Decl.

19   ¶¶ 7, 8; Littlewood Decl. ¶¶ 7, 10; Newman Decl. ¶¶ 5, 8; Wood Decl. ¶ 5.)  Plaintiffs further

20   effectively partner with and depend on online platforms' moderation of false, misleading, or hateful

21   content, including through platforms' flagging, contextualizing, or even removing information

22   when warranted (such as the President's false tweets about mail-in voting).  (DeWitt Decl. ¶¶ 10,

23   11; Friedman Decl. ¶ 10; Littlewood Decl. ¶ 5; Newman Decl. ¶¶ 8, 9; Wood Decl. ¶ 5.)  Those

24   editorial choices are precisely what the Order attacks and seeks to influence.  *See, e.g.*, Order § 1

25   ("we cannot allow a limited number of online platforms to hand pick the speech that Americans

26   may access and convey on the internet").  Because the Order intentionally and predictably chills

27   the curation efforts of online platforms, it thereby deprives Plaintiffs the right to receive that

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

speech—including speech correcting, contextualizing or removing false statements about voting and other topics of public concern.

**B.    Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction.**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "The harm is particularly irreparable" concerning "political speech" because "timing is of the essence in politics" and "[a] delay of even a day or two may be intolerable[.]" *Klein*, 584 F.3d at 1208 (internal quotation marks and citations omitted).

Plaintiffs are non-profit organizations that use online platforms to obtain information and to disseminate accurate and truthful information to voters they seek to educate and empower. (DeWitt Decl. ¶¶ 2, 8, 9; Friedman Decl. ¶¶ 2, 7; Newman Decl. ¶¶ 2, 8, 9; Wood Decl. ¶¶ 3, 5.) They rely on online platforms' recognized rights to moderate and fact-check misinformation about voting and elections, and they are irreparably harmed by the Order's deterrent effect on online platforms' editorial interventions. (DeWitt Decl. ¶ 15; Friedman Decl. ¶¶ 9–13; Littlewood Decl. ¶¶ 10–11; Newman Decl. ¶¶ 10–11; Wood Decl. ¶¶ 8–10.) In the midst of a global pandemic, where voting rules have in some cases changed, and where and many voters (some new to voting altogether) will be voting by mail for the first time, Plaintiffs have a deep interest and commitment to providing reliable information to the public about voting and to encouraging online platforms to moderate content to that end. (DeWitt Decl. ¶ 13; Friedman Decl. ¶ 9; Littlewood Decl. ¶¶ 7, 9.) Because of the Order, Plaintiffs have been deprived of the editorial interventions they seek from online platforms and are now forced to devote resources to fact-checking that misinformation themselves. (DeWitt Decl. ¶ 15; Friedman Decl. ¶ 11; Littlewood Decl. ¶ 11; Newman Decl. ¶ 11.) Yet the parties that can effectively counter misinformation or hateful content (particularly when originating from President Trump or other elected officials) are the platforms themselves, and Plaintiffs are eager to have the platforms continue to do so. The Order deprives Plaintiffs and voters of their right to receive political speech from platforms that correct or contextualize false statements

Cooley LLP
Attorneys at Law
San Francisco

23

Notice of Motion and Motion for
Preliminary Injunction
Case No. 3:20-cv-06021-WHO

made by President Trump and other government officials.   (Littlewood Decl. ¶ 13.)   This infringement of First Amendment rights is an irreparable harm.  *See Klein*, 584 F.3d at 1208.

Notably, since the Order was issued, President Trump has only increased his attacks on mail-in voting and dissemination of false information online, continuing to post false content about mail-in voting on online platforms, which has gone unchecked or not fully checked.  *See, e.g.*, Compl. ¶¶ 108–111, 113, 116.  He and other Defendants also have made clear they will robustly enforce the Order.  *See supra* Section II.F.  These circumstances have confirmed that the irreparable harm threatened by the Order has come to fruition.

**C.    The equities tip sharply in plaintiffs' favor and granting the injunction is in the public interest.**

When the government is a party, consideration of the balance of the equities and the public interest merge. *See, e.g.*, *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1093 (9th Cir. 2020).  And when government action infringes on free speech, "the balance of equities . . . tip sharply in favor of enjoining" the conduct due to the "significant public interest in upholding free speech principles." *Klein*, 584 F.3d at 1208 (internal quotation marks and citation omitted).  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted), and "enforcement of an unconstitutional law is always contrary to the public interest."  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

Here, not only do the equities tip sharply in Plaintiffs' favor due to the violation of their own First Amendment rights, but an injunction will advance the First Amendment and voting rights of the public served by Plaintiffs' organizations. Plaintiffs' missions are all directed at matters of vital public interest:  educating and registering voters so that they can successfully exercise their fundamental right to vote, and combatting misinformation online, including about elections and voting.  (DeWitt Decl. ¶¶ 3, 15; Friedman Decl. ¶¶ 2, 12; Littlewood Decl. ¶¶ 3, 8; Newman Decl. ¶¶ 4, 6.)  These interests are currently at an apex, as our country heads toward a hotly contested national election in the midst of a pandemic, where the need for accurate information on online platforms about election administration and voters' rights is more important than ever.  (DeWitt

Cooley LLP
Attorneys at Law
San Francisco

24

Notice of Motion and Motion for
Preliminary Injunction
Case No. 3:20-cv-06021-WHO

Decl. ¶ 16; Littlewood Decl. ¶ 9.)  An injunction of the Order will strongly advance the public interest in having an informed electorate able to exercise the franchise in November.

On the other side of the coin, and as established above, Defendants have no legitimate interest—never mind a compelling one—in punishing and restricting the speech of disfavored speakers, as the Order does.  *See supra* Section III.A.2.b.i.  Moreover, the President's claimed interest in "promoting free and open debate on the internet," Order § 2(A), is sharply hindered—not advanced—by the Order itself, which seeks to punish and chill online platforms from vital fact-checking and other editorial activity in the run up to the election.  Simply put, there is no valid interest on the other side of the ledger (beyond naked political favoritism), given the Order's blatant violation of the First Amendment and abuse of official power.  To the contrary, the public interest suffers every day that the Order and its ongoing enforcement chill online platforms from exercising their First Amendment rights to combat misinformation online.

**IV.  CONCLUSION**

The Order violates the First Amendment in multiple respects, irreparably harms Plaintiffs, and is directly contrary to the public interest in advance of a national election of utmost importance. Defendants should be enjoined from enforcing the Order.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO

1

Dated:  September 4, 2020

COOLEY LLP

2

3

By:  /s/ Michael G. Rhodes

4

Michael G. Rhodes
Travis LeBlanc

5

Kathleen R. Hartnett
Bethany C. Lobo

6

Electronic Frontier Foundation

7

David Greene
Corynne McSherry

8

Aaron Mackey

9

The Protect Democracy Project, Inc.
Kristy Parker

10

Ngozi J. Nezianya
Ben Berwick

11

Attorneys for Plaintiffs

12

ROCK THE VOTE, VOTO LATINO,
COMMON CAUSE, FREE PRESS, and

13

MAPLIGHT

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-06021-WHO