1   COOLEY LLP
    MICHAEL G. RHODES (116127)
2   (rhodesmg@cooley.com)
    TRAVIS LEBLANC (251097)
3   (tleblanc@cooley.com)
    KATHLEEN R. HARTNETT (314267)
4   (khartnett@cooley.com)
    BETHANY C. LOBO (248109)
5   (blobo@cooley.com)
    101 California Street, 5th Floor
6   San Francisco, California 94111-5800
    Telephone:    (415) 693 2000
7   Facsimile:    (415) 693 2222

8   Attorneys for Plaintiffs
    ROCK THE VOTE; VOTO LATINO;
9   COMMON CAUSE; FREE PRESS; and
    MAPLIGHT
10
    *Additional counsel listed on next page*
11
                    UNITED STATES DISTRICT COURT
12
                    NORTHERN DISTRICT OF CALIFORNIA
13

14
    ROCK THE VOTE; VOTO LATINO;            Case No. 3:20-cv-06021-WHO
15  COMMON CAUSE; FREE PRESS; and
    MAPLIGHT,                              **PLAINTIFFS' REPLY IN SUPPORT OF
16                                         MOTION FOR PRELIMINARY INJUNCTION
                       Plaintiffs,         AND OPPOSITION TO DEFENDANTS'
17                                         MOTION TO DISMISS**
            v.
18
    DONALD J. TRUMP, in his official
19  capacity as President of the United States;
    WILLIAM P. BARR, in his official
20  capacity as Attorney General of the United
    States; WILBUR L. ROSS, JR. in his
21  official capacity as United States Secretary
    of Commerce; DOUGLAS W. KINKOPH,
22  in his official capacity as Associate
    Administrator of the Office of
23  Telecommunications and Information
    Applications; and RUSSELL T. VOUGHT,
24  in his official capacity as Director of the
    Office of Management and Budget,
25
                       Defendants.
26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DAVID GREENE (160107)
(davidg@eff.org)
CORYNNE MCSHERRY (221504)
(corynne@eff.org)
AARON MACKEY (286647)
(amackey@eff.org)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA   94109-7701
Telephone:      (415) 436-9333

KRISTY PARKER (*pro hac vice* pending)
(kristy.parker@protectdemocracy.org)
THE PROTECT DEMOCRACY PROJECT, INC.
2020 Pennsylvania Avenue, NW, #163
Washington, DC 20006
Telephone:      (202) 849-9307
Facsimile:      (929) 777-8428

NGOZI J. NEZIANYA (admitted *pro hac vice*)
(ngozi.nezianya@protectdemocracy.org)
THE PROTECT DEMOCRACY PROJECT, INC.
115 Broadway, Fl 5
New York, NY 10006
Telephone:      (202) 934-3636
Facsimile:      (929) 777-8428

BEN BERWICK (*pro hac vice* pending)
(ben.berwick@protectdemocracy.org)
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
Telephone:      (202) 579-4582
Facsimile:      (929) 777-8428

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION. ................................................................................................. 1

II.     PLAINTIFFS HAVE STANDING AND THEIR CLAIMS ARE RIPE. ........................... 2

    A.      Plaintiffs have standing. ................................................................................. 2

        1.      First Amendment claims tilt dramatically toward a finding of standing. ................................................................................................. 3

        2.      The Executive Order frustrates Plaintiffs' missions and has caused them to divert resources. ..................................................................... 3

        3.      The Executive Order infringes Plaintiffs' right to receive protected speech. ............................................................................................. 6

        4.      Plaintiffs' injuries are fairly traceable to the Executive Order and are likely to be redressed by a favorable ruling. ................................. 9

    B.      Plaintiffs' claims are ripe. ............................................................................. 9

III.    THE COURT SHOULD GRANT PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION. ................................................................................ 11

    A.      Plaintiffs are likely to succeed on the merits of their First Amendment claims. .......................................................................................................... 11

        1.      Plaintiffs will likely succeed on their coercive threat claim (Count III). .......................................................................................... 12

        2.      Plaintiffs will likely succeed on their retaliation claim (Count II). .......... 16

        3.      Plaintiffs will likely succeed on their content-based-restriction claim (Count I). ........................................................................... 17

        4.      Plaintiffs will likely succeed on their right-to-receive claim (Count IV). ......................................................................................... 18

    B.      Plaintiffs will suffer irreparable harm absent preliminary injunctive relief. ......... 19

    C.      Plaintiffs have established that the balance of equities tips in their favor and that an injunction would serve the public interest. ........................................ 22

    D.      Injunctive relief is available against the President. ................................................. 22

    E.      Nationwide relief is appropriate. ............................................................................ 23

IV.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS. ................. 24

    A.      Plaintiffs have adequately pleaded standing and ripeness. ................................... 24

    B.      Plaintiffs sufficiently state their First Amendment claims. .................................... 25

V.      CONCLUSION .................................................................................................. 26

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-i-

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Beverage Ass'n v. City & Cty. of S.F.*,
   916 F.3d 749 (9th Cir. 2019)...................................................................................... 22

*Arc of Cal. v. Douglas*,
   757 F.3d 975 (9th Cir. 2014)...................................................................................... 21

*Ariz. Right to Life Pol. Action Comm. v. Bayless*,
   320 F.3d 1002 (9th Cir. 2003)...................................................................................... 3

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015)...................................................................................................... 26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................................... 25

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015)............................................................................... *passim*

*State ex rel. Becerra v. Sessions*,
   284 F. Supp. 3d 1015 (N.D. Cal. 2018), *reconsideration denied sub nom.*
   *California ex rel. Becerra v. Sessions*, No. 17-CV-04701-WHO, 2018 WL
   3399214 (N.D. Cal. Apr. 24, 2018)............................................................................ 10

*Blair v. Bethel School District*,
   608 F.3d 540 (9th Cir. 2010)...................................................................................... 17

*Bresgal v. Brock*,
   843 F.2d 1163 (9th Cir. 1987)...................................................................................... 23

*Brodheim v. Cry*,
   584 F.3d 1262 (9th Cir. 2009)...................................................................................... 12

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)...................................................................................................... 23

*California v. Bernhardt*,
   No. 19-CV-06013-JST, 2020 WL 3097091 (N.D. Cal. May 18, 2020) .................. 10

*Capp v. Cty. of San Diego*,
   940 F.3d 1046 (9th Cir. 2019)...................................................................................... 16

*CarePartners, LLC v. Lashway*,
   545 F.3d 867 (9th Cir. 2008)...................................................................................... 15

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-ii-

**PLS.' REPLY ISO MOT. FOR PRELIMINARY**
**INJUNC. AND OPP. TO DEFS.' MTD**
**CASE NO. 3:20-CV-06021-WHO**

**TABLE OF AUTHORITIES**
(continued)

Page

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988).................................................................................... 20

*Ctr. for Democracy & Tech. v. Trump,*
    No. 1:20-cv-01456-TNM (D.D.C. filed Aug. 3, 2020)............................................... 21

*City & Cty. of S.F. v. Trump,*
    897 F.3d 1225 (9th Cir. 2018)..................................................................... 14, 18, 22

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013).................................................................................................. 2, 8

*Clinton v. Jones,*
    520 U.S. 681 (1997).................................................................................................... 22

*Doe #1 v. Trump,*
    957 F.3d 1050 (9th Cir. 2020)................................................................................... 23

*Doe v. I.N.S.,*
    120 F.3d 200 (9th Cir. 1997)..................................................................................... 26

*E. Bay Sanctuary Covenant v. Barr,*
    391 F. Supp. 3d 974 (N.D. Cal. 2019), *aff'd*, 964 F.3d 832 (9th Cir. 2020)........................ 23

*El Dia, Inc. v. Governor Rossello,*
    165 F.3d 106 (1st Cir. 1999)..................................................................................... 13

*Elrod v. Burns,*
    427 U.S. 347 (1976)............................................................................................ 19, 20

*Fair Hous. of Marin v. Combs,*
    285 F.3d 899 (9th Cir. 2002)....................................................................................... 3

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11 (1998)....................................................................................................... 6

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992)................................................................................................... 23

*Garcia v. Google, Inc.,*
    786 F.3d 733 (9th Cir. 2015) (*en banc*) ................................................................... 21

*I.N.S v. Pangilinan,*
    486 U.S. 875 (1988)................................................................................................... 26

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-iii-

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

**TABLE OF AUTHORITIES**
(continued)

Page

*Jewel v. Nat'l Sec. Agency*,
    673 F.3d 902 (9th Cir. 2011)......................................................................................... 8

*Johnson v. Stuart*,
    702 F.2d 193 (9th Cir. 1983)......................................................................................... 6

*Klamath Water Users Ass'n v. FERC*,
    534 F.3d 735 (D.C. Cir. 2008) ...................................................................................... 9

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009)............................................................................... 11, 19

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
    302 F. Supp. 3d 541 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019) ..................... 22, 23

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ...................................................................................................... 2

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980)...................................................................................... 20

*La Clinica De La Raza v. Trump*,
    No. 19-cv-04980-PJH, 2020 WL 4569462 (N.D. Cal. Aug. 7, 2020) ................................... 24

*Laird v. Tatum*,
    408 U.S. 1 (1972) .......................................................................................................... 8

*Lopez v. Candaele*,
    630 F.3d 775 (9th Cir. 2010)......................................................................................... 3

*Lucas v. Dep't of Corrs.*,
    66 F.3d 245 (9th Cir. 1995).......................................................................................... 25

*Mendocino Envt'l Ctr. v. Mendocino Cty.*,
    192 F.3d 1283 (9th Cir. 1999)...................................................................................... 17

*Mulligan v. Nichols*,
    835 F.3d 983 (9th Cir. 2016)........................................................................................ 17

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ..................................................................................................... 22

*North Miss. Commc'ns, Inc. v. Jones*,
    792 F.2d 1330 (5th Cir. 1986)...................................................................................... 13

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-iv-

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Novak v. United States*,
795 F.3d 1012 (9th Cir. 2015)...................................................................... 8

*O'Keefe v. Van Boening*,
82 F.3d 322 (9th Cir. 1996)........................................................................ 8

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003)...................................................................... 12

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
961 F.3d 1062 (9th Cir. 2020)................................................................... 6

*Pen Am. Ctr., Inc. v. Trump*,
448 F. Supp. 3d 309 (S.D.N.Y. 2020).......................................................... 7

*Perry v. Sindermann*,
408 U.S. 593 (1972)............................................................................... 14

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989)................................................................................ 6

*Ramirez v. Ghilotti Bros. Inc.*,
941 F. Supp. 2d 1197 (N.D. Cal. 2013) ............................................... 12, 18

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015).......................................................................... 17, 18

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995).............................................................................. 13

*Rubin v. City of Santa Monica*,
308 F.3d 1008 (9th Cir. 2002)............................................................... 7, 8

*S.F. Cty. Democratic Cent. Comm. v. Eu*,
826 F.2d 814 (9th Cir. 1987), *aff'd*, 489 U.S. 214 (1989) ............................ 6

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004)................................................................. 24

*Saget v. Trump*,
375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...................................................... 22

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
467 U.S. 947 (1984)............................................................................... 3

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

–v–

**PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO**

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

4

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,

5

968 F.3d 738, (9th Cir. 2020) ............................................................................. 10

6

*Soranno's Gasco., Inc. v. Morgan*,
874 F.2d 1310 (9th Cir. 1989) ............................................................................. 15

7

*Sorrell v. IMS Health Inc.*,

8

564 U.S. 552 (2011) ............................................................................................. 18

9

*Thalheimer v. City of San Diego*,
645 F.3d 1109 (9th Cir. 2011), *overruled on other grounds by Bd. of Trustees*

10

*of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) ..... 11

11

*United States v. Burr*,

12

25 F. Cas. 187 (Va. Cir. Ct. 1807) ...................................................................... 22

13

*United States v. Nixon*,
418 U.S. 683 (1974) ............................................................................................. 22

14

*Utah v. Evans*,

15

536 U.S. 452 (2002) ............................................................................................... 9

16

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,

17

425 U.S. 748 (1976) ............................................................................................... 6

18

*Wolfe v. Strankman*,
392 F.3d 358 (9th Cir. 2004) ............................................................................... 24

19

*Woodhull Freedom Found. v. United States*,

20

948 F.3d 363 (D.C. Cir. 2020) .............................................................................. 9

21

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ............................................................................................. 22

22

**Statutes**

23

28 U.S.C. § 1651 ............................................................................................................. 25

24

All Writs Act ........................................................................................................... 25, 26

25

FTC Act § 5 ..................................................................................................................... 14

26

**Other Authorities**

27

First Amendment ...................................................................................................... *passim*

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-vi-

**PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO**

**TABLE OF AUTHORITIES**
(continued)

**Page**

Federal Rule of Civil Procedure
   8(a)(2)................................................................................................................... 25
   12(b)(6) ................................................................................................................ 25

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   **I.    INTRODUCTION.**

2         Executive Order 13,925 threatens online platforms with federal law enforcement actions,

3   the withholding of significant government spending, and the gutting of platforms' Section 230

4   immunity—all because President Donald J. Trump does not approve of those platforms' First

5   Amendment–protected expression, or, in the words of the Executive Order, their "editorial

6   conduct."  The Executive Order is a textbook First Amendment violation that the government

7   undertook immediately after one online platform sought to counteract the President's false and

8   misleading speech about mail-in balloting in advance of one of the most consequential elections in

9   U.S. history.  The President's pervasive false statements, via his Twitter account, about mail-in

10  balloting have only gone into hyperdrive since.

11        Plaintiffs are five non-profit organizations whose missions include enhancing voter

12  participation and combating misinformation online, and who rely on the online platforms targeted

13  by the Executive Order to receive accurate information about voting and to correct or contextualize

14  false voting information from their users.  As Plaintiffs' declarations reflect, they are irreparably

15  harmed by the Executive Order, which has the clear purpose and effect of deterring online platforms

16  from flagging and correcting the President's and others' pervasive falsehoods about voting—

17  leaving Plaintiffs deprived of the platforms' expression and forcing them to divert their own

18  resources to fight back against such misinformation.

19        Yet, according to the government, the President's Executive Order means nothing.  (ECF

20  No. 31 at 1.)  The government's reading ignores both the entire context of the Executive Order as

21  well as the Order's plain terms condemning and punishing online platforms for their speech.  The

22  Order does more than direct agencies to "propose, study, and report," as the Government puts it.

23  (*Id.*)  It is being actively implemented, including through an FCC rulemaking already initiated by

24  the Department of Commerce that aims to strip platforms' Section 230 immunity.

25        Moreover, the Executive Order violates the First Amendment because it operates as a

26  ***coercive threat*** against all platforms (and, on the other side of the coin, the recipients of information

27  from those platforms) that dare to have editorial viewpoints that differ from the President's.  The

28  government entirely fails to respond to this core theory of Plaintiffs' case.

The President's words—when, as here, expressed through an Executive Order that is legally binding on his subordinates and that retaliates and threatens further action against private actors based on the content of their expression—matter.  They harm the willing speakers (online platforms) and they harm the willing recipients (Plaintiffs).  They create a ripe conflict and they violate the First Amendment.

The Executive Order should be enjoined and this case should be allowed to proceed.

## II.   PLAINTIFFS HAVE STANDING AND THEIR CLAIMS ARE RIPE.

Conflating the preliminary injunction and motion to dismiss inquiries, the government's combined opposition to Plaintiffs' preliminary injunction motion and motion to dismiss (ECF No. 31) primarily argues that Plaintiffs lack standing to sue and that their claims are unripe, thus requiring denial of their motion for preliminary injunction and granting of the government's motion to dismiss.  (ECF No. 31 at 7–15.)  Here, Plaintiffs explain why the government's standing and ripeness arguments fail.  In Sections III and IV, *infra*, Plaintiffs will relate these arguments to the controlling standards applicable to the two specific motions before the Court.

### A.   Plaintiffs have standing.

Plaintiffs have standing because (1) they have suffered a concrete and particularized injury that is (2) fairly traceable to the Executive Order and (3) likely to be redressed by a favorable ruling. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

The Order has injured Plaintiffs in two distinct ways: it has frustrated their missions and caused them to divert their resources to address the Order's impact; and it has infringed their right to receive protected speech from the platforms in the form of curation, fact-checking, and editorializing.  Each injury is concrete and particularized, traceable to the Executive Order, and redressable by this Court.[1]

---

[1] The government asserts that Plaintiffs lack standing to assert the constitutional rights of third-parties.  ECF No. 31 at 12; *see also Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (holding that organizations may assert standing on behalf of third parties in some circumstances).  The Court need not reach whether Plaintiffs have third-party standing under *Kowalski* because they have direct organizational standing based on frustration of their missions, diversion of their resources, and infringement of their right to receive protected speech.

Cooley LLP
Attorneys at Law
San Francisco

2

Pls.' Reply ISO Mot. for Preliminary
Injunc. and Opp. to Defs.' MTD
Case No. 3:20-cv-06021-WHO

1.     **First Amendment claims tilt dramatically toward a finding of standing.**

Importantly, "First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing." *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (internal quotation marks and citations omitted); *see Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 957 n.7 (1984). "[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (citation omitted).

The government simply ignores the impact of the Executive Order on the First Amendment rights of internet users, asserting that it "does not have any direct effect on online platforms" (ECF No. 31 at 11) and "does not impose any restriction, requirement, or penalty on any of the plaintiff organizations or on any online platform" (*id.* at 9).  In reality, the Order's clear purpose and effect is to threaten and punish online platforms—several of which it calls out by name—in retaliation for lawfully exercising their First Amendment right to fact-check the President's election-related falsehoods, and to deny Plaintiffs the information the intermediaries want to provide to them. Among other things, the Executive Order announces that it "is the policy of the United States" to curtail the scope of Section 230 in response to the platforms' lawful exercise of their speech rights. (Compl., ECF No. 1 ¶ 12; Compl. Ex. A ("Executive Order") § 2(a).)

2.     **The Executive Order frustrates Plaintiffs' missions and has caused them to divert resources.**

Plaintiffs have direct organizational standing to challenge the Executive Order because it undermines their missions and requires them to shift scarce resources to address it.  *See, e.g.*, *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (direct organizational standing is available where an organization faces "both a diversion of its resources and frustration of its mission").  The government concedes that this may be a proper basis for organizational standing. (ECF No. 31 at 12.)

As context for the diversion and frustration at issue here, and as set  forth in the Complaint, Plaintiffs' work includes educating voters, registering voters, encouraging voter turnout, promoting election transparency, and promoting healthy civic discourse.  (Compl. ¶¶ 118–39.)  For instance,

Cooley LLP
Attorneys at Law
San Francisco

3

Pls.' Reply ISO Mot. for Preliminary
Injunc. and Opp. to Defs.' MTD
Case No. 3:20-cv-06021-WHO

Plaintiff Rock the Vote's programs include educating young voters about how to register to vote and cast their ballots, whether voting in-person at a polling location or by receiving ballots by mail and returning them either by mail or in-person. (*Id.* ¶¶ 118–25.) Likewise, Plaintiff Voto Latino aims to educate and empower a new generation of Latinx voters, including through its work to register and inform Latinx voters, and seeks to register 500,000 new voters during the current election cycle. (*Id.* ¶ 126.) Plaintiff Common Cause seeks to promote free, fair, and secure elections, including by expanding access to vote-by-mail options and providing better voter registration options; Plaintiff Free Press aims to ensure diverse and accurate news and media that are responsible to community needs, including with respect to politics and elections; and Plaintiff MapLight informs and empowers voters through a host of initiatives, including by providing voters with accurate information about elections. (*Id.* ¶¶ 131, 134, 137.)

The Executive Order has undermined these organizational missions of Plaintiffs and has forced them to divert organizational resources toward combatting election-related misinformation that the Executive Order punishes online platforms for seeking to combat. Addressing such misinformation could not be more critical, particularly with a major national election only weeks away. Plaintiffs' efforts in direct response to the Executive Order are not "manufacture[d]" or based on the "mere possibility" of future government action, as the government asserts. (ECF No. 31 at 12, 13.) This is shown clearly by the detailed allegations in the Complaint and declarations provided by each Plaintiff organization in support of Plaintiffs' motion for preliminary injunction.

For example, in light of the pervasive election misinformation that the Executive Order threatens to punish online platforms for addressing and correcting, Plaintiff Rock the Vote's mission of educating young voters about how to register to vote and cast their ballots, whether voting in-person at a polling location or by receiving ballots by mail and returning them either by mail or in-person, has been frustrated. (Compl. ¶¶ 118–25.) As a direct result, Rock the Vote has diverted its resources from registering and mobilizing new voters to combatting misinformation about voting on online platforms, including conducting voter education sessions to explain how misinformation targets voters and influences election outcomes, as well as responding to inquiries it has received via email, direct messages on social media, and on its text platform from individuals

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

confused about voting and election procedures.  (*Id.* ¶ 125; ECF No. 19-1 ("DeWitt Decl.") ¶¶ 15–16.)

Similarly, Plaintiff Voto Latino has shifted energy and resources away from its core activities—enabling Latinx voters to register and vote—towards countering misinformation about voting, including President Trump's communications on the platforms targeted by the Executive Order.  (Compl. ¶¶ 128–29; ECF No. 19-5 ("Friedman Decl.") ¶¶ 11–13.)  Indeed, in response to the Order, Voto Latino has cancelled a planned campaign to educate voters about specific candidates and is now instead pursuing a campaign to provide voters with accurate information about voting by mail.  (Compl. ¶ 130; Friedman Decl. ¶ 12.)

The Order has frustrated Plaintiff Free Press's mission to ensure diverse and accurate news and media that are responsive to community needs, including with respect to politics and elections.  (Compl. ¶ 136; ECF No. 19-4 ("Wood Decl.") ¶¶ 7–11.)  The Order has also forced Free Press to devote significant resources—including worktime of up to 15 percent of its staff—to counter the Order's attacks on platforms' curation of content, including by participating in the FCC rulemaking process that the Order mandates.  (Compl. ¶ 136; Wood Decl. ¶ 8.)

Plaintiff Common Cause is also diverting significant organizational resources—including staff time and costs associated with advertising and direct voter contact—away from critical election-year activities (such as educating voters about their rights to cast their ballots) to counter misinformation about voting.  (Compl. ¶ 133; ECF No. 19-2 ("Littlewood Decl.") ¶¶ 11–14.)

Finally, Plaintiff MapLight is shifting resources from mission-critical work—including informing and empowering voters through a host of initiatives, including by providing voters with accurate information about elections—to countering the Order's effects on misinformation online.  (Compl. ¶ 139; ECF No. 19-3 ("Newman Decl.") ¶¶ 10–11.)

The government ignores these allegations, baldly asserting that the Order "does not harm the plaintiffs in any tangible way."  (ECF No. 31 at 13.)  Indeed, it refers to Plaintiffs' declarations only once—and even then, to ***acknowledge*** that Plaintiffs have had to expend resources because the Executive Order caused the FCC proceedings.  (*See* ECF No. 31 at 14 (citing one paragraph from two of Plaintiffs' five Plaintiff declarations).)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

The government's failure to offer countervailing evidence or to otherwise rebut Plaintiffs' showing effectively concedes these prerequisites to direct organizational standing.

### 3. The Executive Order infringes Plaintiffs' right to receive protected speech.

Plaintiffs also have direct organizational standing to challenge the Executive Order because it restricts their First Amendment right to receive information. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) ("[W]here a speaker exists," the First Amendment "necessarily protects the right to receive" the speech." (citation omitted)). The Supreme Court has recognized standing to assert First Amendment right-to-receive claims in a broad array of circumstances. *See, e.g.*, *id.* (consumers had standing to challenge restrictions on advertisers' ability to convey pricing information); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449–51 (1989) (public interest groups had standing to challenge restrictions on the American Bar Association's ability to reveal the content of consultations with the Department of Justice regarding judicial nominees); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19–24 (1998) (voters had standing to challenge the Federal Election Commission's refusal to require a political entity to disclose certain expenditures). The Ninth Circuit has likewise recognized plaintiffs' standing to bring right-to-receive claims in varied contexts. *See, e.g.*, *S.F. Cty. Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 824 (9th Cir. 1987), *aff'd*, 489 U.S. 214 (1989) (political party members had standing to assert a right-to-receive challenge against restrictions on speech by political party committees); *Johnson v. Stuart*, 702 F.2d 193, 195–96 (9th Cir. 1983) (students had standing to challenge restrictions on textbooks); *see also Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069–70 (9th Cir. 2020) (permitting both a teacher-speaker and a student-recipient to bring a First Amendment claim against teaching restrictions).

Here, Plaintiffs have a First Amendment right to receive the editorial speech by online platforms that is targeted by the Executive Order:  fact-checking and contextualizing inaccurate information about voting. (ECF No. 19 at 12–13, 21–23; *infra* Sections III.E, IV.E.)  The Executive Order obstructs this communication between a willing speaker and a willing audience, directly impairing Plaintiffs' right to receive this information.  (Compl. ¶¶ 43–45, 140–42, 174–81; ECF

No. 19 at 3–4, 12–13, 21–24.)  Among other things, the Executive Order establishes as a "policy of the United States" that private intermediaries may not restrict any speech that the government could not; targets certain platforms by name for engaging in disfavored "editorial conduct"; and threatens online platforms with law enforcement actions, withheld government spending, and gutted Section 230 immunity for speaking out against the President's false and misleading speech. (Compl. ¶ 12; ECF No. 19 at 14–16, 20–21.)  Under these circumstances, affected platforms are reasonably chilled from engaging in disfavored First Amendment activities, such as fact-checking or restricting subsequent presidential tweets.  (ECF No. 19 at 18-19, 21–23.)  Plaintiffs thus have "a receipt-of-information injury because Defendants' actions plausibly chill the speech of" Twitter and other platforms.  *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 323 (S.D.N.Y. 2020) (recognizing a right-to-receive injury based on White House threats to revoke press credentials and security clearances of those who would otherwise speak).[2]

Plaintiffs do not, as the government claims, merely assert "a generalized grievance common to all members of the public."  *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1020 (9th Cir. 2002). To the contrary, Plaintiffs are entities with specific mission-critical interests in receiving the speech at issue from the targeted platforms.  As discussed above, Plaintiffs assert particularized injuries arising from their roles as organizations that promote voting rights, disseminate accurate information about voting and elections, and combat misinformation online, including election-related misinformation.  The Executive Order violates *Plaintiffs'* First Amendment rights in particular, rather than the public's First Amendment rights in general.

*Rubin*, in contrast, was the classic example of a "generalized grievance common to all members of the public."  *Rubin*, 308 F.3d at 1020.  In that case, a city council candidate challenged the City of Santa Monica's refusal to permit him to designate his occupation as "peace activist" on the ballot.  *Id.* at 1011–13.  One of plaintiff's arguments for standing was that "as a voter and citizen, his right to receive desired information about candidates is impaired by the regulation."  *Id.*

---

[2] Defendants point to six occasions where Twitter has placed some label on President Trump's tweets following the Executive Order in an apparent attempt to argue that platform speech has not been chilled.  (ECF No. 31 at 11.)  But, as Plaintiffs have demonstrated, Twitter has not fact-checked other false statements, and some of the examples cited by Defendants do not include the fact-check link Twitter implemented before the Order was issued.  (ECF No. 19 at 10.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

1    at 1020.  The Court rejected this theory of standing because it "alleged no more than an abstract

2    interest common to all members of the public."  *Id.*  Here, by contrast, Plaintiffs have shown how

3    the Executive Order harms them in particular—not as members of the public but as organizations

4    with specific missions implicated by the Order—even though the Order's sweeping impact may

5    harm others as well.  *See, e.g.*, *Novak v. United States*, 795 F.3d 1012 (9th Cir. 2015) ("[T]he fact

6    that a harm is widely shared does not necessarily render it a generalized grievance." (quoting *Jewel*

7    *v. Nat'l Sec. Agency*, 673 F.3d 902, 909 (9th Cir. 2011))).

8              Nor do Plaintiffs assert a "subjective chill," as the government contends, in flawed reliance

9    on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) and *Laird v. Tatum*, 408 U.S. 1 (1972).

10   (ECF No. 31 at 9.)  The government's argument ignores Plaintiffs' allegations and evidence that

11   the Executive Order causes specific, immediate, and objective harm to Plaintiffs' right to receive

12   protected speech from the online platforms that are directly retaliated against and threatened by the

13   Order.  In contrast (and in circumstances entirely distinct from those at issue here), *Clapper*

14   involved a surveillance program whose targets had not yet been definitely identified, and the Court

15   rejected standing based on the mere possibility that the plaintiffs would be spied upon at some

16   indefinite time in the future.  *See Clapper*, 568 U.S. at 418.  Likewise, *Laird* involved generalized

17   and speculative allegations of standing to challenge an alleged government surveillance program,

18   where the alleged program had no immediate or direct connection to or effect on the plaintiffs other

19   than arguably "subjective chill." *See Laird*, 408 U.S. at 3, 14.  In *Laird*, plaintiffs alleged a First

20   Amendment injury arising from the general "existence and operation" of the surveillance program,

21   without more, and the Court determined that the plaintiffs lacked standing because they failed to

22   allege that they themselves were surveilled or were likely to be, and thus had not alleged a specific

23   or objective harm*, id.*—whereas here, Plaintiffs have presented ample evidence of direct, objective

24   harm.[3]

---

25   [3]  The government also cites *O'Keefe v. Van Boening*, 82 F.3d 322 (9th Cir. 1996), for the

26   proposition that hypothetical future government action does not support standing, but *O'Keefe* did
     not reach a decision on standing.  *Id.* at 325 ("We need not decide whether [the challenged

27   Department of Corrections policy] has a chilling effect on [the plaintiff's] First Amendment right
     to petition the government for redress of grievances.  Even assuming that the DOC Mail Policy

28   does have such a chilling effect, the State Officials have established that legitimate penological
     interests justify the policy").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

**4.     Plaintiffs' injuries are fairly traceable to the Executive Order and are likely to be redressed by a favorable ruling.**

The government offers only one paragraph of argument concerning the remaining elements of standing—traceability and redressability—and directs that argument only at Plaintiffs' second basis for standing.  (ECF No. 31 at 10–11.)  Plaintiffs have shown traceability and redressability.

With respect to traceability, Plaintiffs have offered detailed and essentially unrebutted allegations and evidence showing how their missions have been frustrated and their resources diverted by the Executive Order's deterrent effect on online platforms, and how their right to receive the protected speech of those platforms has been burdened.  (Compl. ¶¶ 118–42; DeWitt Decl. ¶¶ 15–16; Friedman Decl. ¶¶ 11–13; Wood Decl.¶¶ 7–11; Littlewood Decl. ¶¶ 11–14; Newman Decl. ¶¶ 10–11.)

With respect to redressability, the injunctive and declaratory relief sought by Plaintiffs would allow online platforms to exercise their First Amendment rights without the fear of reprisal that the Executive Order presents.  This is sufficient for standing.  *See, e.g.*, *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 374 (D.C. Cir. 2020) (finding user standing for a challenge to a law restricting online platforms; "Where the requested relief for the [plaintiff] depends on actions by a third party not before the court, the plaintiff must demonstrate that a favorable decision would create a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." (quoting *Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 739 (D.C. Cir. 2008), in turn quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002) (quotation marks omitted))).

**B.     Plaintiffs' claims are ripe.**

The government's assertions that Plaintiffs have failed to establish either constitutional or prudential ripeness must be rejected.

With respect to constitutional ripeness, the government unavailingly argues only that it overlaps with injury-in-fact  (ECF No. 31 at 14).  As explained above, Plaintiffs currently (and irreparably) suffer injury-in-fact from both frustration of mission/diversion of resources and right-to-receive injury.  *See supra* Sections II.A.1–2.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

Where, as here, constitutional ripeness is satisfied, the Court may decline to reach prudential ripeness. *See State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031 (N.D. Cal. 2018), *reconsideration denied sub nom. California ex rel. Becerra v. Sessions*, No. 17-CV-04701-WHO, 2018 WL 3399214 (N.D. Cal. Apr. 24, 2018) (explaining that the "Ninth Circuit has previously declined to reach prudential ripeness when constitutional ripeness is satisfied" and reaching ripeness conclusion based only on constitutional ripeness grounds); *cf. Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 751 n.9 (9th Cir. 2020) (recognizing that the Supreme Court has cast doubt on the "continuing vitality of the prudential ripeness doctrine" but nonetheless applying the prudential ripeness inquiry and finding claims ripe).

Nevertheless, Plaintiffs' claims are prudentially ripe. The prudential ripeness inquiry, which is "discretionary," is "guided by two overarching considerations: the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *California v. Bernhardt*, No. 19-CV-06013-JST, 2020 WL 3097091, at *10 (N.D. Cal. May 18, 2020) (citations omitted); *see also Skyline*, 968 F.3d at 751. Plaintiffs meet both requirements.

First, the legal issues presented are fit for judicial decision. As the Ninth Circuit has explained, in language directly on point here, "[a] claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Skyline*, 968 F.3d at 752 (citation omitted). This case involves the purely legal question of whether the Executive Order, which has been finally issued, violates the First Amendment—a textbook example of a question that is ripe for review. Other considerations relevant to fitness for review also demonstrate prudential ripeness, including that the Order "has a direct and immediate effect on the complaining parties." *Id.* As a result of the Executive Order, Plaintiffs already have had to divert resources to ensure that accurate information is available to voters, and have been deprived of their right to receive online platforms' unadulterated expression. (DeWitt Decl. ¶¶ 15, 18; Friedman Decl. ¶¶ 11, 12; Littlewood Decl. ¶¶ 11, 12, Newman Decl. ¶ 11; Wood Decl. ¶¶ 8–10.) And the government has been actively implementing the Order. For instance, the Commerce Department has filed an FCC petition to narrow Section 230 immunity—which President Trump has made clear was "directed by" the Executive Order—and the FCC has invited public comment.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

(Compl. ¶¶ 96–98.)  In addition, Attorney General Barr has stated that the Department of Justice is implementing the Order through "litigation going forward."  (*Id.* ¶¶ 78, 95.)

Second, Plaintiffs—and the public interest—will be harmed if the Court does not adjudicate this matter now.  A critical national election is approaching, for which Plaintiffs and voters require accurate information about voting.  Each day that the President posts falsehoods about voting runs the risk of jeopardizing a free and fair election.  As discussed above, Plaintiffs have already diverted, and will continue to divert, resources in myriad ways to address the impact of the Executive Order, including the continued proliferation of election-related misinformation.  Voto Latino, for example, has eliminated a planned campaign to educate voters about specific candidates so that it can divert those resources to providing voters with accurate information about voting by mail.  (Friedman Decl. ¶ 12.)  Future adjudication will be too late; the need for responsible platforms to curtail dissemination of President Trump's falsehoods about voting is at its apex now, and each day platforms decline to do so—either entirely or as robustly as they otherwise would—is an irreparable loss for Plaintiffs and the democratic process.

## III.    THE COURT SHOULD GRANT PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION.

Plaintiffs satisfy all requirements for a preliminary injunction against implementation of the Executive Order.  (*See* ECF No. 19 at 12 (setting forth standard).)  Accordingly, the Court should enjoin Defendants from implementing the Order on a nationwide basis.

### A.    Plaintiffs are likely to succeed on the merits of their First Amendment claims.

Plaintiffs are likely to succeed on the merits of their First Amendment claims.  Notably, in this posture, Defendants bear the burden of justifying the Executive Order's infringements on free speech.  *See Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011), *overruled on other grounds by Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) ("[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction."); *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009) (same).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

The government completely fails to engage with the merits of Plaintiffs' multiple First Amendment arguments.  It devotes a mere *two pages* to address the merits (ECF No. 31 at 16–18), and it focuses only on retaliation—simply ignoring Plaintiffs' claims for coercive threats (Count III), content-based restrictions (Count I), and right to receive (Count IV).  And the government's entire argument hinges on one flawed premise:  that the Executive Order does not itself regulate speech (either of platforms or Plaintiffs) because it does not actually do anything.  (ECF No. 31 at 16.)

The government's argument must be rejected for two reasons.

First, it is wrong as a descriptive matter—the Executive Order has present, operative effect on both platforms and Plaintiffs.

Second, it disregards Plaintiffs' claim for retaliatory and coercive threats (Count III), which by definition involves ***threatened*** action by the government as punishment for speech, not action that already has occurred.  The entire point of the Executive Order is to punish, intimidate, and discourage disfavored speech—and that is precisely the unconstitutional message that has been sent and received.  The government does not and cannot dispute that the Executive Order is a coercive threat intended to chill constitutionally protected speech by online platforms—as confirmed by the Order's impetus, its plain terms, the President's rollout of it, and its ongoing implementation.

### 1. Plaintiffs will likely succeed on their coercive threat claim (Count III).

The government (ECF No. 31 at 16–18) ignores Plaintiffs' claim that the Executive Order is a coercive threat against online platforms in violation of the First Amendment.  (*See* ECF No. 19 at 20–21.)  Thus, the government does not dispute that a "[p]ublic official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights."  *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015); *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003); *see* ECF 19 at 20–21.  The government's failure to respond concedes these points.  *See, e.g.*, *Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197, 1210 & n.7 (N.D. Cal. 2013) (collecting cases).

Rather, without specific reference to Plaintiffs' threats claim, the government argues generally that the Executive Order does not *yet* regulate.  (ECF No. 31 at 16–18.)  This argument

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

1   fails because "[t]he power of a threat lies not in any negative actions eventually taken, but in the

2   apprehension it creates in the recipient of the threat." *See Brodheim v. Cry*, 584 F.3d 1262, 1271

3   (9th Cir. 2009).  It does not matter whether the threat is actually carried out.  "[S]uch a threat ***is***

4   ***actionable and thus can be enjoined*** even if it turns out to be empty—the victim ignores it, and

5   the threatener folds his tent." *Dart*, 807 F.3d at 231 (emphasis added).

6        The cudgel of official punishment that the Executive Order holds over online platforms to

7   deter their speech cannot be denied.  Among other things, it includes the following elements:

8        ***Withholding Federal Spending.***  Section 3 of the Executive Order (a provision entitled

9   "Protecting Federal Taxpayer Dollars from Financing Online Platforms That Restrict Free Speech")

10  threatens online platforms with the loss of significant government spending for engaging in

11  disfavored expression.  This section directs the head of each executive agency to review spending

12  on online advertising and marketing and to report those findings to the head of the Office of

13  Management and Budget.  It then directs the Department of Justice to, in light of those reports,

14  "assess whether any online platforms are problematic vehicles for government speech due to

15  viewpoint discrimination, deception to consumers, or other bad practices."  As President Trump

16  explained: "The government spends billions of dollars on giving [online platforms] money.

17  They're rich enough.  ***So we're going to be doing none of it or a very little of it.***"  (ECF No. 19-

18  13, Hartnett Decl. Ex. 7 at 3 (emphasis added).)  The withdrawal of government spending is a

19  severe and deterrent force.  Government actors violate the First Amendment when they withhold

20  funding, including government advertising dollars, in response to disfavored speech.  *See, e.g.*,

21  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995) ("[I]deologically driven

22  attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in

23  other contexts."); *El Dia, Inc. v. Governor Rossello*, 165 F.3d 106, 109 (1st Cir. 1999) ("It would

24  seem obvious that using government funds to punish political speech . . . would run afoul of the

25  First Amendment."); *N. Miss. Commc'ns, Inc. v. Jones*, 792 F.2d 1330 (5th Cir. 1986).

26        Defendants insist that the Executive Order merely instructs federal agencies to review

27  agency spending and report information relevant to the Director of the Office of Management, a

28  process that has already started, according to the schedule required by the Executive Order.  (ECF

Cooley LLP
Attorneys at Law
San Francisco

13

Pls.' Reply ISO Mot. for Preliminary
Injunc. and Opp. to Defs.' MTD
Case No. 3:20-cv-06021-WHO

1   No. 31 at 4–5; Executive Order § 3.)  But the only reason for this review process—clear to any

2   reasonable person or platform and explicit in the President's own statements ("we're going to be

3   doing none of it or a very little of it")—is to advance the threat of withholding the spending if the

4   platforms do not stand down.  The Ninth Circuit has rejected similar ploys from this Administration

5   to avoid the clear intent and meaning of its executive orders.  *See City & Cty. of S.F. v. Trump*, 897

6   F.3d 1225, 1239 (9th Cir. 2018) ("There would be little reason for the Director to perform such a

7   comprehensive review [of federal funding] if the Executive Order meant only that DOJ should

8   continue to do what it has been doing all along.").

9        ***Gutting Section 230 Immunity*.**  As Plaintiffs' submissions have explained—and as the

10   government does not deny—Section 230 immunity is of great value to the online platforms targeted

11   by the Executive Order.  (ECF No. 19 at 4–5.)  The Executive Order specifically seeks to gut that

12   immunity immediately and in the future—through its plain language,[4] through an FCC rulemaking

13   initiated pursuant to the Order, through legislative proposals already announced pursuant to the

14   Order, and through ongoing litigation positions that the Department of Justice has pledged to take.

15   (*See* ECF No. 19 at 7–9.)  As the President explained when announcing the Executive Order, "social

16   media companies that engage in censoring or any political conduct will not be able to keep their

17   liability shield."  (Hartnett Decl. Ex. 7 at 2.)  The loss of such a significant immunity from civil

18   liability is plainly a severe and deterrent consequence.  *Cf. Perry v. Sindermann*, 408 U.S. 593, 597

19   (1972) ("[The government] may not deny a benefit to a person on a basis that infringes his

20   constitutionally protected interests—especially, his interest in freedom of speech.").

21        ***Undertaking Government Investigations*.**  Section 4 of the Executive Order instructs the

22   FTC to enforce Section 5 of the FTC Act against platforms that seek to fact-check him or restrict

23   any speech that would be protected from government censorship.  Moreover, as President Trump

24   has explained, Section 5 of the Executive Order directs the Attorney General to "work[] very much

25   and very closely in cooperation with the states to enforce their own laws against such deceptive

---

[4] Section 2(a) of the Executive Order states (emphasis added): "When an interactive computer service provider removes or restricts access to content and its actions do not meet the criteria of subparagraph (c)(2)(A), it is engaged in editorial conduct.  ***It is the policy of the United States*** that such a provider should properly lose the limited liability shield of subparagraph (c)(2)(A) and be exposed to liability like any traditional editor and publisher that is not an online provider."

Cooley LLP
Attorneys at Law
San Francisco

14

Pls.' Reply ISO Mot. for Preliminary
Injunc. and Opp. to Defs.' MTD
Case No. 3:20-cv-06021-WHO

1   business practices." (Hartnett Decl. Ex. 7 at 3.)  The threat of investigation and enforcement by the

2   FTC and the Attorney General is a severe consequence.  "[A]ggressive enforcement decisions" may

3   be the basis for a First Amendment retaliation claim.  *CarePartners, LLC v. Lashway*, 545 F.3d

4   867, 878 (9th Cir. 2008).  The "cost . . . of criminal or civil liability and of negative press [if] the

5   companies ignore[] [government] threats may well [be] very high, which would explain their

6   knuckling under to the threats with such alacrity."  *Dart*, 807 F.3d at 236.

7                                                      ***

8        Because the Executive Order threatens to employ coercive state power to stifle protected

9   speech, it violates the First Amendment as a coercive threat.  *Dart*, 807 F.3d at 230.  In *Dart*, a

10  county sheriff issued a cease and desist letter to credit card companies demanding that they prohibit

11  use of their cards to purchase any ads on Backpage.com because the sheriff disapproved of some

12  of the content on the site.  *Id.* at 230.  The letter implied that the credit card companies "would face

13  some government sanction—specifically, investigation and prosecution—if they did not comply

14  with his 'request.'"  *Id.* at 236.  The sheriff also contacted other law enforcement agencies urging

15  them to investigate the lawfulness of payments from Backpage.  *Id.* at 237.  As the Seventh Circuit

16  explained, "threatening penalties for future speech goes by the name of 'prior restraint,' and a prior

17  restraint is the quintessential first-amendment violation."  *Id.* at 235 (citation omitted).  The court

18  enjoined the sheriff even though the threats were not made to Backpage, and even though Visa filed

19  an affidavit saying it was *not* threatened by the letter.

20       Plaintiffs have demonstrated an even clearer coercive-threat claim than the plaintiff in *Dart*.

21  Before the Executive Order, online platforms fact-checked and moderated President Trump's lies

22  about mail-in voting.  (*See, e.g.*, Compl. ¶ 66.)  This upset the President.  (*Id.* ¶¶ 67, 69–71.)  Two

23  days later, President Trump issued the Executive Order and threatened to withhold funding, strip

24  platforms of Section 230 immunity, and take enforcement actions against platforms.  (*Id.* ¶¶ 71–

25  77); *see also Soranno's Gasco., Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989) (reversing

26  summary judgment in First Amendment claim in part because of the suspicious timing between

27  defendant's conduct and protected speech).  After issuing the Executive Order, President Trump

28  continued to tweet and post similarly false statements about mail-in voting.  Online platforms

Cooley LLP
Attorneys at Law
San Francisco

15

Pls.' Reply ISO Mot. for Preliminary
Injunc. and Opp. to Defs.' MTD
Case No. 3:20-cv-06021-WHO

1    tagged some of these false tweets, but did not include links to fact-check many of the false

2    statements. (*See, e.g.*, Compl. ¶ 116; ECF No. 19 at 10.)  In short, the Executive Order's coercive

3    threats have denied Plaintiffs' access to speech from an otherwise willing speaker.  (Compl. ¶¶

4    141–43.[5])  As a result, and unsurprisingly, Plaintiffs already have had to divert resources to address

5    the deterrent effect that the Executive Order was intended to and has had on online platforms.  *See*

6    *supra* Section II.A.1 (summarizing declarations).

7            **2.    Plaintiffs will likely succeed on their retaliation claim (Count II).**

8            For similar reasons, Plaintiffs are likely to prevail on their retaliation claim—the only First

9    Amendment theory of liability which the government specifically addresses (ECF No. 31 at 16–

10   18.)  To state a retaliation claim, a plaintiff must demonstrate (1) a "constitutionally protected

11   activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to

12   engage in the protected activity and (3) the protected activity was a substantial or motivating factor

13   in the defendant's conduct."  *Capp v. Cty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019)

14   (citation omitted).   Additionally, a plaintiff must establish a causal connection between the

15   defendant's retaliatory animus and the plaintiff's subsequent injury.  *Id.*  With respect to the second

16   factor, the government's conduct need only amount to a "threat . . . [of] a severe consequence that

17   would chill the average person from voicing criticism of official conduct."  *Id.* at 1055 (concluding

18   that plaintiff stated retaliatory First Amendment retaliation claim by alleging that a government

19   actor encouraged others to file a custody application to remove plaintiff's custody rights to his

20   children).

21          Plaintiffs have more than satisfied all of these elements, as the present case is classic First

22   Amendment retaliation.  Within two days of Twitter exercising its First Amendment right to fact-

23   check a tweet by President Trump, the President issued the Executive Order mandating as the policy

24   of the United States that platforms like Twitter should have their legal immunity stripped because

25   of their expression and threatening severe consequences to online platforms through processes set

26

27   ---
     [5] As noted above, *see supra* note 2, the government's examples of additional fact-checking by
     Twitter ignore instances where false speech has gone unchecked or less checked than before the
28   Executive Order.  In any case, the unconstitutional threat exists *regardless* of whether the speaker
     was actually chilled.  *See Dart*, 807 F.3d at 231.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

1   in motion by the Order, such as the loss of millions of dollars in federal funding, the loss of civil

2   liability immunity, and the threat of federal law enforcement investigation.  *See supra* Section

3   III.A.1; ECF No. 19 at 18–19.

4         Defendants challenge none of this, contending instead (erroneously) that the Executive

5   Order cannot be retaliatory because it does not affect any private rights.  (ECF 31 at 17.)  That is

6   not the law and Defendants' cited authority, to the extent it has any bearing on this case, *supports*

7   Plaintiffs' claim.  In *Blair v. Bethel School District*—which the Ninth Circuit described as "not a

8   typical First Amendment retaliation case"—the court found that there was no retaliation when the

9   plaintiff's peers used the democratic process to vote him off a school board, because at all times,

10   the plaintiff retained his full range of rights.  608 F.3d 540, 544 (9th Cir. 2010).  And in *Mulligan*

11   *v. Nichols*, the Ninth Circuit affirmed a summary judgment ruling that a defendant police union's

12   publication of plaintiff's voluntary drug-use confession did not affect plaintiff's rights, benefits,

13   relationship, or status with the state because it was not backed up by any threat of punishment.  835

14   F.3d 983, 989 (9th Cir. 2016).  The Ninth Circuit readily acknowledged that the result would be

15   different if—as here—the government actor even "intimated that punishment would imminently

16   follow."  *Id.* at 990 (citing *Mendocino Envt'l Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1289–91 (9th

17   Cir. 1999)); *see also Blair*, 608 F.3d at 544 (same).

18         Here, the Executive Order—and the statements of President Trump and other Defendants—

19   does far more than "intimate" that platforms will be punished for engaging in protected speech.

20   The Order is a binding directive to the Executive Branch to carry out the threats made by President

21   Trump: cut valuable advertising spending, erase civil liability immunity, and investigate platforms.

22   Though Defendants may now paint the Executive Order as empty bluster, it threatens tangible

23   consequences as punishment for disfavored speech through processes initiated by the Order, and

24   thus would chill a speaker of ordinary firmness.

25           **3.**    **Plaintiffs will likely succeed on their content-based-restriction claim**

26                  **(Count I).**

27         As Plaintiffs' filings have explained (*e.g.*, ECF No. 19 at 14–18), the Executive Order—

28   which targets a class of speakers for regulation based on their disfavored expression—is a content

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

based-restriction that cannot survive strict scrutiny. Content-based laws are "those that target speech based on its communicative content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Similarly, "laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message [the speech] conveys" are content-based. *Id.* at 164 (internal quotation marks and citation omitted). The government entirely fails to engage with or dispute that the Executive Order is content-based and fails strict scrutiny—thereby conceding these points. *See, e.g.*, *Ramirez*, 941 F. Supp. 2d at 1210 & n.7.

The government's only non-claim specific defense is to argue that the Executive Order cannot offend the First Amendment because it does not restrict any speech. (ECF No. 31 at 16–18.[6]) But, as explained above—and as the Order itself demonstrates—it plainly does. The Executive Order targets a category of speakers (online platforms) for regulation—even identifying some by name—and does so because it disagrees with those speakers' expression. (*See* Executive Order § 1 (complaining of "a warning label on certain tweets in a manner that clearly reflects political bias").) As a result of this disfavored speech, platforms face the loss of immunity, federal spending, and investigation. *See supra* Section III.A.1. Because, "[b]oth on its face and in its practical operation," the Executive Order, "imposes a burden based on the content of speech and the identity of the speaker," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011), it is a content-based restriction for which the government has no defense.

**4.      Plaintiffs will likely succeed on their right-to-receive claim (Count IV).**

Although the government addresses right-to-receive as a basis for standing, it ignores Plaintiffs' First Amendment right to receive claim on the merits. *See, e.g.*, *Ramirez*, 941 F. Supp. 2d at 1210 & n.7. Nevertheless, as Plaintiffs' opening brief demonstrated, longstanding Supreme

---

[6] Defendants incorrectly claim that an executive order announcing mere "policy" cannot violate the Constitution. (ECF No. 31 at 17.) An executive order that requires subordinates to comply with a stated policy may be struck down as unconstitutional. *See City & Cty. of S.F.*, 897 F.3d at 1232, 1239 (enjoining executive order that directed the Attorney General to take enforcement action and the Director of the Office of Management and Budget to review information on all federal grant money consistent with new "policy").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

Court and other precedent recognizes that the First Amendment prevents the government from depriving willing listeners of desired speech without sufficient justification.  (ECF No. 19 at 21–22 (collecting cases).)   The Executive Order punishes and threatens online platforms with significant official sanction for their expression:   curating, editing, and contextualizing misinformation about the voting process on their platforms.  *See supra* Section II.A.  Plaintiffs are public advocacy and activist organizations that rely on online platforms to perform their editorial functions; they are willing listeners who seek the restricted expression.  *See id.*  The government does not dispute that platforms are willing speakers or that Plaintiffs are willing listeners.  Nor does it attempt to justify the Executive Order's restrictions on speech.  Rather, it simply concludes without explanation—or offering any facts to rebut Plaintiffs' declarations—that the Executive Order does not restrict the receipt of speech from others.  (ECF No. 31 at 16.)

**B.     Plaintiffs will suffer irreparable harm absent preliminary injunctive relief.**

Plaintiffs have shown through detailed declarations—which the government ignores—that they are suffering irreparable injury.  *See supra* Section II.A; ECF No. 19 at 23–24.

First, Plaintiffs have and continue to suffer ongoing First Amendment injury as a result of the Executive Order:  the loss of their right to receive constitutionally protected speech.  They rely on platforms to fact-check and moderate information posted by their users (DeWitt Decl. ¶ 10; Littlewood Decl. ¶ 5; Newman Decl. ¶¶ 8–9; Wood Decl. ¶ 5; Friedman Decl. ¶ 10), and through the deterrent effect of the Executive Order, this right is impaired.  *See supra* Section II.A.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). (*See e.g.*, ECF No. 19 at 23 (citing cases)); *see also Dart*, 807 F.3d at 238–39 (same).  The government does not and cannot challenge this black-letter principle.

Second, Plaintiffs have diverted and continue to divert scarce resources—including staff time and energy that cannot be regained, as well as financial resources—as a result of the Executive Order, including to correct deeply damaging misinformation online about voting.  (Compl. ¶¶ 118–42; DeWitt Decl. ¶¶ 15–16; Friedman Decl. ¶¶ 11–13; Wood Decl.¶¶ 7–11; Littlewood Decl. ¶¶

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

11–14; Newman Decl. ¶¶ 10–11.)  Absent the Executive Order's threat of punishment, online platforms would be more likely to correct this misinformation.  Because social media services like Twitter can directly append fact-checking information to any users' tweets that every user can see, social media platforms are in the best position to correct or otherwise moderate false information posted by their users. Although other users, including Plaintiffs, can respond to false information and attempt to correct it, it is not possible to ensure that their responses will be seen by every reader of the original tweet.

The Executive Order's attempt to insulate election-related misinformation from correction by online platforms threatens the franchise of millions of Americans that Plaintiffs seek to educate. (DeWitt Decl. ¶ 17.)  The propagation of false information about voting sanctioned by the Executive Order strikes the core of Plaintiffs' missions and, if allowed to continue, will deprive Plaintiffs of critical resources that would otherwise be used to promote election-related activities, such as registering voters and educating them about their voting rights.  (Friedman Decl. ¶ 12.)

Defendants' irreparable harm argument ignores Plaintiffs' declarations and actual claims of harm, falsely suggesting that Plaintiffs rely solely on "the allegations of the complaint" to establish irreparable harm.  (ECF No. 31 at 15 (citing *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674–75 (9th Cir. 1988) and *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980)).[7]  Plaintiffs' declarations—which the government does not challenge—are unrebutted and establish irreparable harm.  (*See* ECF Nos. 19-1 (DeWitt Decl.), 19-2 (Littlewood Decl.), 19-3 (Newman Decl.), 19-4 (Wood Decl.), 19-5 (Friedman Decl.).)  As these declarations show, the Executive Order—and the election misinformation it seeks to allow to propagate online—has caused Plaintiffs to divert "crucial human and financial resources at a pivotal time." (DeWitt Decl. ¶¶ 17–18.)  As a direct consequence of the Executive Order, Voto Latino will engage in significant spending to correct voting misinformation. (Friedman Decl. ¶ 12.)  If the Executive Order were no longer in effect, Voto Latino could reallocate these resources to initiatives that are critical to its mission of empowering and engaging voters.  (*Id.*)  Similarly, MapLight is

---

[7] Neither *Caribbean Marine* nor *L.A. Mem'l Coliseum Comm'n* involved a First Amendment or other constitutional challenge.  These cases are thus further afield because they do not account for constitutional injuries, which by nature are irreparable.  *See Elrod*, 437 U.S. at 373.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

1   expending significant resources to develop a software tool to report misinformation on platforms.

2   (Newman Decl. ¶ 11.)   As a direct consequence of the Executive Order, Common Cause has

3   diverted its limited human and financial resources before a critical national election (Littlewood

4   Decl. ¶ 14), as has Free Press (Wood Decl. ¶ 11).  This evidence stands uncontroverted.

5       Nor does the timing of Plaintiffs' suit undercut their irreparable harm.  Notably, in seeking

6   to dismiss a challenge to the Executive Order filed by the Center for Democracy and Technology

7   ("CDT") shortly after the Executive Order issued, the government has faulted CDT for suing *too*

8   *soon.*  (*See* Mot. to Dismiss, ECF No. 17 at 1, *Ctr. for Democracy & Tech. v. Trump*, No. 1:20-cv-

9   01456-TNM (D.D.C. filed Aug. 3, 2020) (claiming no Article III case or controversy because

10  "Plaintiff commenced this action less than a week after the President issued the EO, well before

11  any Executive official could implement the EO, let alone concretely apply the EO to Plaintiff or

12  any other private party").)  Here, in contrast, Plaintiffs filed after it became apparent that the

13  Executive Order—far from benign window dressing—was being actively implemented by the

14  Executive Branch, was preventing online platforms from fact-checking content as they otherwise

15  might, and was causing Plaintiffs to divert resources and otherwise address the Executive Order's

16  ill effects in the run-up to a national election.  (*See* ECF No. 19 at 8–11.)

17      The government's reliance on *Garcia v. Google, Inc.* (ECF No. 31 at 15) is misplaced.

18  There, a delay of five months in moving for a preliminary injunction on a copyright claim was

19  relevant because it demonstrated that the plaintiff's harm was personal and "untethered from her

20  commercial interests as a performer"—a requirement for any copyright claim.  786 F.3d 733, 738,

21  746 (9th Cir. 2015) (*en banc*).  Here, Plaintiffs brought suit three months after the Executive Order

22  issued—once its implementation was confirmed and its chilling effect in advance of the election

23  palpable.  (*See* ECF No. 19 at 8–11.)  Moreover, unlike the static piece of content at issue in *Garcia*,

24  786 F.3d at 738, the Executive Order deters new First Amendment activity on an ongoing basis.  In

25  any event, as the Ninth Circuit has explained, "delay is but a single factor to consider in evaluating

26  irreparable injury; courts are loath to withhold relief solely on that ground."  *Arc of Cal. v. Douglas*,

27  757 F.3d 975, 990 (9th Cir. 2014) (citation omitted).  And any alleged "tardiness is not particularly

28  probative in the context of ongoing, worsening injuries."  *Id.* (reversing denial of preliminary

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

1    injunction in case challenging two statutes passed one year and three months, respectively, before

2    the lawsuit was filed).

3    **C.    Plaintiffs have established that the balance of equities tips in their favor and
         that an injunction would serve the public interest.**

4

5        The balance of equities and public interest tip sharply in Plaintiffs' favor.  (ECF No. 19 at

6    24–25.)  Indeed, the government, having earlier characterized the executive order as ineffectual and

7    not intended to accomplish anything of significance on its own, does not try to argue that it is

8    needed for any reason or advances the public interest in substance.   Instead, the government

9    unavailingly puts forth a generalized public interest in minimizing "judicial interference" with the

10   President's executive branch duties.  (ECF No. 31 at 19.)

11       But "it is always in the public interest to prevent the violation of a party's constitutional

12   rights." *Am. Beverage Ass'n v. City & Cty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019).  Courts are

13   fully empowered to enjoin executive orders that violate the Constitution.  *See City & Cty. of S.F.*,

14   897 F.3d at 1239 (agreeing that the District Court was correct to enjoin President Trump's executive

15   order because it was unconstitutional, and remanding for consideration of whether a nationwide

16   relief was appropriate).

17   **D.    Injunctive relief is available against the President.**

18       The "separation-of-powers doctrine does not bar every exercise of jurisdiction over the

19   President of the United States."  *Nixon v. Fitzgerald*, 457 U.S. 731, 753–54 (1982).  Rather, "it

20   is . . . settled that the President is subject to judicial process in appropriate circumstances," *Clinton*

21   *v. Jones*, 520 U.S. 681, 703 (1997), and the Supreme Court has expressly rejected the notion of "an

22   absolute, unqualified Presidential privilege of immunity from judicial process under all

23   circumstances," *id.* at 704 (quoting *United States v. Nixon*, 418 U.S. 683, 706 (1974)).  Courts have

24   rejected the proposition that they "categorically lack authority to enjoin the President."  *Knight*

25   *First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 577–78 (S.D.N.Y. 2018),

26   *aff'd*, 928 F.3d 226 (2d Cir. 2019).[8]

27

28   ---

[8] Courts have enjoined past Presidents and their orders.  *See, e.g.*, *United States v. Nixon*, 418 U.S.
683, 706 (1974); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 584, 587–88 (1952);
*United States v. Burr*, 25 F. Cas. 187, 191, 196 (No. 14,694) (Va. Cir. Ct. 1807).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

President Trump is not immune from the injunction that Plaintiffs seek.  Courts recognize presidential immunity only where "the dangers of intrusion on the authority and functions of the Executive Branch" outweigh "the constitutional weight of the interest to be served" by the court's exercise of jurisdiction.  *Nixon*, 457 U.S. at 754; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 334–35 (E.D.N.Y. 2019) (denying motion to dismiss where "injunctive relief against the President corrects unlawful conduct").

Here, President Trump has transformed a personal vendetta against the speech of Twitter and other online platforms into an Executive Order that violates the First Amendment rights of both Plaintiffs and the online platforms whose expression Plaintiffs seek.  The enormous constitutional weight in protecting those rights far outweighs any intrusion into presidential prerogatives— particularly, where, as here, they are transparently illegitimate.

A President can be "subject to a judicial injunction requiring the performance of a purely 'ministerial' duty."  *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992).  The correction of an unconstitutional act resembles the performance of "a mere ministerial duty, where nothing [is] left to discretion," justifying injunctive relief against the President.  *Knight First Amendment*, 302 F. Supp. 3d at 578 (citation omitted).  As the President must obey the Constitution, an injunction barring enforcement of an unconstitutional Executive Order is proper.  *See id*. at 579 (finding that the President's duty to comply with the Constitution by unblocking users on Twitter is not discretionary because "[n]o government official, after all, possesses the discretion to act unconstitutionally").

### E.      Nationwide relief is appropriate.

It is well-settled that when a national injunction is needed for complete relief, a court should award one. *E. Bay Sanctuary Covenant v. Barr*, 391 F. Supp. 3d 974, 981 (N.D. Cal. 2019), *aff'd*, 964 F.3d 832 (9th Cir. 2020).  "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Thus, the Ninth Circuit has "upheld nationwide injunctions where such breadth was necessary to remedy a plaintiff's harm." *E. Bay Sanctuary Covenant*, 391 F. Supp. 3d at 981 (citation omitted); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1070 (9th Cir. 2020) (affirming

Cooley LLP
Attorneys at Law
San Francisco

23

Pls.' Reply ISO Mot. for Preliminary
Injunc. and Opp. to Defs.' MTD
Case No. 3:20-cv-06021-WHO

1    nationwide injunction); *Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987) (same).

2          Here, the harms facing Plaintiffs can be redressed only with a nationwide injunction.  The

3    challenged Executive Order addresses content on online platforms, which is available throughout

4    the nation.  Plaintiffs are organizations that operate throughout the United States, as they seek to

5    mobilize and inform voters in advance of the upcoming election and otherwise engage in civic

6    activity.  (ECF No. 19 at 23–24.)  Plaintiffs and voters nationwide require access to accurate voting

7    information—particularly in this time of pandemic, where rules are in flux and many voters are

8    voting by mail for the first time.  (*Id.*)  Thus, only a nationwide injunction can provide Plaintiffs

9    with adequate relief.  The President's false tweets and other social media posts that the Executive

10   Order seeks to insulate are not limited in geographic scope.  The President himself has tweeted

11   about election procedures across the country—from Michigan to New York to Nevada to

12   California.  (*See, e.g.*, Compl. ¶¶ 62, 63, 65, 108.)  Plaintiffs have been forced to divert their limited

13   resources to a high-stakes game of whack-a-mole, counteracting false and misleading information

14   about voting across the country as it is posted online.  Only a nationwide injunction can remedy

15   this harm.

16   **IV.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS.**

17         The Court should deny Defendants' motion to dismiss.  Plaintiffs have sufficiently pleaded

18   both standing and ripeness and they have stated a valid claim on each First Amendment theory

19   presented.  And because the President is not above the law, Defendants' argument that the President

20   cannot be enjoined fails, and its attempt to dismiss the *ultra vires* claim, collapses.  Largely for the

21   reasons set forth above, there is no basis for dismissal.

22         **A.    Plaintiffs have adequately pleaded standing and ripeness.**

23         Plaintiffs' Section 12(b)(1) motion to dismiss for lack of subject matter jurisdiction should

24   be denied.  Where, as here, a defendant facially attacks subject matter jurisdiction—"assert[ing]

25   [that the allegations contained in a complaint are insufficient on their face to invoke federal

26   jurisdiction," *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)—the court

27   assumes the truth of Plaintiffs' allegations and draws all reasonable inferences in Plaintiffs' favor,

28   *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  "The Ninth Circuit has noted that

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

**PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO**

1    jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional" and

2    may be granted only "where the alleged claim under the constitution or federal statutes clearly

3    appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where

4    such claim is wholly insubstantial and frivolous." *La Clinica De La Raza v. Trump*, No. 19-cv-

5    04980-PJH, 2020 WL 4569462, at *2 (N.D. Cal. Aug. 7, 2020) (internal quotation marks and

6    citations omitted).

7          Here, for the reasons described above, *see supra* Section II, Plaintiffs have sufficiently

8    pleaded standing and ripeness.  They have substantiated these allegations through declarations

9    showing irreparable harm, *see supra* Section III.B, but at a minimum, they have sufficiently pleaded

10   standing and ripeness to survive the government's motion to dismiss.

11         **B.      Plaintiffs sufficiently state their First Amendment claims.**

12         To state a claim, Plaintiffs must provide a "short and plain statement of the claim showing

13   that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss"

14   under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter,

15   accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility

16   when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

17   the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

18   (citations omitted).  Leave to amend must be granted unless any deficiencies cannot be cured by

19   amendment.  *See Lucas v. Dep't of Corrs.*, 66 F.3d 245, 248 (9th Cir. 1995).

20         For all but Plaintiffs' fifth count, Plaintiffs' preliminary injunction motion identifies the

21   necessary elements for each First Amendment claim and explains how Plaintiffs have satisfied

22   those elements.  (*See* ECF No. 19 at 14–23 (discussing Count I (content-based restriction); Count

23   II (retaliation); Count III (retaliatory/coercive threats); and Count IV (right to receive)).)   As

24   explained above, Defendants' combined motion to dismiss and opposition to Plaintiffs' motion for

25   preliminary injunction does not address any of these four First Amendment claims specifically,

26   other than retaliation.  *See supra* Sections III.A.1–4.  And, with respect to retaliation, the

27   government misconceives Plaintiffs' argument and misstates the controlling legal standard.  *See*

28   *supra* Section III.A.2.  For the reasons detailed above—virtually unrebutted by the government—

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO

Plaintiffs have stated First Amendment claims on the four counts underlying their preliminary injunction motion.

Because Plaintiffs have stated viable First Amendment claims, the Executive Order is also *ultra vires* and Plaintiffs may properly seek relief under the Court's equitable powers and the All Writs Act, 28 U.S.C. § 1651 (Count V). As explained herein and in Plaintiffs' preliminary injunction motion, Plaintiffs have alleged sufficient facts showing the Executive Order violates the First Amendment because it is retaliatory, threatens to chill the speech of online platforms, constitutes an unlawful content-based restriction, and violates the right to receive.  *See supra* Sections III.A.1–4.  The Complaint thus seeks relief against the government's unconstitutional actions. The government acknowledges as much by conditioning dismissal of the *ultra vires* claim on dismissal of Plaintiffs' First Amendment claims.  (ECF No. 31 at 18.)

The cases Defendants cite are inapposite because they are not rooted in underlying constitutional violations that are independently actionable.  *See, e.g.*, *I.N.S v. Pangilinan*, 486 U.S. 875, 884–85 (1988) (declining to invoke equitable powers to confer citizenship in violation of Congressional limitations); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015) (declining to  invoke equitable powers to circumvent Congress's exclusion of private enforcement actions); *Doe v. I.N.S.*, 120 F.3d 200, 205 (9th Cir. 1997) (declining to invoke the All Writs Act when the Court had no independent source in law to vacate a criminal conviction and shield defendant from deportation).  Because Plaintiffs have pleaded viable First Amendment claims, they have also pleaded a viable *ultra vires* claim.

## V.    CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' motion for a preliminary injunction and deny Defendants' motion to dismiss.

Cooley LLP
Attorneys at Law
San Francisco

26

Pls.' Reply ISO Mot. for Preliminary
Injunc. and Opp. to Defs.' MTD
Case No. 3:20-cv-06021-WHO

1

Dated:  October 5, 2020                           COOLEY LLP

2

3                                                 By: */s/ Michael G. Rhodes*
                                                      Michael G. Rhodes
4                                                     Travis LeBlanc
                                                      Kathleen R. Hartnett
5                                                     Bethany C. Lobo

6                                                     Electronic Frontier Foundation
                                                      David Greene
7                                                     Corynne McSherry
                                                      Aaron Mackey
8
                                                      The Protect Democracy Project, Inc.
9                                                     Kristy Parker
                                                      Ngozi J. Nezianya
10                                                    Ben Berwick

11                                                    Attorneys for Plaintiffs
                                                      ROCK THE VOTE, VOTO LATINO,
12                                                    COMMON CAUSE, FREE PRESS, and
                                                      MAPLIGHT
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

27

PLS.' REPLY ISO MOT. FOR PRELIMINARY
INJUNC. AND OPP. TO DEFS.' MTD
CASE NO. 3:20-CV-06021-WHO