1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROCK THE VOTE, et al.,

          Plaintiffs,

    v.

DONALD J. TRUMP, et al.,

          Defendants.

Case No. 20-cv-06021-WHO

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AND GRANTING MOTION TO DISMISS**

Re: Dkt. Nos. 19, 31, 37

## INTRODUCTION

      How companies like Facebook and Twitter moderate their on-line platforms, and what legal protection they should receive as a result of their efforts to moderate false and offensive speech, are significant matters of public interest. President Trump, an avid user of social media, thinks he is being censored when Twitter identifies a tweet as false. But he is hardly the only person concerned about these issues, and those concerns exist (for different reasons) across the political spectrum.

      Plaintiffs, various organizations involved in registering, mobilizing, and educating voters and/or advocating for online platforms to do more to restrict or bar hateful or incorrect information online, (Dkt. No. 1) ("Compl.") ¶¶ 118, 126, 131, 134, 137, bring this action challenging Executive Order No. 13,925, (the "Executive Order"), which announces a policy position expressing concern over allegedly biased content management by online platforms such as Twitter and Facebook and directs federal agencies to take various actions to attempt to combat this purported bias. (Dkt. No. 1-1) ("EO"). These actions include filing a petition with the Federal Communications Commission ("FCC") to propose rules that would narrow the civil immunities granted to online platforms under section 230(c) of the Communications Decency Act; proposing

legislation to Congress that would place additional regulations on platforms; and assessing whether agencies can reduce the amount of money they pay to social media companies for marketing and advertising services.  EO §§ 2, 3, 6.

Plaintiffs challenge the Executive Order on First Amendment grounds.  *See* Compl. They allege that the Executive Order is a content-based regulation on speech and that it was improperly issued as a retaliatory action in response to Twitter's decision to fact check one of President Trump's tweets.  *Id.* ¶¶ 19-20.  They filed a motion for preliminary injunction on September 4, 2020, seeking to enjoin enforcement of the Executive Order.  (Dkt. No. 19) ("PI Motion").  On September 23, 2020, the government filed an opposition to plaintiffs' preliminary injunction motion and moved to dismiss this action under Rules 12(b)(1) and 12(b)(6), arguing that plaintiffs lack standing and have failed to state a plausible claim for relief.  *See* (Dkt. No. 31) ("MTD").  I heard argument on October 21, 2020.

Plaintiffs' novel First Amendment claims are a step removed from the typical kind.  It is not that plaintiffs claim that their rights to free expression have been violated; instead, it is that the speech of on-line platforms like Twitter and Facebook have been chilled by the Executive Order, and as a result plaintiffs' missions are frustrated and they have had to divert resources to combat misinformation on social media.  As discussed below, I conclude that plaintiffs have failed to adequately allege a concrete or personalized injury to themselves traceable to the Executive Order or to show that enjoining or invalidating the Order would redress their alleged injuries. Accordingly, they have failed to adequately allege standing to bring this action.  Plaintiffs' Motion for a Preliminary Injunction is Denied and Defendants' Motion to Dismiss is Granted.  Plaintiffs will have 20 days leave to amend their Complaint.

## BACKGROUND

### I.    EVENTS PRIOR TO ISSUANCE OF ORDER

In the Spring of 2020, President Trump began tweeting about potential fraud arising from the planned use of mail-in ballots for the 2020 primary and general elections.  Compl. ¶ 61.  On April 8, 2020, he tweeted "Republicans should fight very hard when it comes to state wide mail-in voting. . . . Tremendous potential for voter fraud . . ."  *Id.*  On May 20, 2020, he tweeted

United States District Court
Northern District of California

2

"Breaking: Michigan sends absentee ballots to 7.7 million people ahead of Primaries and the General Election.  This was done illegally and without authorization by a rogue Secretary of State. I will ask to hold up funding to Michigan if they want to go down this Voter Fraud path!"  *Id.* ¶ 62.  He also tweeted, "State of Nevada 'thinks' that they can send out illegal vote by mail ballots, creating a great Voter Fraud scenario for the State and the U.S.  They can't! If they do, 'I think' I can hold up funds to the State. Sorry, but you must not cheat in elections. @RussVought45 @USTreasury."  *Id.* ¶ 63.  Twitter did not edit, fact-check, or take down any of these tweets.  *Id.* ¶¶ 61-63.

On May 26, 2020, President Trump tweeted "There is NO WAY (ZERO!) that Mail-In Ballots will be anything less than substantially fraudulent. Mail boxes will be robbed, ballots will be forged & even illegally printed out & fraudulently signed. . . . This will be a Rigged Election. No way!" Compl. ¶ 65.  Shortly after, Twitter placed a notice on the President's tweet which stated, "Get the facts about mail-in ballots" and included a link to a page with information regarding mail-in ballots.  *Id.*  President Trump immediately responded to this action by tweeting "@Twitter is now interfering in the 2020 Presidential Election. They are saying my statement on Mail-In Ballots, which will lead to massive corruption and fraud, is incorrect, based on fact-checking by Fake News CNN and the Amazon Washington Post. . . . Twitter is completely stifling FREE SPEECH, and I, as President, will not allow it to happen!" *Id.* ¶ 67.  Over the next day, the President continued to tweet statements asserting that Twitter and other social media platforms "silence conservative voices" and warning that "We will strongly regulate, or close them down" and that there would be "Big action to follow!"  *Id.* ¶ 69.

## II.    THE EXECUTIVE ORDER

On May 28, 2020, President Trump issued Executive Order No. 13,925, titled "Executive Order on Preventing Online Censorship."  *See* EO.  Section 1 of the Executive Order, titled "Policy", asserts that "Online platforms are engaging in selective censorship that is harming our national discourse" and specifically notes that "Twitter now selectively decides to place a warning label on certain tweets in a manner that clearly reflects political bias." EO § 1.  The section concludes that "We must seek transparency and accountability from online platforms, and

3

1    encourage standards and tools to protect and preserve the integrity and openness of American

2    discourse and freedom of expression." *Id.*

3         Section 2 of the Order, titled "Protections Against Online Censorship", expresses the

4    general goal of creating clear rules for promoting free debate on the internet and particularly

5    promotes a narrow reading of section 230(c) of the Communications Decency Act, a statute that

6    provides broad civil immunity to online platforms arising out of the content on their sites.  EO § 2;

7    *see also* 47 U.S.C. § 230(c).  Specifically, section 230(c) states that "No provider or user of an

8    interactive computer service shall be treated as the publisher or speaker of any information

9    provided by another information content provider" 47 U.S.C. § 230(c)(1), and it provides

10   immunity from liability for "any action voluntarily taken in good faith to restrict access to or

11   availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy,

12   excessively violent, harassing, or otherwise objectionable," *id.* § 230(c)(2).  Section 2 of the

13   Executive Order states that it is the policy of the United States to "clarify" the scope of section

14   230(c) and that "the immunity should not extend beyond its text and purpose to provide protection

15   for those who purport to provide users a forum for free and open speech, but in reality use their

16   power over a vital means of communication to engage in deceptive or pretextual actions stifling

17   free and open debate by censoring certain viewpoints." EO § 2(a).

18        To advance the goals outlined in section 2, the Executive Order directs all executive

19   departments and agencies to "ensure that their application of section 230(c) properly reflects the

20   narrow purpose of the section."  EO § 2(b).  The Order also directs the Secretary of Commerce,

21   "in consultation with the Attorney General and acting through the National Telecommunications

22   and Information Administration (NTIA)," to "file a petition for rulemaking with the Federal

23   Communications Commission (FCC) requesting that the FCC expeditiously propose regulations to

24   clarify" the application of section 230(c), including when "an action restricting access to or

25   availability of material is not 'taken in good faith'" under section 230(c)(2)(A), and "whether

26   actions can be 'taken in good faith' if they are . . . deceptive, pretextual, or inconsistent with a

27   provider's terms of service."  *Id.*

28        Section 3 of the Executive Order directs the heads of each executive department or agency

4

to review the amount of money the agency pays to online platforms for marketing and advertising, assess any statutory authorities that would allow the agencies to restrict such spending, and report their findings to the Office of Management and Budget ("OMB").  EO § 3(a)(b).  It also directs the Department of Justice to assess whether any online platforms are "problematic vehicles for government speech due to viewpoint discrimination, deception to consumers, or other bad practices."  *Id.* § 3(c).

Section 4 of the Executive Order states that the "FTC shall consider taking action, as appropriate and consistent with applicable law" to prohibit unfair or deceptive acts or practices by online platforms, including practices that "restrict speech in ways that do not align with those entities' public representations about those practices."  EO § 4(c).  It also states that the "FTC shall consider developing a report" describing complaints regarding censorship or deceptive practices by online platforms.  *Id.* § 4(d).

Section 5 of the Executive Order directs the Attorney General to establish a "working group regarding the potential enforcement of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices," and which will also develop "model legislation" for consideration by State legislatures in states where no such statutes exist. EO § 5(a).

And section 6 directs the Attorney General to develop a proposal for federal legislation that would promote the policy objectives of the Executive Order.  *Id.* § 6.

### III.    STEPS TO IMPLEMENT THE EXECUTIVE ORDER

On June 17, 2020, as directed in section 6 of the Executive Order, the Department of Justice published a "legislative package" with proposed legislation to be submitted to Congress reflecting the Executive Order's policy goals.  Compl. ¶ 95.

On July 27, 2020, The NTIA filed a rulemaking petition with the FCC, as directed under section 2 of the Executive Order.  Compl. ¶ 96.  On August 3, 2020, the FCC "invite[d] public input" concerning the petition and announced a 45-day public comment period.  *Id.* ¶ 98.  On the same day, President Trump withdrew the nomination of FCC Commissioner Mike O'Rielly to serve a new term.  *Id.* ¶ 99.  Prior to this action, O'Rielly had allegedly expressed "deep reservations" regarding whether Congress had given the FCC power to limit section 230(c)

immunity. *Id.*

In August 2020, FTC Chair Joseph Simons allegedly told Senators that "he didn't plan to act on the president's May 28 executive order on social media because he considers it outside the agency's jurisdiction." Compl. ¶ 100.  President Trump has allegedly personally attempted to pressure Simons into taking steps to address "alleged political bias in social media." *Id.*

On September 23, 2020, President Trump met with State Attorneys General and Attorney General Barr to discuss "protecting consumers from social media abuses." Hartnett Decl. ¶ 2 (Dkt. No. 37-1).[1]  During the meeting, President Trump stated that he and his administration are "watching [online platforms] very closely during this election cycle.  They're being watched and scrutinized very, very closely by everybody at this table." *Id.* ¶ 3.

On October 14, 2020, in response to further fact-checking activity from Twitter and Facebook, President Trump tweeted: "So terrible that Facebook and Twitter took down the story of "Smoking Gun" emails related to Sleepy Joe Biden and his son, Hunter, in the @NYPost. It is only the beginning for them.  There is nothing worse than a corrupt politician.  REPEAL SECTION 230!!!." Hartnett Decl. ¶ 8.  On October 15, 2020, at a campaign event, President Trump discussed repealing section 230(c) to remove certain immunities from social media companies, stating "we're going to take away their Section 230 unless they shape up." *Id.* ¶ 9.

On October 15, 2020, Chairman Pai of the FCC tweeted "I intend to move forward with an FCC rulemaking to clarify the meaning of Section 230." Hartnett Decl. ¶ 10.

## IV.   ONLINE PLATFORM REACTIONS TO EXECUTIVE ORDER

On August 23, 2020, President Trump tweeted "Democrats are using Mail Drop Boxes, which are a voter security disaster. Among other things, they make it possible for a person to vote multiple times. . . ." Compl. ¶ 116.  Twitter added a notice to the tweet stating "This Tweet violated the Twitter Rules about civil and election integrity. However, Twitter has determined that

---

[1] Plaintiffs' Motion for Administrative Relief to File Supplemental Declaration of Kathleen R. Hartnett, *see* Dkt. No. 37 is Granted.  The Court takes judicial notice of the existence of the tweets and other public statements cited in the Hartnett Declaration as information available on publicly available websites. *See e.g. Unsworth v. Musk,* Case No. 19-mc-80224-JSC, 2019 WL 5550060, at *4 (N.D. Cal. Oct. 28, 2019) (taking judicial notice of tweets and other publicly available articles.

United States District Court
Northern District of California

1    it may be in the public's interest for the Tweet to remain accessible. Learn more[.]"  Compl. ¶ 116.

2         On September 3, 2020, President Trump tweeted that, after supporters vote by mail, they

3    should "go to your Polling Place to see whether or not your Mail In Vote has been Tabulated

4    (Counted). If it has you will not be able to Vote & the Mail In System worked properly. If it has

5    not been Counted, VOTE . . ."[2]  Twitter placed a label on the tweet stating that "it violated the

6    Twitter Rules about civic and election integrity" but that Twitter had determined it "may be in the

7    public's interest for the Tweet to remain accessible."  *Id.*

8         On September 17, 2020, President Trump tweeted multiple statements about potential

9    fraud resulting from mail-in voting during the 2020 election.[3]  Twitter placed notices on four of

10   these tweets stating "Learn how voting by mail is safe and secure" and provided a link to

11   information regarding mail-in voting.  *See id.*

12        On October 14, 2020, Twitter blocked users from linking to a *New York Post* story titled

13   "Smoking-gun email reveals how Hunter Biden introduced Ukrainian businessman to VP dad."

14   Hartnett Decl. ¶ 5-6.  On the same day, a Facebook spokesperson tweeted that the story was

15   "eligible to be fact checked by Facebook's third-party fact checking partners" and that, in the

16   meantime, Facebook would be "reducing its distribution on [the Facebook] platform."  *Id.* ¶ 7.

17        On October 15, 2020, Twitter announced that it was changing the policy it had used to

18   block the *New York Post* article and would now allow similar content to be shared, along with a

19   label to provide context about the source of the information.  Hartnett Decl. ¶ 13.

20        In the months since issuing the Executive Order, President Trump has tweeted additional

21

22   [2] Donald J. Trump (@realDonaldTrump), Twitter (Sept. 3, 2020 10:32 AM),
     https://twitter.com/realDonaldTrump/status/1301528522582786049.  The Court takes judicial notice
23   of the existence of the tweets – and responses from Twitter - cited in the government's Motion to
     Dismiss as information available on publicly available websites. *See e.g. Unsworth*, 2019 WL
24   5550060, at *4.

25   [3] *See e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (Sept. 17, 2020 7:36 AM)
     https://twitter.com/realDonaldTrump/status/1306557587375128576; Donald J. Trump
26   (@realDonaldTrump), Twitter (Sept. 17, 2020 7:45 AM),
     https://twitter.com/realDonaldTrump/status/1306559853683445760; Donald J. Trump
27   (@realDonaldTrump), Twitter (Sept. 17, 2020 2:12 PM),
     https://twitter.com/realDonaldTrump/status/1306657377823993857; Donald J. Trump
28   (@realDonaldTrump), Twitter (Sept. 17, 2020 8:20 PM),
     https://twitter.com/realDonaldTrump/status/1306749921173762049.

statements regarding potential fraud in mail-in voting that Twitter has not edited, labeled, or taken down.  Compl. ¶¶ 110-115.

## V.    PLAINTIFFS' REACTIONS TO EXECUTIVE ORDER

Plaintiffs are various organizations involved in registering, mobilizing, and educating voters and/or advocating for online platforms to do more to restrict or bar hateful or incorrect information online.  Compl. ¶¶ 118, 126, 131, 134, 137.  Each alleges that election-related misinformation on social media frustrates their missions and that they have had to, or will have to, divert funds or resources to combat online misinformation as a result of the Executive Order. *Id.* ¶¶ 124-125, 128-130, 133, 136, 139.

## LEGAL STANDARD

## I.    PRELIMINARY INJUNCTION

A preliminary injunction may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.  The Ninth Circuit has held that " 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## II.   MOTION TO DISMISS

### A.    Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure is a challenge to the court's subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction,' and it is "presumed that a cause of action lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994).  The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the authority to grant the relief requested. *Id.*

United States District Court
Northern District of California

8

A challenge pursuant to Rule 12(b)(1) may be facial or factual.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  The challenger asserts that the allegations in the complaint are insufficient "on their face" to invoke federal jurisdiction.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  To resolve a facial challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inferences in favor of the party opposing dismissal.  In contrast, with a factual attack, a court may "look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment" and "need not presume the truthfulness of the plaintiffs' allegations."  *White*, 227 F.3d at 1242.

### B.      Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly,*550 U.S. 544, 556 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fat, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured

9

1    by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

2                                          **DISCUSSION**

3          Plaintiffs' allegations are insufficient to establish Article III standing to challenge the

4    Executive Order.  As a result, they have not met their burden to establish likelihood of success on

5    the merits or irreparable harm and their motion for a preliminary injunction must be denied.

6    Similarly, because they have failed to adequately allege standing, their claims must be dismissed

7    under Rule 12(b)(1).

8    **I.       STANDING**

9          To establish Article III standing, "a plaintiff must show (1) it has suffered an "injury in

10   fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

11   hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is

12   likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

13   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) , Inc.*, 528 U.S. 167, 180-181 (2000).

14   Plaintiffs fail to satisfy each of the three standing requirements.

15         **A.       Injury In Fact**

16         First, plaintiffs have failed to establish that they have suffered an injury in fact that is

17   concrete and particularized.  The posture of this case is unusual – plaintiffs do not allege that the

18   Executive Order directly regulates them or their First Amendment rights or that they themselves

19   are the targets of retaliation.  Instead, they allege that online platforms are engaged in

20   constitutionally protected speech by curating and fact-checking misinformation online; that the

21   Executive Order was issued in retaliation for the platforms' speech and threatens and punishes

22   platforms for this speech; and that platforms are failing to correct misinformation, to the extent

23   they otherwise would, out of fear of the Executive Order.  Compl. ¶¶ 158-160.  Plaintiffs state that

24   they are personally injured as a result of the platforms' failure to check misinformation for two

25   reasons: (1) they have been deprived of their right to receive fact-checking speech from the

26   platforms; and (2) they have been forced to divert resources to combat misinformation that is

27   unchecked by the platforms.  *Id.* ¶¶ 161-162.  Because they are not directly impacted or targeted

28   by the Executive Order, both of their theories of standing require them to preliminarily show some

United States District Court
Northern District of California

                                               10

1    injury to the platforms.  This is a difficult showing to make without evidence from the platforms

2    themselves, and plaintiffs have not made this showing.

3         Plaintiffs have failed to establish an injury-in-fact to the platforms – a first step to

4    establishing injury to themselves - based on a threat of enforcement and a chilling of the

5    platform's First Amendment speech.  A plaintiff may establish injury-in-fact based on a *threat* of

6    enforcement by alleging "an intention to engage in a course of conduct arguably affected with a

7    constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution

8    thereunder." *Susan B. Anthony List v. Driehaus (SBA)*, 573 U.S. 149, 159 (2014).  While a

9    plaintiff may establish injury-in-fact based on a government action's indirect "chilling" effect on

10   First Amendment rights, she must still show that the government action is "regulatory,

11   proscriptive, or compulsory in nature" and that she is "either presently or prospectively subject to

12   the regulations, proscriptions, or compulsions" being challenged.  *Laird v. Tatum*, 408 U.S. 1, 11

13   (1972).  Plaintiffs' allegations fail to meet this standard because they do not establish that the

14   Executive Order proscribes the platforms' constitutionally protected speech or that the platforms

15   face a credible threat of prosecution.

16        The Executive Order does not directly regulate or restrict the speech of online platforms.

17   Instead, it outlines a policy goal of promoting unbiased content management on the internet and

18   orders executive departments and agencies to take various steps that purportedly aim to further this

19   goal.  *See* EO.  These steps include petitioning the FCC for a rule that might narrow the scope of

20   section 230(c) immunity, proposing legislation that would place additional regulations on online

21   platforms, and encouraging the FTC to bring claims against platforms for deceptive practices.  EO

22   §§ 2, 4, 6.  None of these actions proscribe any constitutional right because they do not restrict or

23   regulate the platforms directly; they are simply steps that may or may not lead to additional

24   regulations, restrictions, or liability at some uncertain point in the future, largely dependent on the

25   actions of independent agencies and branches of government.[4]  Any potential enforcement based

26

27   [4] For example, the FCC may deny the government's petition to narrow section 230(c), Congress
     may ignore the legislation the Executive Branch has proposed, and the FTC may decline to pursue
28   cases against online platforms.  In fact, plaintiffs allege that FTC Chair Simons has chosen not to
     take any action as a result of the Executive Order.  *See* Compl. ¶ 100.

1    on these possible future regulations is far too speculative to give rise to a concrete or particularized

2    injury at this point in time.  *See Laird v Tatum*, 408 U.S. 1 (1972) (noting that a plaintiff's fear that

3    an "agency might in the future take some other and additional action detrimental to [plaintiff]"

4    was not enough to establish injury-in-fact).

5            At the October 21, 2020 hearing, plaintiffs argued that the Executive Order's provisions

6    directing agencies to interpret section 230(c) in line with the Executive Order and to assess their

7    ad spending on social media were immediate threats sufficient to establish injury-in-fact. I

8    disagree. Section 230(c) provides certain immunities in civil litigation.  Executive agencies do not

9    have a formal role in interpreting or enforcing section 230(c), making it unclear how these

10   agencies' internal interpretations of section 230(c) would concretely impact platforms.  Plaintiffs

11   also allege that the Justice Department plans to submit amicus briefs promoting the Executive

12   Order's interpretation of section 230(c) in civil litigation matters, *see* Compl. ¶ 78, but this is not a

13   concrete or immediate threat.  It would remain up to the relevant presiding courts to determine

14   whether to adopt such an interpretation in any particular case.  As to ad spending, while "a loss of

15   funds promised under federal law[] satisfies Article III's standing requirement," *Organized Vill.*

16   *Of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015), the facts alleged here are too

17   vague to establish injury-in-fact. It is not clear how much money, if any, federal agencies spend on

18   social media advertising and, if so, on which platforms.  Nor is it clear whether such spending is

19   "promised under federal law" or part of more discretionary agency spending.

20           The facts here are not analogous to those in *City & Cnty. of San Francisco v. Trump*, 897

21   F.3d 1225 (9th Cir. 2018), in which the Ninth Circuit concluded that San Francisco and Santa

22   Clara had established standing to challenge an Executive Order targeting federal funding for

23   "sanctuary jurisdictions."  There, unlike here, the county plaintiffs alleged that they received and

24   relied on billions of dollars in congressionally approved federal grant money each year, and

25   plausibly alleged they were at risk of losing said funding under the Executive Order.  *Id.* at 1235.

26   Here, in contrast, plaintiffs have not alleged any credible facts regarding the ad spending social

27   media companies may or may not receive from federal agencies and have not identified any

28

United States District Court
Northern District of California

1    concrete steps that have been taken to withhold such potential spending.[5]  Plaintiffs' allegations

2    are simply too vague to establish that social media companies have suffered injury-in-fact due to a

3    credible threat of a loss of federal funds.

4         Because plaintiffs have failed to allege that the Executive Order proscribes any

5    constitutionally protected speech, regulates the platforms in any way, or that the platforms are

6    likely to face prosecution as a result of the Executive Order, they have failed to establish an injury-

7    in-fact applicable to the platforms.  And because plaintiffs' injuries are derivative to the

8    platforms', plaintiffs have failed to establish an injury-in-fact to themselves.

9         **B.      Causation**

10        Even if plaintiffs could establish an injury-in-fact to the platforms, they separately cannot

11   show any personal injury traceable to the Executive Order because they have failed to demonstrate

12   that platform speech has been "chilled" or curbed in any way.  Where "a plaintiff's asserted injury

13   arises from the government's allegedly unlawful regulation . . . of *someone* else, . . . causation and

14   redressability ordinarily hinge on the response of the regulated (or regulable) third party."  *Lujan*

15   *v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (emphasis in original).  When necessary

16   elements of standing "depend[] on the unfettered choices made by independent actors not before

17   the courts and whose broad and legitimate discretion the courts cannot presume either to control or

18   predict" it becomes the plaintiff's burden "to adduce facts showing that those choices have been or

19   will be made in such manner as to produce causation and permit redressability of injury."  *Id.*

20        Plaintiffs assert that, as a result of the Executive Order, platforms like Twitter have

21   declined to fact-check or correct misinformation on their platforms, which has harmed plaintiffs

22   by (1) depriving them of such speech; and (2) forcing them to spend resources correcting the

23   misinformation themselves.  Compl. ¶¶ 176-179.  But they have failed to allege facts to support

24   their speculation that the Executive Order has depressed platforms' content moderation activities.

25

26   _____

27   [5] Plaintiffs point to a public statement from President Trump in which he asserted that "[t]he
     government spends billions of dollars on giving [online platforms] money."  *See* Reply at 13.  This
     vague statement does not identify which platforms receive money, in what amounts, or for what
28   purposes. Further, given plaintiffs' many allegations regarding President Trump making false and
     misleading statements, this statement could be false, or incorrect.

1    Judicially noticeable documents further undermine such a conclusion.

2            The only facts plaintiffs allege to demonstrate that the Executive Order has stifled

3    planforms' fact-checking activities are: (1) Twitter has not fact checked several of the president's

4    tweets about alleged mail-in voting fraud, which were posted after the Executive Order was

5    issued; (2) Twitter placed a notice on an August 23, 2020 tweet in which the President called mail

6    drop boxes "[a] big fraud" – noting that the tweet "violated the Twitter Rules about civic and

7    election integrity" – but did not include a fact-check link on the tweet; and (3) On October 15,

8    2020, Twitter reversed a decision to completely block users from sharing a *New York Post* article

9    regarding Hunter Biden and announced that it would simply place a notice on similar content in

10   the future.  *See* PI Motion at 10; Hartnett Decl. ¶ 10.  These allegations are insufficient to establish

11   causation.

12           Plaintiffs' own allegations indicate that, prior to the existence of the Executive Order,

13   Twitter only fact-checked President Trump's statements about election fraud once – fact-checking

14   just one out of four tweets in the Spring that plaintiffs allege were false or misleading.  *See* Compl.

15   ¶¶ 61-66.  Twitter's failure to fact check certain tweets after the Order was issued appears

16   consistent with Twitter's general practice, not a response to the Order.  Similarly, Twitter's

17   decision to place a notice on President Trump's August 23, 2020 tweet and tweets related to the

18   *New York Post* Hunter Biden story, rather than including a fact-check link or blocking the story

19   entirely, does not plausibly indicate a reduction in its fact-checking activities but a commitment to

20   continue moderating the President's content at its discretion. This conclusion is supported by

21   additional public and judicially noticeable tweets indicating that Twitter has placed fact-check

22   notices and links on several other election-related tweets from the President in the last few weeks.

23           Plaintiffs have also submitted supplemental information indicating that Facebook limited

24   distribution of the *New York Post*'s Hunter Biden story on the Facebook platform.  *See* Hartnett

25   Decl. ¶ 7.  As plaintiffs have not alleged any facts about Facebook's pre-Executive Order fact-

26   checking behavior, this single instance of Facebook engaging in fact-checking speech further

27   undermines any conclusion that the Executive Order has reduced or chilled platform moderation

28   activities.

14

United States District Court
Northern District of California

1    In their briefing and at the October 21, 2020 hearing, plaintiffs relied heavily on

2  *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) and *Capp v. County of San Diego*,

3  940 F.3d 1046 for the proposition that to establish a First Amendment violation, a plaintiff need

4  only show that retaliatory government action would "chill a person of ordinary firmness," not that

5  the action actually resulted in any chilling.  While it may not be necessary to establish actual

6  chilling of speech in all First Amendment actions, in this case plaintiffs' theories of injury require

7  them to show that the platforms' fact-checking speech has been actually chilled or curbed as a

8  result of the Executive Order because their identified injuries flow from a reduction in platform

9  speech.  If the platforms have not been chilled and have not reduced their fact-checking activities

10 as a result of the Executive Order, then plaintiffs have not been deprived of speech from the

11 platforms or forced to divert resources to combat misinformation *as a result of the Executive*

12 *Order*.  Because plaintiffs have not alleged facts demonstrating that platforms have reduced or

13 curbed their fact-checking activity, they have failed to establish an injury-in-fact traceable to the

14 Executive Order.

15        **C.       Redressability**

16    Finally, plaintiffs' allegations do not indicate that a favorable ruling is likely to redress

17 their alleged injuries.  "Where the requested relief for the [plaintiff] depends on actions by a third

18 party not before the court, the plaintiff must demonstrate that a favorable decision would create a

19 significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the

20 injury suffered."  *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 374 (D.C. Cir. 2020).

21    Plaintiffs argue that injunctive or declaratory relief would redress their injuries because it

22 "would allow online platforms to exercise their First Amendment rights without the fear of

23 reprisal that the Executive Order presents."  (Dkt. No. 32 ) ("Pl. Reply") at 9.  However, as

24 discussed above, their allegations do not show that the Executive Order has curbed platforms'

25 content moderation behavior and, conversely, have not shown that its injunction or invalidation

26 "would create a significant increase in the likelihood" that platforms will more aggressively

27 moderate misinformation.

28    *Woodhull*, on which plaintiffs rely, is clearly distinguishable.  In *Woodhull*, the D.C.

15

1    Circuit found that a Craigslist user and massage therapist had standing to challenge the Fight

2    Online Sex Trafficking Act ("FOSTA") because the user alleged that he lost most of his business

3    after Craigslist removed the "therapeutics" section of its site in response to FOSTA's passage.

4    948 F.3d at 374.  In *Woodhull*, unlike here, Craigslist had publicly stated that it was removing the

5    therapeutics section from its site due to legal liability concerns created by FOSTA and indicated

6    that, absent the law, it would reverse course, saying of the removed sections, "Hopefully we can

7    bring them back some day."  *Id.*  Here, in contrast, plaintiffs have not alleged facts indicating that

8    Twitter, or other platforms, have changed their behavior as a result of the Executive Order or are

9    likely to increase their moderation and fact-checking of misinformation in the Order's absence.

10           In addition, contrary to plaintiffs' assertion that injunctive or declaratory relief would

11   allow platforms to act "without the fear of reprisal that the Executive order presents," the facts

12   alleged indicate that, to the extent the Order presents a threat to platforms, its invalidation would

13   not meaningfully remove that threat.   Pursuant to the Executive Order, the NTIA has already filed

14   a petition with the FCC seeking a new rule narrowing the scope of section 230(c) and Chairman

15   Pai has indicated that he intends to initiate a rulemaking interpreting section 230(c).  *See* Compl. ¶

16   96; Hartnett Decl. ¶ 10.  The Department of Justice has already submitted proposed legislation to

17   Congress with new possible regulations for social media companies.  *See* Compl. ¶ 95.  Enjoining

18   or invalidating the Executive Order now will not halt or reverse any possible new rules and

19   regulations that the FCC and Congress might adopt as a result of these processes.  Nor would an

20   injunction prevent the president from promoting a narrow view of section 230(c) on social media

21   or in public speeches, as plaintiffs allege he has done since issuing the Executive Order.  *See e.g.*,

22   Hartnett Decl. ¶¶ 8-9, 12.  Because online platforms face a speculative threat of increased

23   regulations and a narrowing of section 230(c) immunity regardless of the Executive Order, it is

24   unlikely that a ruling in plaintiffs' favor would have an impact on platforms' content moderation

25   activities.

26                                      **CONCLUSION**

27           For the reasons discussed above, plaintiffs' allegations are insufficient to establish Article

28   III standing to challenge the Executive Order.  As a result, for purposes of their Motion for a

United States District Court
Northern District of California

Preliminary Injunction, plaintiffs have not met their burden to establish that they are likely to succeed on the merits of their claims or to suffer irreparable harm absent an injunction. Plaintiffs' Motion for a Preliminary Injunction is therefore DENIED. Similarly, because plaintiffs have failed to adequately allege standing, their claims must be dismissed under Rule 12(b)(1). Defendants' Motion to Dismiss under Rule 12(b)(1) is GRANTED. Plaintiffs will have 20 days leave to amend their Complaint.

**IT IS SO ORDERED.** Dated:

October 29, 2020



William H. Orrick
United States District Judge